IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUTAMAX™ ADVANCED BIOFUELS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 11-54-SLR |
| GEVO, INC., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 10th day of October, 2012, in consideration of Butamax's September 14, 2012 Email Request for Emergency Relief regarding the disqualification of Dr. Ron Caspi as an expert witness, the hearing held October 2, 2012 and the papers filed in connection therewith;

IT IS ORDERED that said request (D.I. 531) is denied, for the reasons that follow:

1. **Procedural background.** On September 14, 2012, Butamax contacted chambers via email request in an attempt to "exclude Dr. Caspi [as an expert witness] and preclude Gevo from contacting him further." (*Id.*) While it initially appeared that Dr. Caspi was going to work with Butamax, he subsequently signed an agreement to work for Gevo. In support of its request for disqualification, Butamax explained that Dr. Caspi had signed a confidentiality agreement with Butamax "for the purposes of having frank discussions about litigation issues that relate to his field of technology." (*Id.*) During one such discussion, Dr. Caspi allegedly "raised potential arguments by Gevo"

and counsel for Butamax, specifically a junior associate ("JA") on the case, "discussed how [such arguments] would be addressed." (Id.) According to Butamax, through the "confidential relationship," Dr. Caspi "at least learned counsel's m.o. and decision-making process." (Id.)

2. On October 2, 2012, the court held a hearing on the matter. Dr. Caspi testified about his interactions with Butamax and subsequent decision to consult for Gevo. JA, the associate with whom Dr. Caspi allegedly had confidential discussions, also testified in camera about those interactions. Following the hearing, the parties submitted letter briefs in support of their positions. (D.I. 527 & 528)

3. **Standard.** Federal courts have the inherent power to disqualify experts. See Syngenta Seeds, Inc. v. Monsanto Co., Civ. No. 02-1331, 2004 WL 2223252, at *1 (D. Del. Sept. 24, 2004). While there is no bright line rule for expert disqualification, courts have generally adopted a two-part disqualification inquiry: (1) was it objectively reasonable for the party seeking disqualification to have concluded that a confidential relationship existed with the expert;[1] and (2) was confidential or privileged information actually disclosed to the expert. Id. at *2; Novartis AG v. Apotex Inc., Civ. No. 09-5614, 2011 WL 691594, at *1 (D.N.J. Jan. 24, 2011); Life Technologies Corp. v. Biosearch Technologies, Inc., Civ. No. 12-852, 2012 WL 1604710, at *5 (N.D. Cal. May 7, 2012).

---

[1] In determining the reasonableness of a party's conclusion that a confidential relationship existed, "courts consider several factors, including: (1) the length of the relationship and the frequency of contact; (2) whether the moving party funded or directed the formation of the opinion to be offered at trial; (3) whether the parties entered into a formal confidentiality agreement; (4) whether the expert was retained to assist in the litigation; (5) whether the expert was paid a fee; and (6) whether the expert was asked to agree not to discuss the case with opposing parties or counsel." Syngenta, 2004 WL 2223252, at *2.

<303>

Affirmative answers to both inquiries ordinarily compel disqualification; however, "disqualification is likely inappropriate if either inquiry yields a negative response." *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991) ("[E]ven if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed. . . . Similarly, disqualification should not occur in the absence of a confidential relationship even though some confidential information may be disclosed."); *see also Syngenta*, 2004 WL 2223252, at *2. The party seeking the disqualification bears the burden of proof with respect to both factors. *Syngenta*, 2004 WL 2223252, at *2.

4. In addition to the above analysis, "courts also balance competing policy objectives and concerns for fundamental fairness." *Id.* "The policy objectives in favor of disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity. The policy objectives weighing against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." *Apotex*, 2011 WL 691594, at *1 (citations and quotations omitted).

5. **Facts.** Dr. Caspi signed a confidentiality agreement with Kirkland & Ellis on July 24, 2012. (PX 1) Dr. Caspi signed the agreement following an email exchange between JA and Dr. Caspi on that same day, whereby JA explained that Dr. Caspi would be an "ideal candidate to serve as a consultant" because of his "experience and work with the [EC] Commission;" JA requested a "chance to further discuss this opportunity" with him. (PX 2) Dr. Caspi responded affirmatively, and asked for some

3

information. (*Id.* at 5) JA suggested a telephone conference and, "in preparation for our conversation, would you mind if I send you a non-disclosure form? Signing the form would allow us to discuss the substance of the case in some detail, which may be helpful to you in deciding whether this opportunity is of interest to you." (*Id.*) Still on July 24, 2012, Dr. Caspi received and executed the "NDA,"[2] and faxed it back to JA the next day. (*Id.* at 3-4)

