IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUTAMAX™ ADVANCED BIOFUELS LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEVO, INC., | ) | C.A. No. 11-54 (SLR) |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| E.I. DUPONT DE NEMOURS AND CO., | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

**GEVO, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PATENT NOS. 7,851,188 AND 7,993,889**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Gevo, Inc.*

OF COUNSEL:

Stephen C. Neal
Michelle S. Rhyu
Daniel J. Knauss
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
(650) 843-5000

James P. Brogan
Carolyn V. Juarez
COOLEY LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021-8023
(720) 566-4000

Adam M. Pivovar
Tryn T. Stimart
COOLEY LLP
777 6th Street NW
Washington, DC 20001
(202) 842-7000

November 30, 2012

# TABLE OF CONTENTS

**Page**

Summary of Gevo's Arguments for Invalidity of the '188 Patent.................................................. v

Summary of Gevo's Arguments for Invalidity of the '889 Patent.................................................. vi

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ................................ 2

III.    SUMMARY OF ARGUMENT ................................................................................ 2

IV.    STATEMENT OF FACTS .................................................................................... 3

    A.    Butamax's Patents Cover The "Isobutanol Biosynthetic Pathway" Naturally Present in Yeast ........................................................................................................ 3

    B.    The Use of Recombinant DNA Technology To Express Enzymes of Known Biosynthetic Pathways In Yeast Was Routine and Predictable in 2005 ..................... 5

    C.    There Was Strong Motivation To Develop A Yeast Biocatalyst for The Production of Isobutanol in 2005 ................................................................................................ 6

V.    LEGAL STANDARD ........................................................................................... 8

    Summary judgment should be granted when no reasonable jury could return a verdict for the nonmoving party ................................................................................................ 8

VI.    ARGUMENT ....................................................................................................... 9

    A.    Claims of the '889 Patent Are Invalid for Anticipation ............................................. 9

        1.    Yeast inherently produce isobutanol during fermentation using the claimed "isobutanol biosynthetic pathway." ........................................................ 9

        2.    "A recombinant yeast microorganism expressing an engineered isobutanol biosynthetic pathway" is satisfied when at least one enzyme of the pathway is recombinantly expressed ................................................................ 10

        3.    Claim 1 of the '889 patent is anticipated by Larroy II, Yocum, and Elischweski ...... 11

            a.    Larroy II inherently and expressly anticipates claim 1 of the '889 patent............ 12

            b.    Yocum inherently anticipates claim 1 of the '889 patent ..................................... 15

            c.    Elischweski inherently anticipates claim 1 of the '889 patent............................. 16

            d.    Larroy II, Yocum, and Elischweski anticipate claim 1 of the '889 patent even under Butamax's flawed claim construction.......................................... 16

        4.    Dependent claims of the '889 patent are anticipated by Larroy II, Yocum, and Elischweski ................................................................................................ 18

            a.    Claim 3 is anticipated by Larroy II, Yocum, and Elischweski ............................. 18

            b.    Claims 4 and 5 are anticipated by Yocum ........................................................... 19

            c.    Claim 9 is anticipated by Yocum and Elischweski.............................................. 19

            d.    Claim 10 is anticipated by Elischweski ............................................................... 19

            e.    Claim 11 is anticipated by Yocum and Elischweski............................................ 19

            f.    Claims 14 and 15 are anticipated by Yocum and Elischweski ............................ 20

i

g. Claim 16 is anticipated by Larroy II, Yocum, and Elischweski .......................... 20

h. Claims 17-19 of the '889 patent are anticipated by Larroy II .............................. 21

B. Claims of The '188 and '889 Patents Are Invalid for Obviousness ......................... 21

1. Claim 1 of the '188 patent is obvious in view of the combination of Boulton with Yocum and Smit .................................................................................................... 22

2. Dependent claims of the '188 patent are invalid for obviousness ............................. 25

a. Claims 2-4, 13, 17, 24-25, and 34 of the '188 patent are obvious ...................... 25

b. Claims 14-15 of the '188 patent are obvious ...................................................... 26

c. Claims 18-23, and 35 of the '188 Patent are obvious.......................................... 26

d. Claim 36 of the '188 patent is obvious ............................................................... 27

3. All claims of the '889 Patent are invalid for obviousness ........................................ 27

a. Claim 1 of the '889 patent is obvious over Boulton ............................................ 27

b. Claims 1, 3-5, 9-11, and 14-19 of the '889 patent are obvious when combining Boulton with the anticipating references .............................................................. 28

c. Dependent claims of the '889 patent are obvious when the anticipating references are combined with Boulton and other references .................................................. 29

(i) Claim 2 is obvious over Larroy II, Yocum, or Elischweski in combination with Laffend ................................................................................................ 29

(ii) Claims 6 and 7 are obvious over Larroy II, Yocum, or Elischweski in combination with Card and Cockrem ............................................................ 29

(iii) Claim 12 is obvious over Larroy II, Yocum, or Elischweski in combination with Cheng .................................................................................................... 31

C. Claim 8 of The '889 Patent Is Invalid for Indefiniteness............................................ 31

D. Claims 8, 12, and 13 of the '889 Patent are Invalid for Lack of Written Description and Lack of Enablement ............................................................................................. 33

1. The '889 patent lacks written description and enablement of the "single product" limitation recited in claim 8 ...................................................................................... 34

2. There is no written description in the '889 patent for the "inactivated gene" requirements of claims 12 and 13 .............................................................................. 35

a. The single aspirational statement in the '889 patent specification regarding "gene inactivation" is not written description of that claim element ............................... 36

b. The '889 patent contains no specific disclosure of a recombinant microorganism with inactivated genes to reduce pyruvate decarboxylase (PDC) activity............ 37

c. The Dickinson I reference does not provide written description for inactivating genes to reduce PDC activity ............................................................................... 38

d. Butamax's subsequent patent applications prove there is no written description of inactivating genes to reduce PDC activity in the '889 patent ............................... 39

VII. CONCLUSION............................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alza Corp. v. Andrx Pharms., LLC,*
   603 F.3d 935 (Fed. Cir. 2010)..............................................................................34

*Ariad Pharm., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) .......................................................33, 34

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.,*
   501 F.3d 1274 (Fed. Cir. 2007)..............................................................................34

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,*
   731 F.2d 831 (Fed. Cir. 1984).................................................................................8

*Billups-Rothenberg, Inc. v. Associated Reg'l and Univ. Pathologists, Inc.,*
   642 F.3d 1031 (Fed. Cir. 2011).................................................................36, 37, 39

*Boston Scientific Corp. v. Johnson & Johnson,*
   647 F.3d 1353 (Fed. Cir. 2011)..............................................................................36

*Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.,*
   541 F.3d 1115 (Fed. Cir. 2008)..............................................................................36

*Centocor Ortho Biotech, Inc. v. Abbott Labs.,*
   636 F.3d 1341 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1542 (2012).........................33, 34, 37

*Datamize, LLC v. Plumtree Software, Inc.,*
   417 F.3d 1342 (Fed. Cir. 2005)..........................................................................31, 32

*Erwin v. United States,*
   591 F.3d 313 (4th Cir. 2010) ................................................................................18

*Genentech, Inc. v. Novo Nordisk, A/S,*
   108 F.3d 1361 (Fed. Cir. 1997)..............................................................................34

*Halliburton Energy Servs., Inc. v. M-I LLC,*
   514 F.3d 1244 (Fed. Cir. 2008)..............................................................................32

*In re Baxter,*
   656 F.2d 679 (C.C.P.A 1981) ................................................................................17

*In re de Seversky,*
   474 F.2d 671 (C.C.P.A. 1973) ...............................................................................38

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)......................................................................8

*Intermec Techs. Corp. v. Palm Inc.*,
    738 F. Supp. 2d 522 (D. Del. 2010), *aff'd,* 466 F. App'x 881 (Fed. Cir. 2012) .....................31

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007).............................................................................21, 28

*Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.*,
    195 Fed. Appx. 947, 2006 WL 2686734 (Fed. Cir. 2006).......................................16

*Schering Corp. v. Geneva Pharms.*,
    339 F.3d 1373 (Fed. Cir. 2003).........................................................9, 13, 16

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005)..........................................................9, 14

*Tokai Corp. v. Easton Enters, Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011).........................................................21, 25

*Tyco Healthcare Group LP v. Mutual Pharm. Co., Inc.*,
    642 F.3d 1370 (Fed. Cir. 2011)...............................................................21

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
    358 F.3d 916 (Fed. Cir. 2004)..................................................................35

*Wm. Wrigley Jr. Co. v. Cadbury Adams*,
    683 F.3d 1356 (Fed. Cir. 2012)..................................................................21

## STATUTES

35 U.S.C. § 102(b) ...........................................................................2, 5

35 U.S.C. § 103.................................................................................2

35 U.S.C. § 112.......................................................................2, 31, 33, 34

## OTHER AUTHORITIES

37 CFR 1.57(b)(1)................................................................................38

Fed. R. Civ. P. 56..................................................................................8

**Summary of Gevo's Arguments for Invalidity of the '188 Patent**

| Invalidity of the Claims of Butamax's '188 Patent | | |
|---|---|---|
| **Claim(s)** | **Invalidity Basis** | |
| 1 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum and Smit |
| 2-4, 13, 17-20 24-25, 34-35 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum and Smit |
| 14 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum and Smit in further view of Renna and Presecan |
| 15 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum and Smit in further view of Petersen |
| 21-22 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum, Smit, and Laffend |
| 23 | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum, Smit, and Nakamura |
| 36 | 35 U.S.C. §112 | • Obvious in view of Boulton combined with Yocum, Smit, and Larroy II I |

**Summary of Gevo's Arguments for Invalidity of the '889 Patent**

| | Invalidity of the Claims of Butamax's '889 Patent | |
|---|---|---|
| **Claim(s)** | **Invalidity Basis** | |
| 1 | 35 U.S.C. §102(b) | • Express and inherent anticipation by Larroy II<br>• Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton<br>• Obvious in view of Boulton in combination with Larroy II, Yocum, or Elischweski |
| 2 | 35 U.S.C. §103 | • Obvious in view of Laffend combined with Larroy II, Yocum, or Elischweski and Boulton |
| 3 | 35 U.S.C. §102(b) | • Express and inherent anticipation by Larroy II<br>• Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Larroy II, Yocum, or Elischweski |
| 4, 5 | 35 U.S.C. §102(b) | • Inherent anticipation by Yocum |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum |
| 6, 7 | 35 U.S.C. §103 | • Obvious in view of Card and Cockrem in combination with Larroy II, Yocum, or Elischweski and Boulton |
| 8 | 35 U.S.C. §112 | • Indefinite<br>• Lacks Written Description<br>• Lacks Enablement |
| 9 | 35 U.S.C. §102(b) | • Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum or Elischweski |
| 10 | 35 U.S.C. §102(b) | • Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Elischweski |

| Invalidity of the Claims of Butamax's '889 Patent | | |
|---|---|---|
| **Claim(s)** | **Invalidity Basis** | |
| 11 | 35 U.S.C. §102(b) | • Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum or Elischweski |
| 12 | 35 U.S.C. §103 | • Obvious in view of Cheng combined with Larroy II, Yocum, or Elischweski and Boulton |
| | 35 U.S.C. §112 | • Lacks Written Description |
| 13 | 35 U.S.C. §112 | • Lacks Written Description |
| 14, 15 | 35 U.S.C. §102(b) | • Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Yocum or Elischweski |
| 16 | 35 U.S.C. §102(b) | • Express and inherent anticipation by Larroy II<br>• Inherent anticipation by Yocum<br>• Inherent anticipation by Elischweski |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Larroy II, Yocum, or Elischweski |
| 17-19 | 35 U.S.C. §102(b) | • Express and inherent anticipation by Larroy II |
| | 35 U.S.C. §103 | • Obvious in view of Boulton combined with Larroy II |

## I.    __INTRODUCTION__

Butamax seeks to claim credit for, and preclude others from using, a metabolic pathway that has long been recognized to be used by yeast.  It is undisputed that yeast naturally produce isobutanol from pyruvate.  The only pathways that have been identified for this isobutanol production comprise five steps carried out by the five enzymes recited in Butamax's patent claims.  These enzymes had all been cloned using recombinant DNA technology, sequenced, and characterized more than a year before Butamax filed its U.S. Patents Nos. 7,851,188 (the "'188 patent")[1] and 7,993,889 (the "'889 patent").[2]  Indeed, the prior art contains many instances where routine recombinant DNA technology was used to express these enzymes in yeast.  As reported in peer-reviewed journals, these prior art recombinant yeast microorganisms made isobutanol as expected.  Unfortunately, the U.S. Patent and Trademark Office (PTO) did not consider many of these key prior art references before granting the patents.  On Reexamination of the '188 and '889 patents, when the key prior art was reviewed, the PTO agreed that substantial questions of patentability exist regarding all of the asserted claims in these patents.  Gevo seeks summary judgment of invalidity, because, when the overwhelming prior art is considered, no reasonable jury could conclude that Butamax's patents were properly granted.