6. On August 16, 2012, Dr. Caspi received clearance from his employer to perform the consultation, and asked JA for "the relevant patents, and the stated dispute." (*Id.* at 2) By email dated August 20, 2012, JA responded by forwarding the two patents under discussion, and identifying the dispute as "the interpretation of 'acetohydroxy acid isomeroreductase having the EC number 1.1.1.86' in claim 1 of the '188 patent and 'acetohydroxy acid isomeroreductase enzyme' in claim 1 of the '899 patent." (*Id.*) Following a brief phone conversation on August 27th, Dr. Caspi sent an email to JA on August 29, 2012 wherein he asked her for more "details," "specifically, what is Butamax's exact complaint against Gevo, and what does Gevo claim in return? This was discussed briefly in our phone conversation, but not enough for me to fully understand the nature of the conflict." (*Id.* at 1-2) In a responsive email sent that same day, JA proposed another telephone conversation in order to "better give you the details that you need and answer any questions you may have." (*Id.* at 1)

7. The ensuing telephone conversation took place on September 5, 2012, and

---

[2] Presumably, the confidentiality, or nondisclosure, agreement.

lasted no more than 30 minutes.[3] Although Dr. Caspi does not have a specific recollection of this conversation, he does not dispute that, after JA went through the patents as they related to the numbering system, and explained Butamax's position about how the claims should be interpreted in view of cofactors, KARI enzymes, and EC numbers, Dr. Caspi proposed an argument Gevo might make in response. (D.I. 532 at 17-24, 78) Dr. Caspi recalls that JA did not want to discuss the subject any further and did not respond with anything of substance. (*Id.* at 24-25) JA recalls that she responded in a substantive fashion as to how Butamax would address this hypothetical. (*Id.* at 78-79 (under seal))

8. Although Dr. Caspi ended the conversation with JA by expressing the expectation that he would accept the assignment (*id.* at 26), Dr. Caspi in fact declined the opportunity by an email dated September 11, 2012 and agreed to serve as an expert for Gevo's counsel on September 13, 2012. (PX 2 at 1) In this regard, Dr. Caspi had been contacted by Gevo's counsel on September 4th, met with counsel for Gevo on September 11th, and agreed to serve as an expert for Gevo on September 12, 2012. Prior to making his decision, Dr. Caspi reviewed copies of several declarations (as well as some of the other materials filed in this litigation) provided by Gevo's counsel. (D.I. 532 at 33-36)

9. **Discussion.** For purposes of this analysis, I will assume that a confidential relationship existed between Kirkland & Ellis and Dr. Caspi, based upon the executed

---

[3] Dr. Caspi estimated that it lasted 10 to 15 minutes. (D.I. 532 at 50) In the interests of fairness but the absence of a better estimate from Butamax, I have doubled that estimate.

confidentiality agreement. (PX 1) I note in this regard, however, that it is apparent from the record that not much, if any, explanation was given to Dr. Caspi before he signed the agreement and that he did not fully understand the scope of the agreement even at the time of the hearing.[4]

10. With respect to the second prong of the test and the fairness/policy considerations, and even accepting Butamax's version of the facts, I conclude that the hypothetical posed by Dr. Caspi and JA's unsolicited response thereto do not constitute confidential information sufficient to disqualify Dr. Caspi from consulting for Gevo. It is evident from the record that Dr. Caspi was not retained by Butamax, had received no fees from Butamax, had received no confidential documents from Butamax,[5] and had participated in only two telephone conversations with counsel which, at most, lasted less than an hour collectively. When compared to those cases where disqualification has been granted,[6] the nature of the relationship and of the information allegedly disclosed instantly is much too abbreviated to warrant such a drastic sanction. I

---

[4] More specifically, Dr. Caspi testified that no confidential information was ever shared with him. (See, e.g., id. at 18, 36-37) Dr. Caspi is correct in his view that no confidential technical information was shared. It is Butamax's contention, however, that JA's analyses constitute attorney work product that should be deemed confidential.

[5] Indeed, counsel from Kirkland & Ellis declined to provide Dr. Caspi with even publicly available documents from the litigation, e.g., the declarations of two other EC Commission members that had been submitted on behalf of Butamax. (Id. at 35)

[6] See, e.g., Koch Refining Co. v. Jennifer L. Boudreaux MV, 85 F.3d 1178, 1182 (5th Cir. 1996) (counsel spent considerable time with expert explaining his entire theory of the case as well as trial tactics and documents generated for trial); Wang Laboratories, 762 F. Supp. at 1249 (counsel shared a memorandum detailing and assessing the patent file wrapper history, as well as a letter outlining potential defenses to the suit).

conclude as well that the integrity of the judicial process will not be called into question, and that it would be contrary to the interests of justice to preclude Dr. Caspi, one of a limited number of individuals with expertise related to the EC numbering system, from sharing his expertise under these narrow facts.

_____
United States District Judge