Just as it cannot claim credit for what existed before it filed for a patent, Butamax cannot claim credit for inventions it did not possess or teach in its patent.  Accordingly, Gevo seeks summary judgment that certain claims of the '889 patent are indefinite, not enabled, and/or lack sufficient written description in the patent specification.

---

[1] Attached to Gevo's Summ. J. Appendix in Support of Its Motion for Summary Judgment of Invalidity of U.S. Patent Nos. 7,851,188 and 7,993,889 ("GA") Ex. 1.
[2] GA Ex. 2.

## II.   STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This litigation began on January 14, 2011 when Butamax filed suit asserting the '188 patent.  Butamax amended its Complaint on August 11, 2011 to add the '889 patent, which shares the same specification as the '188 patent.   On September 13, 2011, Gevo added counterclaims asserting infringement of two of its newly-issued patents, 8,017,375 and 8,017,376 (the "'375" and "'376" patents, respectively).   On September 22, 2011, Butamax filed a motion for preliminary injunction alleging infringement of claims 1, 13, and 14 of the '889 patent.  This Court found that Butamax was unlikely to prevail at trial.  (D.I. 369-370.)   On November 16, 2012, the Federal Circuit affirmed that decision, upholding the denial of the preliminary injunction and agreeing that Gevo had raised substantial questions of invalidity of the '889 patent.  (*Butamax Advanced Biofuels v. Gevo, Inc.*, Case No 12-1490, D.I. 79-2 (Fed. Cir. Nov. 16, 2012); *see also* D.I. 591 (attaching transcript of oral argument).)

## III.   SUMMARY OF ARGUMENT

Gevo requests summary judgment that the following claims are invalid:[3]

1.      Claims 1, 3-5, 9-11, and 14-19 of the '889 patent are invalid as anticipated by prior art under 35 U.S.C. § 102(b).

2.      Claims 1-12, and 14-19 of the '889 patent are invalid as obvious under 35 U.S.C. § 103.

3.      Claims 8, 12 and 13 of the '889 patent are invalid for indefiniteness, lack of written description, and/or lack of enablement under 35 U.S.C. § 112.

5.      Claims 1-4, 13-15, 17-25, and 34-36 of the '188 patent are invalid as obvious under 35 U.S.C. § 103.

---

[3] Butamax alleges infringement of claims 1-3, 5-14, and 16-19 of the '889 patent and claims 1-4, 13-15, 17-25, and 34-36 of the '188 patent.  (*See* Butamax's Resp. to Gevo's Interrog. No. 1.)

## IV.    STATEMENT OF FACTS

### A.    Butamax's Patents Cover The "Isobutanol Biosynthetic Pathway" Naturally Present in Yeast.

"***Isobutanol is produced*** biologically as a by-product of yeast fermentation." ('889 patent,[4] 1:39-40 (emphasis added).)   Butamax's asserted claims are directed to this basic, naturally occurring pathway of isobutanol biosynthesis in yeast.   When provided with a fermentation medium containing a carbon substrate, such as glucose, yeast produces pyruvate from the carbon substrate through a multistep process referred to as glycolysis.   The "isobutanol biosynthetic pathway"[5] recited in Butamax's patents comprises five substrate-to-product conversion steps that begin with this pyruvate.   Yeast naturally converts pyruvate to the life-essential amino acid valine, and likewise converts valine to isobutanol.   Through the key intermediate in these processes, α-ketoisovalerate, pyruvate is converted to isobutanol in yeast. (*See* '889 patent, 11:57-61 ("This pathway combines enzymes known to be involved in the well-characterized pathways for valine biosynthesis (pyruvate to α-ketoisovalerate) and valine catabolism (α-ketoisovalerate to isobutanol).").)   Each of the five steps of the claims in the '188 and '889 patents involves a different enzyme for performing a specific substrate-to-product conversion in the transformation of pyruvate to isobutanol.

The existence and operation of the five-step isobutanol biosynthetic pathway recited in the claims of the '188 and '889 patents was known in yeast more than one year before the patent filing date of October 26, 2006.   In fact, prior art teaching the five substrate-to-product conversions from pyruvate to isobutanol have been known for decades and include, for example, the Webb (1963) (GA Ex. 3), Yoshizawa (1965), Rainbow (1970) (GA Ex. 4), and Chen (1977)

---

[4] The '188 and '889 patents share the same specification.   For simplicity, citation to the specification in the Statement of Facts are identified in reference only to the '889 patent.
[5] The claim term "isobutanol biosynthetic pathway" has been defined in the patents as "an enzyme pathways [*sic*] to produce isobutanol."   ('889 patent, 6:52-53, 59-60.)

(PX 119) references.  (*See* Steph. ¶¶ 23-31.)  In 2001, Boulton again set forth this natural yeast pathway for the production of isobutanol from pyruvate and identified the identical steps and enzymes recited in the isobutanol biosynthetic pathway that Butamax claims is novel:



(*See* GA Ex. 6 (Boulton) at 119 (Fig. 3.14) (annotated enzymes identified at 136 (Fig. 3.21), 118 (Fig. 3.13)); *see also* Steph. ¶¶ 37-40.)   Likewise, in 2003, Hansen depicted the claimed isobutanol biosynthetic pathway and identified enzymes involved in the natural production of isobutanol by yeast.  (D.I. 161, Ex. 13) (Hansen) at 153 (Fig. 2); *see* Steph. ¶¶ 41-42.)  None of these references disclosing yeast's natural pathway for biosynthesis of isobutanol from pyruvate were considered by the PTO during the original prosecution of the applications that matured into the '188 or '889 patents.

**B.** **The Use of Recombinant DNA Technology To Express Enzymes of Known Biosynthetic Pathways In Yeast Was Routine and Predictable in 2005.**

The recombinant DNA and microbial expression technologies described in the '188 and '889 patents were considered routine in the field of molecular biology as of October 25, 2005.[6] (*See, e.g.*, '889 patent, 11:7-17; *see also* GA Ex. 39 (Expert Report of Alexander Klibanov (hereinafter "Klibanov")) ¶ 90 ("It was indeed well known in the art that heterologous genes could be cloned and expressed in yeast.").) In fact, the '188 and '889 patents do not disclose any novel enzymes at all. To the contrary, all of the enzymes identified for use in the claimed pathway were extensively characterized, having published DNA sequences, known functionality, known cofactor usage, and known EC numbers. (*See, e.g.,* '889 patent, 6:61-7:64, 11:58-12:32.) These enzymes were easily identified from publicly available databases and references. Identifying known and previously cataloged enzymes for recombinant expression in yeast, as set forth in the patents, from these public sources was regularly, predictably, and successfully performed in the art. ('889 patent, 14:1-3 ("the person of skill in the art will be able to utilize publicly available sequences to construct the relevant pathway").)

The success and prevalence of yeast as a candidate for recombinant DNA technology is due in large part to the relative simplicity and precision with which a desired gene can be inserted into the genome of a target yeast strain. As discussed above, yeast also has long been known as an accessible organism for the production of organic molecules, such as ethanol. (*See, e.g.*, GA Ex. (Pretorius)[7] at 3-4.) Thus, one of ordinary skill in the art would have reasonably expected that a strategy to increase isobutanol production could draw on existing fermentative pathways as of October 2005.

---

[6] The '188 patent has a filing date of October 25, 2006 and '889 patent claims priority to the same October 25, 2006 application. The critical date for determining anticipation under 35 U.S.C. § 102(b) is therefore October 25, 2005.

[7] GA Ex. 31 (Pretorius *et al.*, 2003, *Food Technol. Biotechnol.* 41:3-10 ("Pretorius")).

5

Given the breadth of available scientific literature regarding the production of ethanol and isobutanol in yeast, including the known expression of each of the five claimed enzymes, one of ordinary skill in the art would have had a reasonable expectation of success for the expression of the claimed five-step isobutanol-producing pathway in yeast as of October 2005. Butamax simply applied these well-known recombinant DNA technologies to achieve a predictable result when expressing the known enzymes of the five-step biosynthetic pathway. (*See, e.g.*, GA Ex. 6 (Boulton) at 118-119, 136; GA Ex. D.I. 161, Ex. 13 (Hansen) at 153; '889 patent, 6:61-7:64, 11:58-12:32; GA Ex. 38 (Expert Report of Susan Henry), ¶¶ 36-37.) At the time Butamax filed the '188 patent, those of skill in the art commonly sought to genetically modify target genes to increase the efficiency and productivity of fermentation in yeast. (*See, e.g.*, GA Ex. 18 (Sauer, *et al.*, 2004, *Appl. Environ. Microbiol.* 70: 6086-6091); *see also* Steph. ¶¶ 78, 82.) Butamax did nothing more than apply this approach to the production of isobutanol, and in doing so obtained the expected result of a very modest increase of isobutanol yields over baseline levels. (*See* '889 patent, 42:58-45:48 (Examples 18-19).) Butamax's contributions as of October 26, 2005 are of little value given that the five-step biosynthetic pathway was already known be operational in yeast. Butamax did nothing more than achieve slight increases in isobutanol production by the routine approach of increasing the aggregate activity of the pathway enzymes through overexpression.

### C.  There Was Strong Motivation To Develop A Yeast Biocatalyst for The Production of Isobutanol in 2005.

As stated in the '188 and '889 patents, "[b]utanol is an important industrial commodity chemical with a variety of applications, where its potential as a fuel or fuel additive is particularly significant." ('889 patent, 6:31-40). As explained by Butamax's expert, Dr. Susan Henry, there was "absolutely" a motivation to find alternative biofuels in 2005 (GA Ex. 40

(Henry Dep.) at 294:23-25) and "[isobutanol was one of] a number of [potential] solutions" at the time (*id.* at 296:5-8).

Microorganisms, including yeast, have long been viewed as valuable for the production of isobutanol from carbohydrate sources such as grain or sugar. (*See, e.g.*, GA Ex. 6 (Boulton) at 113-15, 117- 21.) At least since the early 1900s, isobutanol was known to be a component of the so-called fusel alcohols (or fusel oils) produced as by-products of yeast ethanol fermentation. (*See* GA Ex. 4 (Rainbow)[8] at 190-97.) Accordingly, it has been understood for over a century that fermenting yeast microorganisms naturally produce isobutanol as a component of "fusel oil" or "fusel alcohols," a fact acknowledged by the Butamax patentees. ('889 patent, 2:39-42.)

Yeast, in particular *Saccharomyces cerevisiae*, is the microorganism of choice for many industrial applications. (*See, e.g.*, GA Ex. 31 (Pretorius) at 3-4.) Yeast has been domesticated for its fermentation capabilities for production of foods and drinks and for its exceptional ability to ferment sugars into ethanol and other alcohols. (*Id.*) Yeast has been a key platform organism for advancing genetic and metabolic engineering, and was the first eukaryote to have its genome sequenced. (*Id.*) These developments have facilitated the new application of fermentative pathways of this organism toward the production of other commodity chemicals. For example, yeast strains have been engineered to overproduce some of its natural metabolites, such as organic acids, D-ribose, glycerol, and α-ketoisovalerate (an intermediate in the isobutanol biosynthetic pathway); as well as non-native metabolites, such as 1,2-propanediol, ethylene and polyhydroxy-alkanoates. (*See* Steph. ¶ 82.) Yeast has also been engineered to produce high value chemicals, including artemisinic acid, L-ascorbic acid, resveratrol, and patchoulol as well

---

[8] GA Ex. 4 (Rainbow, 1970, *The Yeasts* 3:190-199 ("Rainbow")).

as protein drugs, such as insulin-like growth factor 1, single chain antibodies, and hepatitis B virus antigens.  (*Id.*)

Yeast is well suited for industrial applications because it is a "facultative" organism that can grow in both aerobic (oxygen-rich) and anaerobic (oxygen-deficient) environments.  ('889 patent, 12:27-29.)   Yeast also has minimal nutritional requirements and a relatively high tolerance to the different chemical environments of industrial fermentation processes.  (*See* Steph. ¶ 82.)  Indeed, yeast's natural ability to synthesize a variety of fermentation products provides it with a natural tolerance to those products so that it can withstand their accumulation in the fermentation medium at high concentrations.  (*Id.*)  Thus, amenability to genetic manipulation and robustness makes yeast an excellent host organism for industrial applications.

## V.     LEGAL STANDARD

Summary judgment should be granted when no reasonable jury could return a verdict for the nonmoving party.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  "Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources."  *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).  To defeat summary judgment, "[t]he party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant.  Mere denials or conclusory statements are insufficient."  *Id.* at 835-36.

8

## VI.   ARGUMENT

### A.   Claims of the '889 Patent Are Invalid for Anticipation.

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Id*.  Inherent anticipation does not require that the missing characteristic always occurs under all conceivable conditions, but only requires that the result "necessarily and inevitably forms . . . ***under normal conditions***." *Id.* at 1378 (emphasis added).  Consequently, anticipation of a patent occurs when "the disclosure [of the prior art] is sufficient to show that the natural result flowing from the operation as taught [in the prior art] would result in the claimed product." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (internal quotations omitted) (reversing finding of no inherent anticipation because the district court applied "too exacting" of a standard in evaluating the inherent aspects of the prior art).  Such "inherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *Id.*

### 1.   Yeast inherently produce isobutanol during fermentation using the claimed "isobutanol biosynthetic pathway."

The Butamax patents admit that "[i]sobutanol is produced biologically as a by-product of yeast fermentation," ('889 patent, 1:39-40,) and the prior art agrees, (*see, e.g.*, GA Ex. (Oshita);[9] GA Ex. (Giudici);[10] *see also* D.I. 366 at 64:20-77:21).  Claim 1 of the '889 patent is directed to "a method for producing isobutanol" by providing a "fermentation media comprising carbon

---

[9] GA Ex. 5 (Oshita *et al.*, 1995, Proceedings of the 25th Congress of the European Brewery Convention, at 387-394 ("Oshita")) at 391 (Fig. 3).
[10] GA Ex. 37 (Giudici *et al.*, 1990, Can. J. Microbiol. Vol. 36 at 61-64 ("Giudici") at 61 (abstract)).

substrate . . . whereby isobutanol is produced."  None of the '899 claims require any particular amount of isobutanol that must be produced by the claimed method.  Nor do the claims set any limits on the fermentation media other than containing "carbon substrate."  (*See* '889 patent, 9:57-62.)  Consequently, the '889 patent claims cover the production of *any* amount of isobutanol from *any* fermentation media comprising carbon substrate.

As noted above, the production of isobutanol as a by-product of natural yeast fermentation occurs from pyruvate through the five substrate-to-product conversions of the claimed isobutanol biosynthetic pathway and use the identical enzymes recited in claim 1 of the '889 patent.  (*See supra* Section IV.B.)  Thus, yeast inherently produce isobutanol as a fermentation by-product using the claimed isobutanol biosynthetic pathway, and there is no dispute the basic, five-step, pathway recited in claim 1 of the '889 patent is described in Boulton.

### 2. "A recombinant yeast microorganism expressing an engineered isobutanol biosynthetic pathway" is satisfied when at least one enzyme of the pathway is recombinantly expressed.

The '889 patent claims "a recombinant yeast microorganism expressing an engineered isobutanol biosynthetic pathway."  ('889 patent, claim 1.)  A "recombinant" microorganism, as defined by the patent, refers to a microorganism that has undergone a "transformation" by "the transfer of a nucleic acid fragment into a host organism, resulting in genetically stable inheritance."  ('889 patent, 10:33-38.)  The '889 patent further teaches that an isobutanol biosynthetic pathway is "engineered" when a "recombinant microorganism" has at least one recombinant nucleic acid fragment that expresses one of the enzymes of the claimed pathway. (*See* D.I. 535 (Gevo's Answering Claim Constr. Br.) at 27-28.)  For example, the "Summary of the Invention" states that "[t]he invention provides a recombinant microorganism having an engineered isobutanol biosynthetic pathway."  ('889 patent, 2:3-4)  The Summary discloses several embodiments wherein "the invention provides a recombinant microbial host cell

comprising *at least one* DNA molecule encoding a polypeptide that catalyzes a substrate to product conversion . . . ." ('889 patent, 2:6-9, 2:22-24, 2:38-41.) These embodiments demonstrate there need only be "*at least one* DNA molecule" recombinantly expressing an enzyme of the pathway to meet the "engineered" limitation of the claim. (*See* D.I. 535 (Gevo's Answering Claim Constr. Br.) at 27.) This is consistent with other teachings in the patent, including that isobutanol production is "engineered" by recombinantly expressing a single enzyme of the natural pathway. ('889 patent, 13:54-60.) Overall, therefore, the patent teaches that "a recombinant yeast microorganism expressing an engineered isobutanol biosynthetic pathway" is satisfied when one enzyme in the isobutanol pathway is recombinantly expressed.

### 3. Claim 1 of the '889 patent is anticipated by Larroy II, Yocum, and Elischweski.

By 2005, the prior art included many references that disclosed yeast microorganisms that recombinantly expressed one or more enzymes of the claimed five-step pyruvate-to-isobutanol pathway. These publications include Larroy II,[11] Yocum,[12] and Elischweski.[13] Under normal fermentation conditions, the recombinant yeast disclosed in these references naturally produce isobutanol as a by-product of fermentation using the claimed engineered isobutanol biosynthetic pathway, thereby anticipating claims of the '889 patent. In fact, the PTO has recently used Larroy II, Yocum, and Elischweski—which were not considered by the examiner during the initial examination—to reject claims 1, 3-4, 9-11, and 14-19 for anticipation during reexamination. (*See* D.I. 155 (Grimm Decl), Ex. B (Nov. 25, 2011 Office Action in Reexam'n Ser. No. 95/001,735).)

---

[11] GA Ex. 29 (Larroy *et al.*, 2003, *Chemico-Biological interactions* 143-44:229-238 ("Larroy II")).

[12] GA Ex. 21 (Yocum *et al.*, 2004, U.S. Patent Application Publication No. U.S. 2004/0146996 ("Yocum"); *see also* D.I. 161 (Stephanopoulos Decl.), Ex. 20).

[13] GA Ex. 30 (Elischweski, *et al.*, 2004, U.S. Patent No. 6,787,334 ("Elischweski")).

### a.   Larroy II inherently and expressly anticipates claim 1 of the '889 patent.

In 2003, Larroy II anticipated claim 1 of the '889 patent by making a recombinant yeast microorganism that produced isobutanol from a fermentation media comprising a carbon substrate using the claimed engineered isobutanol biosynthetic pathway.  (GA Ex. 29 (Larroy II) at 229-37; Steph. ¶¶ 133-35.)  Larroy II expressly identified a new gene that encodes an alcohol dehydrogenase enzyme referred to as "ADH6." (Larroy II abstract ("identified a new gene . . . which coded for a Zn-containing NADP(H)-dependent alcohol dehydrogenase (ADHVI)" (or "ADH6")).)  The overexpressed alcohol dehydrogenase gene in Larroy II is literally the alcohol dehydrogenase (or "ADH") recited in step e) of claim 1 of the '889 patent.

Larroy II constructed a recombinant yeast microorganism that overexpressed the ADH6 gene and provided it with fermentation media including carbon substrates such as "2% glucose, 2% galactose or 3% glycerol."  (GA Ex. 29 (Larroy II) at 231 ("Expression of ADHVI in different carbon sources.").)  Larroy II discloses recombinant yeast strains that were contacted with fermentation media comprising carbon substrate.  (*Id.* ("[f]lasks containing 150-ml medium were inoculated with yeast cells").)  Larroy II further discloses that recombinant yeast "[s]amples were taken at different phases of the growth curve." (*Id.*)  Under these conditions, Larroy II's recombinant yeast inherently produced isobutanol as a fermentation by-product by consuming the glucose, galactose, or glycerol carbon substrates.  (*Id.*)  Yeast naturally convert the carbon substrates to pyruvate through glycolysis.  Then, isobutanol is produced from this pyruvate as a fermentation by-product using the claimed engineered isobutanol biosynthetic pathway, with the recombinantly expressed ADH6 gene catalyzing the conversion of isobutyraldehyde to isobutanol (*i.e.*, step "e)" of the engineered pathway).  Butamax has not identified any other pathway that produces this isobutanol.  Accordingly, the production of isobutanol necessarily

12

reflects the activity of each component of the five step pathway.  Larroy II therefore inherently

anticipates claim 1 of the '889 patent.  *See Schering*, 1339 F.3d at 1378 (finding inherent

anticipation because the claimed chemical metabolite "is not formed accidentally or under

unusual conditions," but was "a necessary consequence" of use "under normal conditions").

Larroy II expressly discloses the production of isobutanol using the recombinantly

engineered enzyme encoded by the ADH6 gene.  Figure 6 in Larroy II expressly depicts a

pathway from pyruvate to isobutanol and indicates that the enzyme product "ADHVI" of the

recombinantly overexpressed ADH6 gene is utilized in the substrate-to-product conversion of

"isobutanal" (isobutyraldehyde) to "isobutanol":



Fig. 6. Scheme for anabolic and catabolic routes leading to fuel alcohols production. Intermediate reactions not described are indicated with dotted lines. Taken from [21] in a modified form.

(GA Ex. 29 (Larroy II) at 237.)  Larroy II also discloses that "the yeast produces . . . isobutanal"

and that the isobutanal is "quickly reduced" to its "corresponding alcohol" (i.e., isobutanol).  (*Id.*

13

at 236.)  Larroy II further discloses that "several reports have implicated yeast ADHI and ADHII in the last step of fusel alcohol production.  However, participation of ADHVI in this process should not be ignored."[14]  (*Id.*)  Larroy II ultimately concludes that the "high efficiency" towards aldehydes, such as isobutanal, "***makes reliable*** the participation of ADHVI in the metabolism of fusel alcohols."  (*Id.* (emphasis added).)  This statement shows that the production of fusel alcohols, including isobutanol, through the engineered pathway was expressly recognized by Larroy II as a necessary result of fermentations using the recombinant yeast constructed.  *See, e.g., SmithKline Beecham*, 403 F.3d at 1344 (finding that a prior art patent directed to the production of PHC anhydrate inherently anticipated the patent-in-suit's claims to production of PHC hemihydrate because the "manufacture of PHC anhydrate according to the [prior art] patent necessarily results in the production of PHC hemihydrates").  Moreover, Larroy II disclosed that the fermentations proceeded through various "different phases of the growth curve," (GA Ex. 29 (Larroy II) at 231) and isobutanol would inevitably be produced during different growth phases.

Larroy II expressly discloses the production of isobutanol from pyruvate using the claimed engineered isobutanol biosynthetic pathway.  Larroy II depicted part of the overall engineered isobutanol biosynthetic pathway in Figure 6 by abbreviating the two-step conversion of "α-Acetolactate" (i.e., acetolactate) to "α-Ketoisovaleric acid" (i.e., α-ketoisovalerate) with a single dashed arrow, but this does not mean that Larroy II considered the conversion from acetolactate to ketoisovalerate in yeast to occur in a single enzymatically catalyzed step or that

---

[14] Larroy expressly recognized that the alcohol dehydrogenase enzymes operating in step "e)" converted isobutyraldehyde to isobutanol using "NAD(P)H." According to Enzyme Commission Rule 18 nomenclature, "NAD(P)H" is meant to identify enzymes able to use either NADH or NADPH cofactor.  (GA Ex. 7 (*Enzyme Nomenclature, Recommendations (1992) of the Nomenclature Committee of the International Union of Biochemistry and Molecular Biology*, 1992, Rule 18 ("Where the enzyme can use either coenzyme, this should be indicated by writing NAD(P).")).)

the production of isobutanol from pyruvate was a four-step process. Rather, the figure's caption expressly incorporates the isobutanol pathway disclosures of Boulton, noting that the pathway depicted in Figure 6 was "[t]aken from [Boulton] *in a modified form*." (GA Ex. 29 (Larroy II) at 237 (emphasis added).) As described above, Boulton sets forth the unmodified 5-step isobutanol pathway as it naturally occurs in yeast and also discloses the enzymes naturally present in yeast that perform the conversions. (*See supra* Section III.B.; Steph. ¶¶ 37-40.) Thus, Larroy II discloses a recombinant yeast microorganism, where the yeast was provided fermentation media comprising carbon substrate. It further discloses that the recombinant yeast expresses the five-step engineered biosynthetic pathway from pyruvate to isobutanol and discloses the participation of the enzyme from the overexpressed ADH6 gene in the production of fusel alcohols, including isobutanol.

### b. Yocum inherently anticipates claim 1 of the '889 patent.

In 2004, Yocum inherently anticipated claim 1 of the '889 patent by disclosing a yeast microorganism that recombinantly overexpressed the enzymes involved in steps "a)," "b)," and "c)" of the claimed engineered pathway. (*See* GA Ex. 21 (Yocum) at [0040]-[0041], [0075]-[0077], Fig. 1; Steph. ¶ 137.) The overexpression of these enzymes enhanced the synthesis of the isobutanol intermediate α-ketoisovalerate. (*See* GA Ex. 21 (Yocum) at [0040]-[0041]; Steph. ¶¶ 138-39.) In addition to the overexpressed enzymes for the first three steps, the yeast disclosed in Yocum naturally includes the enzymes for performing steps "d)" and "e)" of the claimed engineered pathway. (Steph.¶ 140.) Yocum also discloses methods that involve "culturing" the yeast with an appropriate fermentation substrate, including several carbon sources. (GA Ex. 21 (Yocum) at [0083]; *see also* Steph. ¶ 140.) The recombinant yeast of Yocum was subsequently proven to produce isobutanol as a fermentation by-product using the "engineered isobutanol

biosynthetic pathway" of claim 1 of the '889 patent. (*See e.g.*, GA Ex. 10 (Chen (2011))[15] at 1 (abstract); Steph. ¶ 60.)   Therefore, Yocum anticipates it.   *See Schering*, 339 F.3d at 1378 ("inherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure"); *see also Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.*, 195 Fed. Appx. 947, 952, 2006 WL 2686734, at *5 (Fed. Cir. 2006) (finding anticipation even though the inherent properties of the prior art were not recognized until after the priority date of the asserted patent).

### c.   Elischweski inherently anticipates claim 1 of the '889 patent.

Elischweski, published in 2004, discloses the construction of a recombinant yeast that overexpressed the enzyme involved in step "b)" of the claimed isobutanol pathway.  (*See* GA Ex. 30 (Elischweski) at col. 2:10-16, 3:14-53, claims 1 and 17; Steph. ¶ 136.)  Elischweski discloses that the invention "can be cultured" from carbon substrates, including glucose, sucrose, lactose, and fructose.  (GA Ex. 30 (Elischweski) at col. 7:7-20; *see also* Steph. ¶ 136.)  In addition to the overexpressed enzyme for performing step "b)," the Elischweski yeast also includes the enzymes for performing pathway steps "a)" and "c)" through "e)" of the claimed engineered isobutanol pathway.  (Steph. ¶ 136.)  Under ordinary fermentation conditions, the recombinant yeast of Elischweski was subsequently shown to make isobutanol as a fermentation by-product.  (*See, e.g.*, GA Ex. 11 (Omura) at 511 (Table 3); Steph ¶ 61.)  Accordingly, Elischweski anticipates claim 1 of the '889 patent.  *Id.*

### d.   Larroy II, Yocum, and Elischweski anticipate claim 1 of the '889 patent even under Butamax's flawed claim construction.

There is nothing recited in claim 1 of the '889 patent that requires the claimed chemical conversions to be contiguous.  (*See* D.I. 535 (Gevo's Answering Claim Construction Br.) at 25-

---

[15] GA Ex. 10 (Chen *et al.*, 2011, *Biotechnol. Biofuels* 28:4-21 ("Chen (2011)")).

27.)  To the contrary, the claim recites that the "pathway *comprises* the following substrate to product conversions."  (*Id.*)  It is long-standing, black letter law that by using the open-ended transition "comprises," Butamax was signaling to the public that the claim does not exclude additional unrecited elements or method steps.  *See, e.g.*, *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A 1981) ("the term 'comprises' permits the *inclusion* of other steps, elements, or materials").  Butamax nevertheless has asked the Court to depart with long-standing precedent and a bedrock principle of patent practice to redraft the claims in this litigation as if it had used "consisting of" transition.  Without the extraneous importation of a "contiguous" limitation to the claimed pathway, Butamax cannot distinguish claim 1 from the anticipating disclosures of Larroy II, Yocum, and Elischweski and Gevo is entitled to summary judgment.

Yet, even under a contiguous construction, Gevo is still entitled to summary judgment. There is no dispute that yeast naturally produce isobutanol by making α-ketoisovalerate in the mitochondria from pyruvate through steps "a)," "b)," and "c) of the claimed isobutanol pathway, converting the α-ketoisovalerate to valine in the mitochondria, transporting the valine from the mitochondria to the cytosol, reconverting the valine back α-ketoisovalerate in the cytosol, and converting the α-ketoisovalerate to isobutanol through steps "d)" and "e)" of the claimed pathway.[16]  But yeast also naturally produce isobutanol through a contiguous pathway that involves the direct transport of α-ketoisovalerate from the mitochondria to the cytosol without first being converted to valine.  (*See* Steph. ¶¶ 63-75.)  Perhaps the most probative evidence of a native, contiguous pathway in yeast comes from Butamax itself.  Before bringing this lawsuit, Butamax submitted a patent application that expressly stated "*[a]lpha-ketoisovalerate that is*

_____

[16] Butamax's experts admit that yeast naturally produce isobutanol from pyruvate using the five chemical conversions and five enzymes recited in claim 1, albeit with α-ketoisovalerate-to-valine-back to-α-ketoisovalerate.  (*See* GA Ex. 39 (Klibanov), ¶¶ 30-31; GA Ex. 38 (Henry), ¶¶ 36-38.)

*synthesized in yeast mitochondria is also transported to the cytosol* . . . ." (GA Ex. 16 (Anthony *et al.*, 2010, U.S. Patent Application Publication No. 2010/0129886) at [0091].)   Butamax's recognition of a contiguous five-step pathway for the production of isobutanol in yeast is also corroborated by the metabolic pathways for *S. cerevisiae* depicted in GA Ex. 10 (Chen (2011)).[17] The Court has ample authority to accept Butamax's own pre-litigation statements to the PTO, submitted under penalty of perjury, as an admitted fact that demonstrates the absence of a dispute regarding the transport of α-ketoisovalerate from the mitochondria in yeast.  *See Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (no genuine issue of fact when only issue is which of two conflicting versions of party's testimony is correct).  If the Court holds Butamax to its word, there will be no dispute that isobutanol would necessarily be produced by a contiguous pathway from pyruvate and, accordingly, claim 1 would be inherently anticipated by Larroy II, Yocum, and Elischweski even under Butamax's flawed construction.

### 4. Dependent claims of the '889 patent are anticipated by Larroy II, Yocum, and Elischweski.

Claim 1 is the only independent claim in the '889 patent.  As described in the foregoing sections, Larroy II, Yocum, and Elischweski anticipate claim 1.  Anticipation of the dependent claims therefore requires only the additional showing that one of these references inherently or expressly discloses the additional limitations added by the dependent claims.  Since many of the dependent claims add trivial limitations to claim 1, a number of the dependent claims are also invalid as being anticipated by Larroy II, Yocum, and Elischweski.

### a. Claim 3 is anticipated by Larroy II, Yocum, and Elischweski.

Claim 3 adds the limitation of "a batch fermentation" to independent claim 1.  Batch fermentation is how Larroy II's yeast was grown.  (GA Ex. 29 (Larroy II) at 231; Steph. ¶¶ 144-

---

[17] GA Ex. 10 (Chen (2011) at 2 (Fig. 1).

46.)  Yocum and Elischweski both expressly disclose batch fermentation.  (GA Ex. 21 (Yocum) at [0087]; GA Ex. 30 (Elischweski) at col. 6:63-66; Steph. ¶¶ 147-48.)

### b.  Claims 4 and 5 are anticipated by Yocum.

Claim 4 adds a continuous fermentation requirement to independent claim 1, whereas claim 5 requires that the isobutanol produced by the recombinant microorganism be recovered using "distillation, liquid-liquid extraction, adsorption, decantation, pervaporation, or combinations thereof."  Yocum expressly anticipates these claims by disclosing a "continuous fermentation" process and recovering a desired compound from the fermentation media by "solvent extraction."  (GA Ex. 21 (Yocum) at [0087], [0091]; Steph. ¶¶ 151-55.)

### c.  Claim 9 is anticipated by Yocum and Elischweski.

Claim 9 adds the limitation that the fermentation media comprise a mixture of carbon substrates.  Yocum and Elischweski expressly disclose that mixtures of carbon substrates can be in the fermentation medium.  (GA Ex. 21 (Yocum) at [0083]; GA Ex. 30 (Elischweski) at col. 7:13-21; Steph. ¶¶ 165-67.)

### d.  Claim 10 is anticipated by Elischweski.

Claim 10 requires that the fermentation media comprise "unpurified carbon substrates." Elischweski expressly discloses this limitation in the form of, for example, fermentation media from "corn steep liquor."  (GA Ex. 30 (Elischweski) at col. 7:21-28; Steph. ¶¶ 168-69.)

### e.  Claim 11 is anticipated by Yocum and Elischweski.

Claim 11 requires that the fermentation be performed between about 25 and 40 degrees Celsius.  Yocum discloses yeast fermentation with "[p]referred temperatures are between 20ºC and 55ºC, more preferably between 30ºC and 50ºC.  (GA Ex. 21 (Yocum) at [0086]; Steph. ¶ 170.)  Elischweski expressly discloses that the "temperature of the culture is usually 20ºC to 50ºC, and preferably 25ºC to 45ºC" and further teaches growth of yeast microorganisms at 30ºC.

(GA Ex. 30 (Elischweski) at col. 7:52-53, 24:32-35; Steph. ¶ 170.)   Yocum and Elischweski therefore expressly anticipate claim 11.  (Steph. ¶ 171.)

### f.   Claims 14 and 15 are anticipated by Yocum and Elischweski.

Claim 14 adds the limitation that one or more enzymes of the pathway "uses NADH as an electron donor."  Claim 15 adds the limitation that the "alcohol dehydrogenase of step (e) is a native enzyme to the yeast microorganism."  Yeast naturally possess an NADH-dependent alcohol dehydrogenase, such as ADH-1, that acts in pathway step "e)" of the engineered isobutanol biosynthetic pathway.  (*See* D.I. 161 (Stephanopoulos Decl.), Ex. 9 (Derrick) at 2783-84;[18] Steph. ¶¶ 177-78.)  For example, Larroy II discloses that ADH enzymes are able to use either NADPH or NADH, as indicated by the "NAD(P)H" in Figure 6.[19]  Thus, the recombinant yeast strains of both Yocum and Elischweski inherently anticipate claims 14 and 15.[20]  (Steph. ¶¶ 179, 182-83.)

### g.   Claim 16 is anticipated by Larroy II, Yocum, and Elischweski.

Dependent claim 16 adds the limitation that "steps (i)-(v) are performed by separate and distinct enzymes."  The recombinant yeast strains of Larroy II, Yocum, and Elischweski catalyze the conversion of steps "(i)" through "(v)" using separate and distinct enzymes: an acetolactate synthase, an acetohydroxy acid isomeroreductase, an acetohydroxy acid dehydratase, a decarboxylase, and an alcohol dehydrogenase, respectively.  (*See* Steph. ¶ 184.)  Accordingly, the recombinant yeast strains of Larroy II, Elischweski, and Yocum anticipate claim 16.  (*Id.*)

---

[18] D.I. 161 (Stephanopoulos Decl.), Ex. 9 (Derrick & Large, 1993, *J. Gen. Microbiol.* 139:2783-2792 ("Derrick")).

[19] *See supra* n.14.

[20] This conclusion is supported under either parties' proposed construction for the claim term "uses NADH as an electron donor."  (Steph. ¶¶ 190-91.)

h.      **Claims 17-19 of the '889 patent are anticipated by Larroy II.**

Dependent claims 17, 18, and 19 recite additional limitations requiring that "isobutanol is produced in the fermentation media," that isobutanol is produced in the fermentation media during one or more recited "growth phases," and that "the recombinant yeast microorganism is a whole cell catalyst subjected to conditions for isobutanol production," respectively.  ('889 patent, claims 17-19; Steph. ¶ 185.)   As described with respect to claim 1, the recombinant yeast microorganism of Larroy II inherently produces isobutanol in the fermentation media.  (GA Ex. 29 (Larroy II) at 236-37; Steph. ¶ 186.)   As further described above, Larroy II expressly discloses that "[s]amples were taken at different growth phases." (GA Ex. 29 (Larroy II) at 231; *Id.*)   Finally, the recombinant yeast strain of Larroy II is, by definition, a "whole cell catalyst." (Steph. ¶ 186.)   Based on these disclosures, the limitations of dependent claims 17-19 are expressly and/or inherently disclosed in Larroy II.  (*See* Steph. ¶ 187.)

B.      **Claims of The '188 and '889 Patents Are Invalid for Obviousness.**

"A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art." *Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011) (citing 35 U.S.C. § 103(a)).  Obviousness is a question of law, based on underlying facts.  *See id.*   A patent claim is obvious when it does no more than combine familiar elements according to known methods to yield predictable results.  *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415-16 (2007); *see also Wm. Wrigley Jr. Co. v. Cadbury Adams*, 683 F.3d 1356, 1362-63 (Fed. Cir. 2012) (affirming summary judgment of invalidity for obviousness); *Tyco Healthcare Group LP v. Mutual Pharm. Co., Inc.*, 642 F.3d 1370, 1377 (Fed. Cir. 2011) (same); *Tokai*, 632 F.3d at 1366 (same).

      1.     **Claim 1 of the '188 patent is obvious in view of the combination of Boulton with Yocum and Smit.**

The '188 patent, like the '889 patent, is directed to the known five-step pyruvate-to-isobutanol pathway discussed above.  Although claim 1 of the '188 patent is limited to recombinant microorganisms in which each of steps "a)" through "d)" of the pathway are recombinantly expressed, it is still obvious.  As discussed above, Boulton indisputably disclosed the precise five-step pathway recited by the claim.  (*See* Section IV.B, *supra*.)  Additional prior art, specifically the Yocum[21] and Smit[22] references, disclose recombinant microorganisms in which parts "a)" through "c)" and "d)" of the "a)"through "d)" pathway were overexpressed, respectively.  There is nothing nonobvious about combining the teachings of Yocum and Smit in view of the large body of prior art describing the enzymes and catalytic conversions of these natural pathway steps and the clear motivation to combine them to achieve the microbial host of claim 1 of the '188 patent.  (*See* Steph. ¶¶ 84-91.)

The combination of Yocum and Smit with Boulton teaches all elements of claim 1 of the '188 patent.  Steps "a)"-"c)" of the claims of the '188 patent involve the creation of the intermediate molecule α-ketoisovalerate from pyruvate.  As the '188 patent acknowledges, this intermediate has long been known to be shared by the natural valine biosynthetic and catabolic pathways of yeast.  ('188 patent, 12:19-38.)  Yocum expressly discloses the recombinant expression of the enzymes that convert pyruvate to α-ketoisovalerate in claimed steps "a)"-"c)" and teaches that a metabolic product made from the overexpressed α-ketoisovalerate can be increased by increasing the availability of α-ketoisovalerate using the disclosed recombinant

---

[21] GA Ex. 21 (Yocum *et al.*, 2004, U.S. Patent Application Publication No. 2004/0146996 ("Yocum")).

[22] GA Ex. 20 (Smit, 2004, Ph.D. Thesis, Wageningen Universiteit (Wageningen, The Netherlands), *Formation of Amino Acid Derived Cheese Flavour Compounds*, orally defended on April 23, 2004, cataloged into the U.S.D.A. Nat'l Agric. Library system on October 3, 2004 ("Smit")).

enzymes.  (GA Ex. 21 (Yocum) at Fig. 1, ¶ [0040]; *see also* Steph. ¶¶ 95-96.)  Smit discloses the recombinant expression of the enzyme responsible for step "d)" of the claimed pathway—the conversion of α-ketoisovalerate to isobutyraldehyde.  (GA Ex. 20 (Smit) at 80-81, 86-87; *see* Steph. ¶¶ 97-99.)  Smit teaches that recombinant expression of the claimed branched-chain α-ketoacid decarboxylase impacts the production of isobutyraldehyde.  (*Id.*)  Thus, Yocum and Smit disclose the claimed "recombinant microbial host cell" by teaching the recombinant expression of heterologous DNA molecules encoding enzymes catalyzing steps "a)"-"d)" of the recited pathway (Steph. ¶ 100):

| Gene Name | Enzyme Name | Reaction Catalyzed | EC Number | '188 Claim Step | Expressed By |
|---|---|---|---|---|---|
| *IlvBN, AlsS, ILV2* | Acetolactate Synthase | pyruvate to acetolactate | 2.2.1.6 | "1 a)" | Yocum |
| *IlvC, ILV5* | Acetohydroxy Acid Isomeroreductase | acetolactate to 2,3-dihydroxyisovalerate | 1.1.1.86 | "1 b)" | Yocum |
| *IlvD, ILV3* | Acetohydroxy Acid Dehydratase | 2,3-dihydroxyisovalerate to α-ketoisovalerate | 4.2.1.9 | "1 c)" | Yocum |
| *kdcA, BCKAD* | Branched-Chain α-ketoacid Decarboxylase | α-ketoisovalerate to isobutyraldehyde | 4.1.1.72 | "1 d)" | Smit |

As discussed above, numerous prior art references, including Boulton, expressly disclose the four enzymes (i.e., polypeptides) that catalyze the substrate to product conversions of the four-step metabolic pathway recited in claim 1.  (*See also* Steph. ¶¶ 26-42, 59, 92-94.)  In the context of known metabolic pathways, a common strategy for increasing flux through a desired pathway is to simply overexpress the genes responsible for conversion steps in that pathway. (Steph. ¶¶ 78, 88-91.)  This results in an effective increase in the use of the pathway, much as adding lanes to an existing roadway will allow for increased traffic.  Indeed, this method would have been immediately obvious to one of ordinary skill in the art considering the known

existence of the production of isobutanol through the combined valine biosynthetic and catabolic pathways and the routine nature of recombinant technologies. ('188 patent, 12:19-22, 13:44-48.) The motive to combine Yocum and Smit with Boulton was apparent to one of ordinary skill in the art from the predictable and expected success achievable from their combined disclosures. One of ordinary skill in the art would have been motivated to utilize the references of Yocum and Smit because: (1) they both involve the field of metabolic engineering and the fermentation arts; (2) they both address the problem of understanding and altering the operation of metabolic pathways; (3) isobutanol was well-known as a product of pyruvate metabolism and it was known that increasing the concentration of pathway intermediates increased isobutanol production; and (4) the predictable successes in producing end-products through metabolic engineering would have caused there to be an expectation of success for the production of isobutanol. (*See* Steph. ¶¶ 84-105.)

As discussed above, Butamax does not dispute that the techniques for recombinant engineering in yeast were routine in 2005. Nor does Butamax dispute that the existing pathway from pyruvate to α-KIV and from α-KIV to isobutanol were known. (*See supra* Section IV.C.) One of ordinary skill would still have recognized that recombinantly expressing the known enzymes of the known pathway from pyruvate to isobutanol through the shared α-ketoisovalerate intermediate would have been an obvious way to produce isobutanol in yeast. (Steph. ¶¶ 76-78, 86-91). The '188 patent concedes that the invention is a combination of known elements: "this pathway ***combines*** enzymes known to be involved in well-characterized pathways for valine biosynthesis (pyruvate to α-ketoisovalerate) and valine catabolism (α-ketoisovalerate to isobutanol)." ('188 patent, 12:19-22.) With the benefit of the prior art (not considered by the PTO) that had already combined these enzymes, claim 1 is obvious. No reasonable jury could

conclude otherwise.  *See Tokai*, 632 F.3d at 1367 (affirming summary judgment of obviousness where key pieces of prior art were not considered by the PTO during examination of the asserted patents").

**2.     Dependent claims of the '188 patent are invalid for obviousness.**

**a.     Claims 2-4, 13, 17, 24-25, and 34 of the '188 patent are obvious.**

Asserted dependent claims 2-4, 13-15, 17-25, and 34-36 add trivial limitations to the obvious recombinant cell of the '188 patent.  These dependent claims merely add further limitations regarding the host microorganism in which the recited pathway enzymes are recombinantly expressed.  They are all obvious because the microorganisms recited are expressly disclosed in the prior art.  Claims 2, 3, and 13 recite a variety of hosts including the yeast *S. cerevisiae*, which is expressly disclosed as a suitable host by the Yocum reference.  (GA Ex. 21 (Yocum), at [0075]-[0077]; *see also* Steph. ¶¶ 107-109.)  Claim 17 recites that the host be a "facultative anaerobe," an inherent property of the *S. cerevisiae* yeast disclosed in Yocum.  (Steph. ¶ 110; GA Ex. 39 (Klibanov), ¶ 97.)  Claims 24 and 34 mirror the added microorganism limitations of claims 3 and 13 and are obvious for the same reasons.  (Steph. ¶¶ 114-15.)  The only difference is that claims 24 and 34 limit the method of claim 18, which is directed to using the microbes of claim 1, which itself is obvious as discussed below.  Finally, claims 4 and 25 limit the microbe and method of claims 1 and 18 to the bacteria *E. coli*.  It is not disputed that *E. coli* is one of the most common model organism[s] used in biology and, regardless, the prior art expressly discloses the use of *E. coli* for metabolic engineering of microbes for the production of desired metabolites.  (GA Ex. 21 (Yocum) at [0076]-[0077]; GA Ex. 22 (Yocum *et al.*, 2001, WO 01/21772 A2) at 21:12-14; *see also* Steph. ¶ 118.)  Thus, Yocum and Smit render each of claims 2-4, 13, 17, 24-25, and 34 obvious.

**b.      Claims 14-15 of the '188 patent are obvious.**

Claims 14 and 15 limit claim 1 by reciting certain amino acid sequences for the acetolactate synthase (ALS) and acetohydroxy acid isomeroreductase (AAIR) enzymes recombinantly expressed in the microbe of claim 1.  Butamax does not dispute that the prior art discloses amino acid sequences for the claimed ALS and AAIR enzymes.  (*See* GA Ex. 23 (Renna, *et al.* 1993, *J. Bacteriology* 175: 3863-3875) at 3863, 3870-71; GA Ex. 24 (Presecan *et al.*, 1997, *Microbiology* 143: 3313-3328 (Accession No. Z93767)); GA Ex. 25 (Petersen, *et al.*, 1986, *Nuc. Acids Res.* 14: 9631-9651) at 9631, 9636-37.)  The '188 patent acknowledges the ALS and AAIR enzymes which perform steps "a)" and "b)" of the claimed pathway, respectively, were known prior to 2005 as part of the "well-characterized" pathway in yeast which leads to the creation of the intermediate α-KIV.  ('188 patent, 12:19-38.)  Simply using the prior art amino acid of claims 14 and 15 for their known and recognized catalytic function would have been obvious.  (*See* Steph. ¶¶ 119-20.)

**c.      Claims 18-23, and 35 of the '188 Patent are obvious.**

Claim 18 recites a method for using the obvious microbe of claim 1 for its intended purpose, production of isobutanol, by culturing it under fermentation conditions with a fermentable carbon substrate.  Claim 18 is obvious because fermentation of microbes overexpressing enzymes from the claimed isobutanol pathway is expressly disclosed by the Yocum reference.  (GA Ex. 21 (Yocum) at [0082]-[0099]; *see also* Steph. ¶¶ 111-12.)

Claims 19-23 limit the method of claim 18 by specifying that the fermentable carbon substrate be a type of saccharide (claims 19-20), by specifying the level of oxygenation of the culture media (claims 21-22), or by specifying that the culture media be "minimal" (claim 23).  All of these claims deal with trivial variations to the conditions under which the claimed microbes are cultured.  The prior art expressly recites these added limitations.  (*See* GA Ex. 21

26

(Yocum) at [0005], [0023], [0102] (claims 19-20); GA Ex. 26 (Laffend *et al.*, U.S. Patent No. 5,686,276) at 9:54-56 (claims 21-22); GA Ex. 27 (Nakamura *et al.*, U.S. Patent No. 6,013,494) at 27:55-60, Col. 28 (Table 3) (claim 23); *see also* Steph. ¶¶ 113, 121-22.)  Since one of skill in the art would have known of these trivial aspects of the culture media, claims 19-23 are obvious.

Claim 35 adds the trivial limitation of claiming the fermentation medium of claim 18 which contains isobutanol as a composition.  Given that the purpose of the obvious method of claim 18 is to generate the isobutanol containing medium of claim 35, this claim is likewise obvious.  (*See* Steph. ¶ 116.)

### d.    Claim 36 of the '188 patent is obvious.

Claim 36 limits claim 1 by requiring that the microbe be recombinantly modified to include the alcohol dehydrogenase (ADH) enzyme responsible for step "e)" of the recited five-step pathway.  As discussed above, the role of ADH in the production of isobutanol in natural yeast is not disputed.  Butamax also does not dispute that the prior art Larroy I reference expressly teaches the recombinant expression of an ADH gene in yeast.  (*See* GA Ex. 28 (Larroy *et al.*, 2002, *Biochem. J.*, 361: 162-172 ("Larroy I")) at 171.)  Nor does Butamax dispute that Larroy I shows the ADH-catalyzed conversion of isobutyraldehyde to isobutanol in biochemical experiments.  (GA Ex. (Larroy I) at 186.)  It would therefore have been obvious to combine the teachings of Larroy I with knowledge of existing isobutanol pathways and the admittedly well-characterized ADH enzyme to arrive at claim 36.  (*See, e.g.*, GA Ex. 29 (Larroy II) at 231, 236-37; Steph. ¶¶ 123-26.)

### 3.    All claims of the '889 Patent are invalid for obviousness.

### a.    Claim 1 of the '889 patent is obvious over Boulton.

As detailed above, Boulton expressly discloses the five steps of the claimed isobutanol biosynthetic pathway.  (*See supra* Section III.B.)  Boulton further teaches that recombinant

methods are routinely used for metabolic engineering in yeast in which natural pathways are modified through overexpression of pathway components.  (*See* GA Ex. 6 (Boulton) at 121, 232; Steph. ¶ 141.)  During prosecution neither Boulton nor any of the other pieces of art disclosing the claimed pathway were considered before the '889 patent issued.  However, the pathway disclosed in Boulton in combination with knowledge of one of ordinary skill in the art as of 2005 renders claim 1 obvious, because claim 1 represents the combination of known elements, with no change in their respective functions, which led to the predicted result.  *See KSR*, 550 U.S. at 415-16.  The '889 patent acknowledges this fact: "the person of skill in the art will be able to utilize publicly available sequences to construct the relevant pathways."  ('889 patent, 14:1-3.)  In light of (1) the pyruvate to isobutanol pathway disclosed in Boulton, (2) the fact that "[s]tandard recombinant DNA and molecular cloning techniques used [in the '889 patent] are well known in the art," (*id.* 11:7-8), and (3) the fact that "[m]ethods for gene expression in *Saccharomyces cerevisiae* are known in the art," (*id.* 20:7-8), no reasonable jury could dispute the obviousness of claim 1 of the '889 patent.

> **b.**     **Claims 1, 3-5, 9-11, and 14-19 of the '889 patent are obvious when combining Boulton with the anticipating references.**

As noted in the prior section, claim 1, the sole independent claim of the '889 patent, is obvious in view of Boulton, which teaches the pathway, the enzymes, and the use of recombinant technologies.  Likewise, Boulton in combination with Larroy II, Yocum, or Elischweski, which expressly describe the use of recombinant enzymes of the claimed pathway as set forth in Section VI.A.3-5, further renders claims 1, 3-5, 9-11, and 14-19 invalid for obviousness.  (*See* Steph. ¶¶ 141, 149, 152, 155, 167, 169, 171, 175, 179, 183, 184, 187.)

c.      **Dependent claims of the '889 patent are obvious when the anticipating references are combined with Boulton and other references.**

Larroy II, Yocum, and Elischweski expressly and/or inherently anticipate claim 1 of the '889 patent.  Certain dependent claims add trivial limitations that would have been obvious when Boulton and Larroy II, Yocum, and/or Elischweski are combined with other prior art addressed to the dependent claim limitations.  One of skill in the art would have been motivated to combine the pathway of Boulton and the recombinant yeast of Larroy II, Yocum, and/or Elischweski with the additional pieces of art as they are all directed towards metabolic engineering, biosynthesis, fermenting yeast, and/or technologies involved in the commercial production of alcohols.

(i)      **Claim 2 is obvious over Larroy II, Yocum, or Elischweski in combination with Laffend.**

Claim 2 limits claim 1 by requiring that the recited fermentation "is performed under anaerobic or microaerobic conditions."  ('889 patent, claim 2; Steph.¶ 142.)  Laffend,[23] published in 1997, taught that fermentation "reactions may be performed under aerobic or anaerobic conditions where anaerobic or microaerobic conditions are preferred."  (GA Ex. 26 (Laffend) at 9:54-56; Steph. ¶ 142.)  It would have been obvious to one of ordinary skill in the art to combine the anaerobic or microaerobic fermentation conditions of Laffend for cultivating the recombinant yeast disclosed in Larroy II, Yocum, or Elischweski.  (*Id.*)  One would have been motivated to combine these references because they are in the same field of art (metabolic engineering) as the '889 patent and address the same problem—the production of biosynthetic compounds.  (*Id.*)  Additionally, one would have expected to be able to successfully perform fermentations under anaerobic or microaerobic conditions.  (*Id.*)  Thus, claim 2 is invalid because Laffend in combination with Larroy II, Yocum, or Elischweski renders it obvious.  (*Id.*)

---

[23] GA Ex. 26 (Laffend *et al.*, U.S. Patent No. 5,686,276 ("Laffend")).

        **(ii)**     **Claims 6 and 7 are obvious over Larroy II, Yocum, or Elischweski in combination with Card and Cockrem.**

Claims 6 and 7 limit claim 1 by requiring that the fermentation media comprise water and isobutanol in the form of a "heterogeneous azeotrope" (claim 6) or that the isobutanol of claim 6 be recovered by "distillation and decantation" (claim 7). ('889 patent, claims 6, 7; Steph. ¶ 156.) Card[24] discloses methods for separation of alcohol-water mixtures and that butanol and water form an azeotrope. Cockrem[25] discloses that various alcohols form heterogeneous azeotropes with water. (Steph. ¶ 156.) The fact that isobutanol and water form a heterogeneous azeotrope was known in the art by 2005, as shown by Card and Cockrem. (GA Ex. 32 (Card) at 2, 4; GA Ex. 33 (Cockrem) at Table 1; Steph. ¶ 157.) Card teaches that "variations on simple distillation are employed to effect separation" of water-alcohol azeotropes. (GA Ex. 32 (Card) at 2; Steph. ¶ 158.) One skilled in the art would have been motivated to combine Card and Cockrem with Larroy II, Yocum, or Elischweski because Card indicates that butanols form an azeotrope with water and that azeotropic distillation can be used to exploit this feature for separation. (Steph. ¶ 159.) The '889 patent purports to teach methods for the commercial production of isobutanol, which would require recovering it from the fermentation media by unit operations such as the distillation and decanting method taught by Card. (*Id.*) Accordingly, it would have been obvious to combine Card and Cockrem with Larroy II, Yocum, or Elischweski to achieve the limitations of claims 6 and 7.

---

[24] GA Ex. 32 (Card *et al.*, 1982, *Separation of Alcohol-Water Mixtures Using Salts*, in Technical Reports of Oak Ridge National Laboratory, Chemical Technology Division, Contract No. W-7405-eng-26 ("Card")).

[25] GA Ex. 33 (Cockrem *et al.*, 1993, U.S. Patent No. 5,210,296 ("Cockrem")).

### (iii)     Claim 12 is obvious over Larroy II, Yocum, or Elischweski in combination with Cheng.

Claim 12 limits claim 1 by requiring that the recombinant yeast microorganism of claim 1 further comprises "inactivated genes thereby reducing yield loss from competing pathways for carbon flow." The prior art Cheng[26] reference teaches this exact limitation: "It may be necessary to reduce or eliminate the expression of certain genes in the target pathway or in competing pathways that may serve as competing sinks for energy or carbon." (GA Ex. 34 (Cheng) at 21:59-62.) Cheng teaches a variety of methods for accomplishing this, including by performing "gene disruption and similar techniques" such as by selecting genes to be "upregulated or down regulated." (*Id.* at 21:38-43, 21:63-22:6; Steph. ¶ 174.) It was obvious to combine this teaching from Cheng with Larroy II, Yocum, or Elischweski to create recombinant yeast with the inactivated genes contemplated by claim 12. (Steph. ¶ 175.) The motivation to combine the references with Cheng is found in the fact that they are in the same field (metabolic engineering) and address the same problem (enhanced production of biosynthetic compounds). (*Id.*)

### C.     Claim 8 of The '889 Patent Is Invalid for Indefiniteness.

Claim 8 of the '889 patent depends from and further limits claim 1 by requiring that the microorganism produce isobutanol as a "single product." This "single product" limitation is indefinite. A patent claim is invalid for indefiniteness if it fails to "point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." *See* 35 U.S.C. § 112; *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Indefiniteness is a question of law. *See, e.g.*, *Intermec Techs. Corp. v. Palm Inc.*, 738 F. Supp. 2d 522, 545 (D. Del. 2010) (granting summary judgment of invalidity for indefiniteness), *aff'd*, 466 F. App'x 881 (Fed. Cir. 2012). The purpose of the definiteness requirement is to "inform

---

[26] GA Ex. 34 (Cheng *et al.*, 2003, U.S. Patent No. 6,660,507 ("Cheng")).

the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Id.*

There is no definition for the phrase "single product" in the '889 patent. Nor are there any guidelines or examples to indicate to one of skill in the art a reasonable measure of the scope of what would (or would not) comprise a yeast microorganism that produces isobutanol as a "single product." One option would be for the recombinant yeast to produce isobutanol and no other fermentation products. One of skill in the art, however, would recognize that an organism that produces literally nothing besides isobutanol from its fermentation would be highly unlikely because the microorganism would still produce other fermentation by-products, including, for example, significant volumes of carbon dioxide ($CO_2$). (Steph. ¶ 188.) The question then becomes how much non-isobutanol fermentation product does a microorganism need to produce in order for the isobutanol production to no longer be considered a "single product" of the microorganism? The patent's failure to give any guidance on this measure renders the "single product" requirement insolubly ambiguous and, consequently, invalid because it is "completely dependent on a person's subjective opinion." *Datamize,* 417 F.3d at 1350.

Butamax's proposed claim construction does not resolve the indefiniteness of claim 8. "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251. Butamax proposes that the phrase "produces isobutanol as a single product" be interpreted as "produces isobutanol without substantial amounts of other fermentation products." (*See* D.I. 535 (Gevo Answering Claim Construction Br.) at 29.) This

construction does not clarify the scope of claim 8, but rather demonstrates the ambiguity of the recited "single product" as it merely seeks to replace it with the vague phrase "without substantial amounts of other fermentation products." However, like the lack of any description of "single product," there is nothing in the patent specification that would allow one of ordinary skill in the art to evaluate whether there are "substantial" or "insubstantial" amounts of other fermentation products. *Id.* In fact, even Butamax's own expert stated that he "would not be able to answer" the question of "[w]hat percentage of other fermentation products could be produced along with isobutanol and still infringe claim 8 under Butamax's proposed construction." (GA Ex. 41 (Mikulka Dep.) at 132:3-133:19.) Because claim 8 and the specification fail to set forth a basis for gauging whether the isobutanol that is produced is a "single product," those of ordinary skill in the art are unable to translate claim 8 into meaningfully precise claim scope, and it is invalid for indefiniteness.

**D.    Claims 8, 12, and 13 of the '889 Patent are Invalid for Lack of Written Description and Lack of Enablement.**

There is no written description or enablement support for dependent claims 8, 12, and 13 in the specification of the '889 patent. The written description requirement of 35 U.S.C. § 112 is only satisfied if the specification "convey[s] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*) (reversing the denial of a motion for judgment as a matter of law of invalidity for lack of written description); *see also Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1344 (Fed. Cir. 2011) (reversing the denial of a motion for judgment as a matter of law of invalidity for lack of written description), *cert. denied,* 132 S.Ct. 1542 (2012). While "[t]he term 'possession' . . . has never been very enlightening . . . the test requires an objective inquiry into the four corners of the specification

from the perspective of one of ordinary skill in the art." *Ariad Pharm.*, 598 F.3d 1351.  Thus, a patent "can be held invalid for failure to meet the written description requirement based solely on the face of the patent specification." *Centocor*, 636 F.3d at 1347.

Whether the disclosure of a patent specification satisfies the enablement requirement of 35 U.S.C. § 112 is a question of law based on underlying facts.  *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007).  "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Alza Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).  To satisfy this requirement, patentees are "required to provide an adequate enabling disclosure in the specification; it cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification." *Id.* at 941. "[N]ovel aspects of the invention" must be enabled in the patent.  *Auto. Techs.*, 501 F.3d at 1283.

## 1.    The '889 patent lacks written description and enablement of the "single product" limitation recited in claim 8.

The patent's only mention of the "single product" is a statement in the "Background of the Invention" that merely asserts "[t]here is a need . . . for an environmentally responsible, cost-effective process for the production of isobutanol as a single product."  ('889 patent, 1:63-65.) This statement provides neither written description nor enablement of claim 8.

Butamax provides no evidence in the '889 patent that it was in possession of a method for producing isobutanol as a single product nor any description of how such a result would be achieved without undue experimentation.  In addition to the written description requirement, 35 U.S.C. § 112 also has an enablement requirement.  To satisfy this requirement, the specification must teach one of ordinary skill in the art how to make and use the invention without "undue experimentation." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997).

During prosecution, Butamax cited the aspirational statement that "[t]here is a need, therefore, for an environmentally responsible, cost-effective process for the production of isobutanol as a single product" as the sole support for claim 8.  (BJA 2095-2100.)  But this aspirational statement does not demonstrate to one of skill in the art that Butamax was in possession of a microorganism capable of producing isobutanol as a "single product" as of the filing date of the '889 patent.  *See Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 926-27 (Fed. Cir. 2004).  To the contrary, inspection of the examples set forth in the '889 patent by one of ordinary skill in the art would have led to the recognition that the '889 patent does not describe or enable anything other than the production of exceptionally low levels of isobutanol.  (Steph. ¶ 189.)  In fact, the highest yield obtained from the recombinantly engineered yeast of the '889 patent was a mere 0.6%.  ('889 patent, Table 9; Steph. ¶ 189.)  This indicates that several other products were being produced in large quantities by the yeast taught in the '889 patent.  (Steph. ¶ 189.)  Nor are there any additional teachings in the '889 patent that would allow one of skill in the art to achieve the production of isobutanol at anything above these exceptionally low yields without extensive experimentation.  (*Id.*)  Consequently, there is neither written description nor enablement of the production of isobutanol as a "single product" by the '889 patent.

### 2. There is no written description in the '889 patent for the "inactivated gene" requirements of claims 12 and 13.

Claim 12 depends from and recites the method of claim 1 for producing isobutanol, with the added limitation of inactivating genes to "reduce yield loss from competing pathways for carbon flow."  Claim 13 depends on Claim 12, and adds the limitation requiring the inactivation of genes that "reduce pyruvate decarboxylate activity" (PDC).  Butamax's '889 patent contains no description or examples of a recombinant yeast microorganism with inactivated genes to

35

reduce yield loss from competing pathways for carbon flow, let alone a recombinant yeast microorganism that accomplishes this through inactivating genes to reduce PDC activity. "[T]he lack of any disclosure of examples may be considered when determining whether the claimed invention is adequately described." *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011) (affirming summary judgment of invalidity for lack of written description); *see also Billups-Rothenberg, Inc. v. Associated Reg'l and Univ. Pathologists, Inc.*, 642 F.3d 1031, 1032 (Fed. Cir. 2011) (affirming summary judgment of invalidity for lack of written description); *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1126 (Fed. Cir. 2008) (same). The claims are therefore invalid for lack of written description.

Butamax attempts to refute the lack of written description claims 12 and 13 by identifying three portions of the '889 patent specification and relying on the knowledge of one of ordinary skill in the art. (*See, e.g.*, GA Ex. 39 (Klibanov Rebuttal Report) ¶ 219, *citing* '889 patent, 12:12-17; 16:55-59; 1:46-47.) But none of the portions of the specification Butamax relies on provides written description support for the specific limitations recited in these claims. (*See* Steph. ¶¶ 190-195.) Furthermore, Butamax's own, later-filed patent application that provided extensive disclosure for the purpose of supporting claims directed to the same subject matter as claims 12 and 13 further demonstrates the lack of written description in the '889 patent. (*See* Steph. ¶ 196.)

### a. The single aspirational statement in the '889 patent specification regarding "gene inactivation" is not written description of that claim element.

The sole mention in the '889 patent regarding the inactivation of genes for competing carbon flow pathways is a general statement of the desirability of achieving a microbial host with such properties. (*See* '889 patent, 16:55-57 ("[t]he microbial host also has to be manipulated in order to inactivate competing pathways for carbon flow by deleting various genes.").) But "[a]

36

'mere wish or plan' for obtaining the claimed invention is not adequate written description."
*Centocor*, 636 F.3d at 1348.  The patent does not identify any microbial host, any examples, any pathways, or any specific genes that could be inactivated in order to achieve this vague, aspirational reduction in yield loss by competing pathways of carbon flow.  (*See* Steph. ¶ 190.) Since the '889 patent states a mere desire of manipulating the host organism for inactivating competing pathways for carbon flow, this statement is not written description of the claims.  *See, e.g.*, *Billups-Rothenberg*, 642 F.3d at 1032 (holding that claims covering a genus of genetic mutations were invalid for lack of written description when the patent did not identify a single species within the genus).

> **b.    The '889 patent contains no specific disclosure of a recombinant microorganism with inactivated genes to reduce pyruvate decarboxylase (PDC) activity.**

There is no reference in the '889 patent to either the role of PDC in a competing pathway, or to inactivation of PDC genes, as specifically required by Claim 13.  None of the patent's examples describe methods for producing the microorganism of Claim 13.  Indeed, the Patent Office has similarly concluded that the '889 patent fails to teach the inactivation of PDC genes as recited in Claim 13.  During the prosecution of Gevo's own PDC patent application, the Examiner considered the '889 patent as potential prior art.  The Examiner concluded that the '889 patent "do[es] not teach the disruption of endogenous pyruvate decarboxylase genes."  (D.I. 155 (Grimm Decl.), Ex. C (Mar. 30, 2011 PTO Office Communication re App. Ser. No. 12/343,375), at 16).[27]

The patent only discusses substrate selectivity in connection with the "decarboxylase" enzyme catalyzing the conversion of step "d)" of the five step pathway.  The patent recognizes

---

[27] This conclusion has been repeated by the PTO.  (D.I. 155 (Grimm Decl.), Ex. D (April 1, 2011 PTO Office Communication re App. Ser. No. 12/820,505), at 16; *Id.*, Ex. E (Oct. 26, 2011 PTO Office Communication re App. Ser. No. 13/229,438), at 12.)

that "α-ketoisovalerate can be converted to isobutyraldehyde by a number of keto acid decarboxylases, such as for example pyruvate decarboxylase." ('889 patent, 12:12-15.)  But this is not related to gene inactivation.  Instead, it merely acknowledges that pyruvate decarboxylase is one of the "decarboxylase" enzymes that converts α-ketoisovalerate to isobutyraldehyde.  The patent also states that "[t]o prevent misdirection of pyruvate away from isobutanol production, a decarboxylase with decreased affinity for pyruvate is desired," ('889 patent, 12:15-15), and identifies the two known enzymes in the art from *Lactococcus lactis* that have a selective preference for α-ketoisovalerate over pyruvate ('889 patent, 12:17-22).  This statement therefore refers to the selection of keto acid decarboxylases with specific substrate selectivity for use as the "decarboxylase" recited in step "d)" of the claimed pathway.  It does not provide written description of the construction of a recombinant yeast microorganism with "inactivated genes" to reduce yield loss or PDC activity.  (*See* Steph. ¶¶ 193-94-99.)

> c.    **The Dickinson I reference does not provide written description for inactivating genes to reduce PDC activity.**

Finally, Butamax relies on the citation to Dickinson I[28] in the specification for the '889 patent as purported support for claims 12 and 13.  First, the Dickinson I paper was not incorporated by reference into the patent and cannot therefore be used as written description.  *See* 37 CFR 1.57(b)(1) (references are incorporated into patents only when the perfecting words "incorporated by reference" or similar language is used); *See also In re de Seversky*, 474 F.2d 671 (C.C.P.A. 1973).  Second, Dickinson I was cited in the "Background of The Invention" and distinguished for its use of exogenous L-valine to increase isobutanol production in yeast.  ('889 patent, 1:39-62.)  Third, Dickinson I only discusses the role of PDC in natural isobutanol production by yeast (i.e., as part of step "d)" of the claimed pathway) and it concludes that

---

[28] GA Ex. 35 (Dickinson *et al.*, *J. Biol. Chem.* 273(40): 25752-25756 (1998) ("Dickinson I")).

deleting PDC genes "virtually abolished [isobutanol] production." (*See* GA Ex. 35 (Dickinson I) at 25751.) Dickinson I does not disclose inactivating competing pathways to improve carbon flow, nor does it teach reducing PDC activity to achieve increased isobutanol. (*See* Steph. ¶ 192.)

> **d.   Butamax's subsequent patent applications prove there is no written description of inactivating genes to reduce PDC activity in the '889 patent.**

The lack of written description of claims 12 and 13 of the '889 patent is further demonstrated by Butamax's later filed patent application which sought claims to yeast microorganisms comprising PDC inactivation. (GA Ex. 36 (Donaldson *et al.*, U.S. Patent App. 2011/0303206 A1 (material not in the '889 specification highlighted for emphasis).) "The written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived." *Billups-Rothenberg*, 642 F.3d at 1036 (Fed. Cir. 2011). The later Butamax application is a "continuation-in-part" of the '188 and '889 patents and includes matter not disclosed in the original specification of the '889 patent.[29] The additional information stands in stark contrast to the '889 patent, as it provides extensive disclosure of the rationale for pathway inactivation, details of the pathways to be inactivated, and experiments for preparing a PDC-knockout yeast. (Steph. ¶ 196.) The lack of this information in the '889 patent demonstrates that those inventors did not possess the inventions of claims 12 and 13 in 2006.

## VII.   CONCLUSION

Based on the foregoing, all claims of the '889 and claims 1-4, 13-15, 17-25, and 34-36 of the '188 patents are invalid.

---

[29] "A continuation-in-part is an application . . . *adding matter not disclosed* in the said earlier nonprovisional application." MPEP 201.08.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
    *Attorneys for Gevo, Inc.*

OF COUNSEL:

James P. Brogan
Carolyn V. Juarez
COOLEY LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO  80021-8023
(720) 566-4000

Michelle S. Rhyu
Jesse Dyer
Daniel Knauss
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2055
(650) 843-5000

November 30, 2012

| US Patent No. 7,851,188 Claims: |
|---|
| 1. A recombinant microbial host cell comprising heterologous DNA molecules encoding polypeptides that catalyze substrate to product conversions for each step below:<br><br>i) pyruvate to acetolactate;<br><br>ii) acetolactate to 2,3-dihydroxyisovalerate;<br><br>iii) 2,3-dihydroxyisovalerate to a-ketoisovalerate; and<br><br>iv) a-ketoisovalerate to isobutyraldehyde;<br><br>wherein said microbial host cell produces isobutanol; and wherein<br><br>a) the polypeptide that catalyzes a substrate to product conversion of pyruvate to acetolactate is acetolactate synthase having the EC number 2.2.1.6;<br><br>b) the polypeptide that catalyzes a substrate to product conversion of acetolactate to 2,3-dihydroxyisovalerate is acetohydroxy acid isomeroreductase having the EC number 1.1.1.86;<br><br>c) the polypeptide that catalyzes a substrate to product conversion of 2,3 -dihydroxyisovalerate to a-ketoisovalcrate is acetohydroxy acid dehydratase having the EC number 4.2.1.9;<br><br>d) the polypeptide that catalyzes a substrate to product conversion of a-ketoisovalerate to isobutyraldehyde is branched-chain a-keto acid decarboxylase having the EC number 4.1.1.72. |
| 2. A host cell according to claim 1 wherein the cell is selected from the group consisting of: a bacterium, a cyanobacterium, a filamentous fungus and a yeast. |
| 3. A host cell according to claim 2 wherein the cell is a member of a genus selected from the group consisting of *Clostridium, Zymomonas, Escherichia, Salmonella, Rhodococcus, Pseudomonas, Bacillus, Lactobacillus, Enterococcus, Alcaligenes, Klebsiella, Paenibacillus, Arthrobacter, Corynebacterium, Brevibacterium, Pichia, Candida, Hansenula and Saccharomyces.* |
| 4. A host cell according to claim 3 wherein the cell is *Escherichia coli.* |
| 5. A host cell according to claim 3 wherein the cell is *Alcaligenes eutrophus.* |
| 6. A host cell according to claim 3 wherein the cell is *Bacillus licheniformis.* |
| 7. A host cell according to claim 3 wherein the cell is *Paenibacillus macerans.* |
| 8. A host cell according to claim 3 wherein the cell is *Rhodococcus erythropolis* |
| 9. A host cell according to claim 3 wherein the cell is *Pseudomonas putida.* |
| 10. A host cell according to claim 3 wherein the cell is *Bacillus subtilis.* |
| 11. A host cell according to claim 3 wherein the cell is *Lactobacillus plantarum.* |
| 12. A host cell according to claim 3 wherein the cell is selected from the group consisting of *Enterococcusfaecium, Enterococcus gallinarium, and Enterococcusfaecalis.* |

| US Patent No. 7,851,188 Claims: |
|---|
| 13. A host cell according to claim 3 wherein the cell is *Saccharomyces cerevisiae.* |
| 14. A host cell according to claim 1 wherein the acetolactate synthase has an amino acid sequence selected from the group consisting of SEQ ID NO:2, SEQ ID NO: 178, and SEQ ID NO:180. |
| 15. A host cell according to claim 1 wherein the acetohydroxy acid isomeroreductase has an amino acid sequence selected from the group consisting of SEQ ID NO:43, SEQ ID NO:181, SEQ ID NO:183, and SEQ ID  NO:185. |
| 16. A host cell according to claim 1 wherein the acetohydroxy acid dehydratase has an amino acid sequence selected from the group consisting of SEQ ID NO:6, SEQ ID NO: 186, SEQ ID NO:188, and SEQ ID NO:190. |
| 17. A host cell according to claim 1 wherein the host cell is a facultative anaerobe. |
| 18. A method for the production of isobutanol comprising: 1) providing a recombinant microbial host cell of claim 1; and 2) contacting the host cell of (i) with a fermentable carbon substrate in a fermentation medium under conditions whereby isobutanol is produced. |
| 19. A method according to claim 18 wherein the fermentable carbon substrate is selected from the group consisting of monosaccharides, oligosaccharides, and polysaccharides. |
| 20. A method according to claim 18 wherein the carbon substrate is selected from the group consisting of glucose, sucrose, and fructose. |
| 21. A method according to any of claim 18 wherein the conditions whereby isobutanol is produced are anaerobic. |
| 22. A method according to any of claim 18 wherein the conditions whereby isobutanol is produced are microaerobic |
| 23. A method according to claim 18 wherein the host cell is contacted with the carbon substrate in a minimal medium. |
| 24. A method according to claim 18 wherein the host cell is a member of a genus selected from the group consisting of *Clostridium, Zymomonas, Escherichia, Salmonella, Rhodococcus, Pseudomonas, Bacillus, Lactobacillus, Enterococ- cus, Alcaligenes, Klebsiella, Paenibacillus, Arthrobacter, Corynebacterium, Brevibacterium, Pichia, Candida, Hansenula* and *Saccharomyces.* |
| 25. A method according to claim 24 wherein the host cell is *Escherichia co/i.* |
| 26. A method according to claim 24 wherein the host cell is *Alcaligenes eutrophus.* |
| 27. A method according to claim 24 wherein the host cell is *Bacillus licheniformis* |
| 28. A method according to claim 24 wherein the host cell is *Paenibacillus macerans.* |

| US Patent No. 7,851,188 Claims: |
|---|
| 29. A method according to claim 24 wherein the host cell is *Rhodococcus erythropolis.* |
| 30. A method according to claim 24 wherein the host cell is *Pseudomonas putida.* |
| 31. A method according to claim 24 wherein the host cell is *Bacillus subtilis.* |
| 32. A method according to claim 24 wherein the host cell is *Lactobacillus plantarum* |
| 33. A method according to claim 24 wherein the host cell is selected from the group consisting of *Enterococcusfaecium, Enterococcus gallinarium,* and *Enterococcusfaecalis.* |
| 34. A method according to claim 24 wherein the host cell is *Saccharomyces cerevisiae.* |
| 35. An isobutanol containing fermentation medium produced by the method of claim **18.** |
| 36. The host cell of claim 1, wherein said host cell comprises at least one DNA molecule encoding a polypeptide that catalyzes conversion of isobutyraldehyde to isobutanol wherein said polypeptide is a branched-chain alcohol dehydrogenase having an EC number of 1.1.1.1, 1.1.1.2, or 1.1.1.265. |
| 37. A host cell according to claim **36,** wherein said polypeptide has an amino acid sequence selected from the group consisting of SEQ ID NO: 10, SEQ ID NO: 199, SEQ ID NO:201, SEQ ID NO:203, and SEQ ID NO:204. |

## US Patent No. 7,993,889 Claims:

1. A method for producing isobutanol comprising;

a. providing a fermentation media comprising carbon substrate; and

b. contacting said media with a recombinant yeast microorganism expressing an engineered isobutanol biosynthetic pathway wherein said pathway comprises the following substrate to product conversions;

   i. pyruvate to acetolactate (pathway step a);

   ii. acetolactate to 2,3-dihydroxyisovalerate (pathway

   step b);

   iii. 2,3-dihydroxyisovalerate to a-ketoisovalerate (pathway

   step c);

   iv. a-ketoisovalerate to isobutyraldehyde (pathway step d); and

   v. isobutyraldehyde to isobutanol (pathway step e);

and wherein

   a) the substrate to product conversion of step (i) is performed by an acetolactate synthase enzyme;

   b) the substrate to product conversion of step (ii) is performed by an acetohydroxy acid isomeroreductase enzyme;

   c) the substrate to product conversion of step (iii) is performed by an acetohydroxy acid dehydratase enzyme;

   d) the substrate to product conversion of step (iv) is performed by a decarboxylase enzyme; and

   e) the substrate to product conversion of step (v) is performed by an alcohol dehydrogenase enzyme;

whereby isobutanol is produced.

2. The method of claim 1, wherein contacting said media with a recombinant microorganism is performed under anaerobic or microaerobic conditions.

3. The method of claim 1, wherein contacting said media with a recombinant microorganism is performed as a batch fermentation.

4. The method of claim 1, wherein the contacting said media with a recombinant microorganism is performed as a continuous fermentation.

5. The method of claim 1, further comprising recovering the isobutanol from the fermentation media by distillation, liquid-liquid extraction, adsorption, decantation, pervaporation or combinations thereof.

6. The method of claim 1, wherein the fermentation media further comprises water and wherein said isobutanol and water form a heterogeneous azeotrope.

7. The method of claim 6, further comprising recovering the isobutanol from the azeotrope by distillation and decantation.

| US Patent No. 7,993,889 Claims: |
|---|
| 8. The method of claim 1, wherein the microorganism produces isobutanol as a single product. |
| 9. The method of claim 1, wherein the fermentation media further comprises mixtures of carbon substrates. |
| 10. The method of claim 1, wherein the fermentation media further comprises unpurified carbon substrates. |
| 11. The method of claim 1, wherein the contacting said media with a recombinant microorganism is performed at a temperature range of about 25° C. to about 40° C. |
| 12. The recombinant yeast microorganism of claim 1 wherein the said microorganism further comprises inactivated genes thereby reducing yield loss from competing pathways for carbon flow. |
| 13. The recombinant yeast microorganism of claim 12, wherein said inactivated genes reduce pyruvate decarboxylase activity. |
| 14. The method of claim 1, wherein one or more enzymes of said engineered isobutanol biosynthetic pathway uses NADH as an electron donor. |
| 15. The method of claim 1, wherein said alcohol dehydrogenase enzyme of step (e) is a native enzyme to the yeast microorganism. |
| 16. The method of claim 1, wherein steps (i)-(v) are performed by separate and distinct enzymes. |
| 17. The method of claim 1, wherein said isobutanol is produced in the fermentation media. |
| 18. The method of claim 17, wherein said isobutanol is produced in one or more of the following growth phases, high growth log phase, moderate through static lag phase, stationary phase, steady state growth phase, and combinations thereof. |
| 19. The method of claim 17, wherein the recombinant yeast microorganism is a whole cell catalyst subjected to conditions for isobutanol production. |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 30, 2012, upon the following in the manner indicated:

Richard L. Horwitz, Esquire                              *VIA ELECTRONIC MAIL*
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Butamax™ Advanced*
*Biofuels LLC*

Richard A. De Sevo, Esquire                              *VIA ELECTRONIC MAIL*
Hank Heckel, Esquire
Abigail Langsam, Esquire
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
*Attorneys for Butamax™ Advanced*
*Biofuels LLC*

Daniel Forchheimer, Esquire                              *VIA ELECTRONIC MAIL*
Leora Ben-Ami, Esquire
Thomas F. Fleming, Esquire
Christopher T. Jagoe, Esquire
Patricia A. Carson, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Butamax™ Advanced*
*Biofuels LLC*

William Cory Spence, Esquire                                    *VIA ELECTRONIC MAIL*
Kɪʀᴋʟᴀɴᴅ & Eʟʟɪs LLP
300 North LaSalle
Chicago, IL  60654
*Attorneys for Butamax™ Advanced*
*Biofuels LLC*

*/s/ Jeremy A. Tigan*
Jeremy A. Tigan (#5239)