IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUTAMAX(TM) ADVANCED BIOFUELS LLC, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | C.A. No.  11-54-SLR |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GEVO, INC., | ) ) | **PUBLIC VERSION** |
| Defendant/Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Counterclaim Defendant. | ) | |

## BUTAMAX AND DUPONT'S OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THE '375 AND '376 PATENTS

OF COUNSEL:

Leora Ben-Ami
Thomas F. Fleming
Christopher T. Jagoe
Daniel Forchheimer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Tel:  (212) 446-4800

*Attorneys for Plaintiff/Counterclaim Defendant Butamax$^{TM}$ Advanced Biofuels LLC*

Dated:  November 30, 2012
PUBLIC VERSION
Dated:  December 12, 2012
1086324 / 36429

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Plaintiff/Counterclaim Defendant Butamax$^{TM}$ Advanced Biofuels LLC and Counterclaim Defendant E. I. du Pont de Nemours and Company*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ...................................................2

SUMMARY JUDGMENT OF INVALIDITY OF THE '375 PATENT.......................3

I.  SUMMARY OF THE ARGUMENT ..........................................................3

II.  STATEMENT OF UNDISPUTED FACTS...................................................5

    A.  The '375 Patent ...............................................................................5

    B.  Pertinent Claim Constructions ......................................................6

    C.  Pertinent Prosecution History of the '375 Patent..........................7

III.  ARGUMENT..............................................................................................10

    A.  The Claims of the '375 Patent Are Invalid for Lack of Written Description .......................................................................10

        1.  The '375 Patent Does Not Adequately Describe the Claimed Yields ...........................................................11

        2.  The '375 Patent Does Not Adequately Describe or Enable the High Yields Claimed .................................14

        3.  Under Gevo's Construction, a "KARI" Lacks Written Description .................................................................18

    B.  Adopting Gevo's Proffered Constructions, the Claims of the '375 Patent Are Indefinite...............................................................19

SUMMARY JUDGMENT OF INVALIDITY OF THE '376 PATENT.....................20

I.  SUMMARY OF THE ARGUMENT ........................................................20

II.  STATEMENT OF UNDISPUTED FACTS.................................................21

    A.  The '376 Patent ...............................................................................21

    B.  Recombinant DNA Technology and the Subject Matter of the '376 Patent ......................................................................................22

III.  ARGUMENT..............................................................................................25

    A.  The Asserted Claims of the '376 Patent are Anticipated by Int'l Pat. Pub. No. WO 2011/103300 ("the Butamax '300 Publication").........25

    B.  The '376 Patent is Not Entitled to an Earlier Filing Date........................27

    C.  The '376 Patent is Invalid under 35 U.S.C. § 112 for Failure to Satisfy the Written Description and Enablement Requirement ...............33

CONCLUSION..........................................................................................................39

i

## TABLE OF AUTHORITIES

CASES

**Pages**

*Advanced Display Sys. v. Kent State Univ.,*
   212 F.3d 1272 (Fed. Cir. 2000)................................................................26

*AK Steel Corp. v. Sollac and Ugine,*
   344 F.3d 1234 (Fed. Cir. 2003).............................................................37

*Amgen, Inc. v. Chugai Pharm. Co.,*
   927 F.2d 1200 (Fed. Cir. 1991) ............................................................34

*Ariad Pharm., Inc. v. Eli Lilly and Co.,*
   598 F.3d 1336 (Fed. Cir. 2010)................................................*passim*

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,*
   796 F.2d 443 (Fed. Cir. 1986)...............................................................27

*Benckiser v. Procter & Gamble Co.,*
   No. 2011-012650, 2012 WL 1071549 (B.P.A.I. March 28, 2012) ........................16

*Boston Sci. Corp. v. Johnson & Johnson,*
   647 F.3d 1353 (Fed. Cir. 2011)..............................................................38

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,*
   246 F.3d 1368 (Fed. Cir. 2001) ............................................................27

*Brown v. Barbacid,*
   276 F.3d 1327 (Fed. Cir. 2002)..............................................................32

*Burroughs Wellcome Co. v. Barr Labs., Inc.,*
   40 F.3d 1223 (Fed. Cir. 1994)...............................................................32

*Callaway Golf Co. v. Acushnet Co.,*
   576 F.3d 1331 (Fed. Cir. 2009)..............................................................26

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,*
   541 F.3d 1115 (Fed. Cir. 2008) ........................................................10, 15

*Chiron Corp. v. Genentech, Inc.,*
   363 F.3d 1247 (Fed. Cir. 2004)..........................................................28, 31

*Cooper v. Goldfarb,*
   154 F.3d 1321 (Fed. Cir. 1998)..............................................................31

*Ecolochem, Inc. v. Southern California Edison Co.,*
   227 F.3d 1361 (Fed. Cir. 2000)..............................................................27

*Eiselstein v. Frank,*
    52 F.3d 1035 (Fed. Cir. 1995)......................................................................16

*Fiers v. Revel,*
    984 F.2d 1164 (Fed. Cir. 1993)........................................................10, 13, 15

*Genentech, Inc. v. Novo Nordisk, A/S,*
    108 F.3d 1361 (Fed. Cir. 1997).....................................................................16

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003).....................................................................20

*Gentry Gallery, Inc v. Berkline Corp.,*
    134 F.3d 1473 (Fed. Cir. 1998).....................................................................10

*In re Buchner,*
    929 F.2d 660 (Fed. Cir. 1991).......................................................................29

*In re Costello,*
    717 F.2d 1346 (Fed. Cir. 1983).....................................................................31

*In re Fisher,*
    427 F.2d 833 (C.C.P.A. 1970) ......................................................................18

*In re Omeprazole Patent Litig. v. Apotex Corp.,*
    536 F.3d 1361 (Fed. Cir. 2008).....................................................................33

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988)..........................................................16, 17, 34

*In re Wertheim,*
    541 F.2d 257 (C.C.P.A. 1976) ......................................................................16

*Lockwood v. American Airlines, Inc.,*
    107 F.3d 1565 (Fed. Cir. 1997).............................................................13, 28

*Magsil Corp. v. Hitachi,*
    687 F.3d 1377 (Fed. Cir. 2012).....................................................................18

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
    579 F.3d 1363 (Fed. Cir. 2009).....................................................................34

*Monsanto Co. v. Syngenta Seeds, Inc.,*
    503 F.3d 1352 (Fed. Cir. 2007).....................................................................37

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
    243 F.3d 1316 (Fed. Cir. 2001).....................................................................31

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.,*
298 F.3d 1290, 1294 (Fed. Cir. 2002)................................................................31

*Novartis Corp. v. Ben Venue Labs., Inc.,*
271 F.3d 1043 (Fed. Cir. 2001)..........................................................................10

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
806 F.2d 1565 (Fed. Cir. 1986)..........................................................................19

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.,*
315 F.3d 1335 (Fed. Cir. 2003)..........................................................................37

*Poweroasis, Inc. v. T-Mobile USA, Inc.,*
522 F.3d 1299 (Fed. Cir. 2008)..........................................................................27

*Research Corp. Techs. v. Microsoft Corp.,*
627 F.3d 859 (Fed. Cir. 2010)............................................................................28

*Schering Corp. v. Geneva Pharms.,*
339 F.3d 1373 (Fed. Cir. 2003)......................................................................25, 27

*SmithKline Beecham Corp. v. Apotex Corp.,*
403 F.3d 1331 (Fed. Cir. 2005)..........................................................................25

*Star Scientific, Inc. v. RJ Reynolds Tobacco Co.,*
655 F.3d 1364 (Fed. Cir. 2011)..........................................................................31

*Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.,*
713 F. Supp. 2d 184 (W.D.N.Y. 2010).................................................................38

*Tech. Licensing Corp. v. Videotek, Inc.,*
545 F.3d 1316 (Fed. Cir. 2008)..........................................................................28

*Warner-Lambert Co. v. Teva Pharm. USA, Inc.,*
418 F.3d 1326 (Fed. Cir. 2005)..........................................................................16

**STATUTES**

35 U.S.C. § 102(e)(1)...........................................................................21, 25, 26

35 U.S.C. § 112...........................................................................................*passim*

35 U.S.C. § 119..................................................................................................25

35 U.S.C. § 119(e)(1)........................................................................................26

35 U.S.C. § 120..........................................................................................13, 28

iv

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ...................................................................................................................10

Plaintiff/Counterclaim Defendant Butamax™ Advanced Biofuels LLP and Counterclaim Defendant E. I. du Pont de Nemours and Company (collectively "Butamax") move for summary judgment of invalidity of Gevo's U.S. Patent Nos. 8,017,375 ("the '375 patent") and 8,017,376 ("the '376 patent").

### PRELIMINARY STATEMENT

As the pioneer in this nascent industry, Butamax developed foundational technology directed to the production of high levels of bioisobutanol in recombinant yeast microorganisms and the recovery of said isobutanol, technology that is embodied by Butamax's pioneering U.S. Patent Nos. 7,851,188 ("the '188 patent") and 7,993,889 ("the '889 patent") (collectively "Donaldson"). Upon learning of Gevo's infringement of these patents, Butamax promptly filed suit. Soon thereafter, Gevo's '375 and '376 patents issued and Gevo prematurely accused Butamax of infringing those patents, allegations that Gevo has come to realize have no merit. Aside from not being infringed, Gevo's patents suffer from fatal invalidity problems which are ripe for summary judgment, as presented in this brief.

With respect to the '375 patent, Gevo finds itself in a predicament because that patent essentially mimics, and is therefore rendered obvious and/or anticipated by the earlier-issued Donaldson '188 patent. To attempt to overcome that conclusion, Gevo argues here, as it did to the Patent Office, that its claimed isobutanol and ethanol yield levels are novel and unexpected when compared to the prior art. But of course, to make such an argument, Gevo would have to also show that these purported yields are adequately supported and enabled by the patent disclosure. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████. In a further attempt to encompass technology that it did not

invent, Gevo propounds constructions of claim terms that, if accepted, would circumvent explicit rejections by the Patent Office and render the '375 patent's claims incomprehensible.

Gevo is also in a predicament with respect to the '376 patent. In order for the '376 patent to issue, Gevo amended its claims to require a recombinant yeast microorganism that recombinantly overexpresses polynucleotides for both DHAD enzyme and Aft proteins, which increases DHAD activity. However, the provisional application upon which Gevo relies for priority did not disclose or support this later-claimed invention, meaning that the asserted claims of the '376 patent are anticipated by a Butamax patent application filed before the Gevo application that issued as the '376 patent. Nor does the '376 patent specification teach and describe the as-issued '376 patent claims. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. And although the '376 patent claims require increased DHAD activity as a result of AFT gene overexpression, the '376 patent fails to teach what levels of AFT overexpression give increased DHAD activity without killing the cells.

For all of these reasons, Butamax moves for summary judgment of invalidity of asserted claims 1–3 and 5–7 of the '375 patent and asserted claims 1–9, 14 and 18–20 of the '376 patent.[1]

## NATURE AND STAGE OF THE PROCEEDINGS

Butamax filed this action on January 14, 2011, alleging that Gevo infringes U.S. Patent No. 7,851,188 (D.I. 1), later amending its complaint to allege infringement of U.S. Patent No. 7,993,889 on August 11, 2011. (D.I. 41). On September 13, 2011, Gevo answered the amended complaint and asserted, as counterclaims, that Butamax and DuPont infringe the '375 and '376

---

[1]  Butamax moves for summary judgment of these claims based on current information and belief concerning the claims Gevo asserts. However, the same rationale would apply to invalidating all other dependent claims of the '375 and '376 patents, which depend from claim 1 of the respective patents.

patents. (D.I. 52). The parties have completed fact and expert discovery, as well as claim construction briefing. The hearing on claim construction and summary judgment is scheduled for January 18, 2013. Trial on Butamax's affirmative claims is scheduled to begin on April 1, 2013, and trial on Gevo's counterclaims has not been assigned a start date.

<u>SUMMARY JUDGMENT OF INVALIDITY OF THE '375 PATENT</u>

I.    **SUMMARY OF THE ARGUMENT**

It is a fundamental tenet of the patent laws that in exchange for the limited right to exclude afforded by a patent, the inventor must disclose sufficient information to (a) show that the inventor actually invented what he claims to have invented and (b) enable a person skilled in the relevant art to practice or replicate the claimed invention.  The '375 inventors were awarded the right to exclude, but failed to live up to their end of the bargain.

Gevo obtained its '375 patent by arguing that what it claimed to create advanced the art by establishing a means of obtaining higher yields of isobutanol through metabolic engineering, specifically calling its purported invention an advance over the issued Donaldson '188 patent, also in-suit here.  Indeed, the '375 patent bears the title "Yeast Organism Producing Isobutanol at a High Yield."  As Gevo's expert Dr. Voigt described, "[t]he '375 patent relates to recombinant yeast microorganisms that produce isobutanol at a ***substantially higher yield than the levels produced by*** natural yeast metabolism and/or ***prior known bioengineering methods***."  (Ex. 1 [Voigt Op. Report] ¶ 28) (emphasis added).[2]  ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[2]    Exhibits referenced herein (Ex. __) are contained in the Appendix of Exhibits filed contemporaneously herewith.

████████████████████████████████████████████████████████

████████████████████████████████ Furthermore, after facing numerous rejections during the prosecution of the '375 patent, Gevo only overcame those rejections by arguing that the obtained yields were achieved unexpectedly, and through the use of a particular KIVD enzyme in the 5-step pathway, as described herein.

Notwithstanding the optimistic yields set forth in claim 1 of the '375 patent—and carried through to all of the asserted claims—the '375 patent specification sets forth no example where the inventors actually achieved a yield of isobutanol greater than 10% of theoretical.[4] Furthermore, although the patent purports on its face to establish that the inventors achieved isobutanol yields approaching 13% of the theoretical yield, this is based on an improper calculation that contradicts the claim construction agreed to here. Even if these calculations were accepted, the patent never establishes that the inventors possessed yields greater than 15%, i.e., never even approaching the 90–100% levels covered by claim 1. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████. In other words, the undisputed evidence shows that the Gevo inventors failed to actually invent or teach a means for doing the very (and only) thing they claimed to be novel over existing art. Thus, as a matter of law based on undisputed facts, summary judgment of invalidity for inadequate written description and, for the same reasons, non-enablement, is appropriate.

---

[3]   Butamax, of course, disagrees that this constituted an inventive step as Donaldson does describe PDC deletion, and reserves all rights with respect to its anticipation and obviousness arguments, not addressed herein.

[4]   As explained herein, the parties have agreed to a claim construction that, when applied, shows that Gevo never achieved a 10% isobutanol yield.

4

Additionally, in an attempt to capture subject matter not properly covered by the claims, Gevo offers several claim constructions that, if accepted, would circumvent explicit written description and indefiniteness rejections by the Patent Office. These constructions are inconsistent with the '375 patent's prosecution history and, in any event, return the claims to their unpatentable pre-rejection state, requiring a holding of invalidity.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The '375 Patent

The '375 patent issued on September 13, 2011 from U.S. Appl. No. 12/343,375 ("the '375 application"), filed December 23, 2008, and purports to have priority to U.S. Provisional Appl. No. 61/016,483 ("the '483 provisional application"), filed December 23, 2007. It is titled "Yeast Organism Producing Isobutanol at a High Yield" and lists Reid M. Renny Feldman, Uvini Gunawardena, Jun Urano, Peter Meinhold, Aristos A. Aristidou, Catherine Asleson Dundon and Christopher Smith as inventors (collectively, "Feldman Inventors"). The '375 patent contains one independent claim (claim 1) and dependent claims 2–7. Only claims 1–3 and 5–7 are asserted by Gevo in this litigation.

Claim 1 of the '375 patent reads as follows:

> A recombinant yeast microorganism for producing isobutanol, the recombinant yeast microorganism comprising an isobutanol producing metabolic pathway, wherein said isobutanol producing metabolic pathway comprises the following substrate to product conversions:
> (i)     pyruvate to acetolactate;
> (ii)    acetolactate to 2,3-dihydroxyisovalerate;
> (iii)   2,3-dihydroxyisovalerate to α-ketoisovalerate;
> (iv)    α-ketoisovalerate to isobutyraldehyde; and
> (v)     isobutyraldehyde to isobutanol;
> wherein said recombinant yeast microorganism expresses:
> (a)     an acetolactate synthase to catalyze the conversion of pyruvate to acetolactate;
> (b)     a ketol-acid reductoisomerase to catalyze the conversion of acetolactate to 2,3-dihydroxyisovalerate;

(c)     a dihydroxy acid dehydratase to catalyze the conversion of 2,3-dihydroxyisovalerate to α-ketoisovalerate;

(d)     an α-ketoisovalerate decarboxylase from *Lactococcus lactis* to catalyze the conversion of α-ketoisovalerate to isobutyraldehyde; and

(e)     an alcohol dehydrogenase to catalyze the conversion of isobutyraldehyde to isobutanol;

wherein the recombinant yeast microorganism has been engineered to disrupt, mutate, or delete one or more endogenous pyruvate decarboxylase (*PDC*) genes, wherein said recombinant yeast microorganism has reduced endogenous PDC activity as compared to the corresponding yeast microorganism that has not been engineered to have reduced endogenous PDC activity, and wherein said recombinant yeast microorganism produces:

(A)     isobutanol at a yield which is at least 10% of the theoretical yield of isobutanol from glucose; and/or

(B)     ethanol at a yield which is 1.8% or less of the theoretical yield of ethanol from glucose.

Dependent claims 2–7 are presented in the '375 patent at col. 223–24.[5]

## B.     Pertinent Claim Constructions

The parties agree on the following claim constructions:

| Claim Term | Agreed Construction |
|---|---|
| **Claim 1** ||
| wherein said recombinant yeast microorganism produces:<br>(A) isobutanol at a yield which is at least 10% of the theoretical yield of isobutanol from glucose; and/or<br>(B) ethanol at a yield which is 1.8% or less of the theoretical yield of ethanol from glucose | the claimed recombinant yeast microorganism when used for producing isobutanol produces:<br>isobutanol at a yield which is at least 10% of the theoretical yield of isobutanol from glucose; or<br>ethanol in a yield which is 1.8% or less of the theoretical yield of ethanol from glucose; or<br>isobutanol at a yield which is at least 10% of the theoretical yield of isobutanol from glucose and ethanol in a yield which is 1.8% or less of the theoretical yield of ethanol from glucose |
| theoretical yield of . . . from glucose | the maximum amount of product that can be produced from the total amount of glucose provided |

The parties dispute the meaning of a number of claim terms, as set forth herein. (*See also* D.I. 480, Ex. 3). Butamax has extensively briefed the issues pertaining to claim construction,

_____

[5]     The '375 patent was previously provided to the Court at D.I. 512 at GJA1–148.

6

and refers the Court to its briefing on these matters, incorporated herein by reference. (*See* D.I. 534, 559).

### C.   Pertinent Prosecution History of the '375 Patent

While the '375 patent claims to be entitled to priority to the '483 provisional filing date of December 23, 2007, the '483 application contains no experimental data showing isobutanol or ethanol production within the yields expressly recited by the issued '375 claims. In fact, the only "yields" for isobutanol and ethanol set forth in the '483 provisional application in a PDC-minus yeast strain—as required by the claims of the '375 patent—are labeled "prophetic," meaning that the experiments were not actually carried out and yields were not actually measured. These prophetic examples, reflected in Tables 7 and 8 of the '483 provisional application, list "expected" isobutanol yields ranging between 50% and 80% of theoretical, and 0.05% of theoretical for ethanol. (D.I. 517 at GJA4902, GJA4905, Table 7, Table 8).

It was not until the '375 non-provisional application was filed on December 23, 2008 that the inventors provided any experimental data for isobutanol and ethanol yields obtained in PDC-minus yeast. Despite having added such information in the non-provisional application, the inventors initially sought broad claims that failed to recite any specific yields or ranges of yields. For example, the following claims were presented:

> 131. (New) A recombinant yeast microorganism for producing isobutanol, the recombinant yeast microorganism obtainable by:
>
> (a)   engineering the microorganism to express an isobutanol producing metabolic pathway comprising at least one heterologous gene encoding an enzyme that catalyzes a pathway step in the conversion of pyruvate to isobutanol; and
>
> (b)   engineering the microorganism to have reduced pyruvate decarboxylase (PDC) activity as compared to a parental microorganism.
>
> 132. (New) The recombinant yeast microorganism of claim 131, wherein said pathway step in the conversion of pyruvate to isobutanol is selected from:
>
> (a) pyruvate to acetolactate;
>
> (b) acetolactate to 2,3-dihydroxyisovalerate;

(c) 2,3-dihydroxyisovalerate to a-ketoisovalerate;

(d) a-ketoisovalerate to isobutyraldehyde; and

(e) isobutyraldehyde to isobutanol.

134. (New)  The recombinant yeast microorganism of claim 132, wherein the enzyme that catalyzes the conversion of acetolactate to 2,3-dihydroxyisovalerate is a ketol-acid reductoisomerase.

136. (New)  The recombinant yeast microorganism of claim 132, wherein the enzyme that catalyzes the conversion of a-ketoisovalerate to isobutyraldehyde is a 2-keto acid decarboxylase.

(D.I. 513 at GJA2463–64).

Relevant to this motion for summary judgment, the Patent Examiner rejected these claims

on several grounds including the following:

(i)   The Examiner found that the claims were obvious based on the teachings of Donaldson *et al.* (U.S. patent Appl. No. 11/586,315) in view of van Maris *et al.* (*Appl. Env. Microb.* 70:159–166 (2004)), noting that Donaldson *et al.* teaches yeast "transformed with genes encoding enzymes that catalyze several reactions of the isobutanol biosynthetic pathway," while van Maris *et al.* teaches PDC-minus yeast. The Examiner concluded that "[i]t would have been obvious to one of ordinary skill in the art at the time the invention was made to transform the S. cerevisiae cell of van Maris et al. with the genes of Donaldson et al." (D.I. 513 at GJA2526–27).

(ii)  With respect to the broadly claimed "heterologous gene encoding an enzyme that catalyzes a pathway step . . . ," the Examiner rejected the claims for lack of written description, noting that "[t]here is no actual structural limitation with regard to the members of the genus of nucleic acids encoding any enzyme associated with the conversion of pyruvate to isobutanol required by the claims. . . . No correlation between structure and the desired enzymes has been provided." (*Id.* at GJA2519).

(iii) Independent claim 131 was rejected as being indefinite in part based on the claim term "A recombinant yeast microorganism for producing isobutanol, the recombinant yeast microorganism obtainable by . . . *engineering the microorganism to have reduced* pyruvate decarboxylase (PDC) activity *as compared to a parental microorganism*" because the italicized portion, specifying "a parental organism," "does not require the comparison to be made with the corresponding unmodified non-engineered yeast microorganism but rather allows for the comparison to be made with any unmodified non-engineered yeast microorganism." (*Id.* at GJA2516, GJA2517; Ex. 3 [Henry Op. Report] ¶¶ 109–13).

With respect to the prior art rejection over Donaldson *et al.* and van Maris *et al.*, two of

the Feldman Inventors, Drs. Meinhold and Asleson Dundon, participated in an interview with the

Examiner and argued that the claims were patentable over the prior art because their results were

8

"unexpected." (D.I. 513 at GJA2623).   In so arguing, the inventors emphasized that it was not "known whether the KIVD protein would allow for ethanol production also." (*Id.*).[6]

In light of these arguments, the Examiner required several claim amendments, including amendments (i) to expressly limit the claims to the specific KIVD enzyme that was purportedly the source of the "unexpected results" and (ii) to specifically recite the isobutanol and ethanol yields that the inventors relied on to support their "unexpected" results. (*Id.* at GJA2816–17, GJA3015–19, GJA2623). In fact, the limitations requiring specific isobutanol and ethanol yields were added by *Examiner's* amendment (with the approval of the Feldman Inventors' representative).[7]   (*Id.* at GJA3015–17).   After thus amending the claims, emphasizing her reliance on the Feldman Inventors' purportedly unexpected yields in allowing the claims, the Examiner explained her reasons for allowing the claims stating that although "one of skill in the art would have been motivated to use the [PDC-minus] cell of van Maris et al." modified to "comprise the isobutanol pathway of Donaldson et al. to increase the production of isobutanol . . . one of skill in the art *would have not expected the recited isobutanol or ethanol yields.*" (*Id.* at GJA3018) (emphasis added).

During prosecution, the Feldman Inventors also addressed the Examiner's written description rejection by amending the claims to recite each step of the five-step isobutanol biosynthetic pathway and the enzyme used to catalyze each step. (*Id.* at GJA2811–15, GJA2819–20).   Further, to address the indefiniteness rejection, the Feldman Inventors (through an

---

[6]   All claims now stand rejected in reexamination.

[7]   In amending the claims to recite the specific isobutanol and ethanol yields, the Examiner relied on certain tables and examples as providing support. (D.I. 513 at GJA3015). However, as detailed herein, under the agreed-upon claim construction for the yield language, these tables and examples fail to support even the lowest yield of isobutanol claimed and as to the higher yield levels claimed, Gevo's own experts have admitted that the specification does not support those yields.

Examiners' amendment) amended the claims to require that the comparison of endogenous PDC activity and growth rates (present in issued claims 1 and 2) be made between the engineered organism and *the* corresponding non-engineered organism, obviating the earlier indefiniteness rejections. (*Id.* at GJA3016–17).

## III.   ARGUMENT

"Summary judgment is appropriate when, after opportunity for discovery and upon motion, there is no genuine dispute of material fact for trial and one party is entitled to judgment as a matter of law." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *Gentry Gallery, Inc v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998); Fed. R. Civ. P. 56.

### A.   The Claims of the '375 Patent Are Invalid for Lack of Written Description

To satisfy the written description requirement of 35 U.S.C. § 112 ¶ 1, the patent specification must "reasonably convey[] to those of skill in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). A statement that an element is part of the invention does not suffice. *Fiers v. Revel*, 984 F.2d 1164, 1170–71 (Fed. Cir. 1993). Likewise, a mere wish or plan for obtaining the claimed invention is not sufficient. *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008). Rather, "the description must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Id.*

### 1.    The '375 Patent Does Not Adequately Describe the Claimed Yields

The '375 patent claims recombinant microorganisms producing isobutanol at a yield greater than 10% of the theoretical yield, and as high as 100% of the theoretical yield. The patent disclosure does not provide sufficient written description to support this scope. When calculated in accordance with the agreed-upon claim construction, the highest isobutanol yield disclosed by the '375 patent falls far short of the claimed minimum of 10% of theoretical.

The parties agreed that "theoretical yield of . . . from glucose" is defined as "the maximum amount of product that can be produced from the total amount of glucose provided." (D.I. 480, Ex. C). That is, as agreed, theoretical yield is calculated based on the glucose provided to the system or media. (Ex. 3 [Henry Op. Report] ¶ 46).

Only Examples 8A and 8B of the '375 patent purport to provide isobutanol yields greater than 10% of the theoretical yield. In example 8A, glucose is added to the media to a final concentration of 5%—that is, 50 g/L. ('375 patent, 42:3–4). As shown in Table EX8A-2, however, the yeast consumed less than 10% of the glucose provided.[8]

TABLE EX8A-2

| 48 hour time point data are shown as an average of three replicates | | | |
|---|---|---|---|
| | Glucose consumed (g/L) | Isobutanol (mg/L) | Yield (% theoretical) |
| iB250 | 3.6 ± .7 | 4.7 ± 0.00 | 0.31 ± 0.04 |
| iB251 | 2.8 ± 1.6 | 122 ± 41 | 11.0 ± 5.0 |
| iB252 | 1.2 ± .5 | 62 ± 11 | 12.8 ± 2.8 |

---

[8]    Specifically and by way of example, of the three data points provided in the table, 3.6 g/L is the highest amount of glucose consumed, and when compared to the 50 g/L glucose provided, it is clear that only 7.2% of the glucose provided was actually consumed. In this respect, it is evident that when the amount of isobutanol produced is converted to a percentage based on the glucose consumed versus the glucose provided, the former will universally give higher percent yields, except when the cell consumes 100% of the glucose provided, in which case the yields will be identical under either calculation.

Similarly, in example 8B, 20 g/L of glucose was provided to the media (*Id.* at 27:7–28:17, 44:13), but the yeast consumed less than half the glucose during the 48 hour fermentation.

TABLE EX8B-2

| 48 hour time point data are shown as an average of three replicates | | | | |
|---|---|---|---|---|
| Fermentation # | | Isobutanol Titer (g/L) | Glucose Consumed (g/L) | Ethanol Consumed (g/L) | Yield (% theor.)] |
| iB300 | Vector Control (CEN plasmids) | 0.012 ± 0.003 | 9.75 ± 4.17 | 2.47 ± 0.30 | 0.30% |
| iB301 | Isobutanol pathway (CEN plasmids) | 0.392 ± 0.087 | 9.31 ± 5.03 | 0.95 ± 0.64 | 10.27% |
| iB302 | Vector Control (2µ plasmids) | 0.013 ± 0.006 | 8.61 ± 4.51 | 0.64 ± 0.17 | 0.37% |
| iB303 | Isobutanol pathway (2µ plasmids) | 0.248 ± 0.032 | 9.51 ± 1.25 | 0.77 ± 0.59 | 6.36% |

Instead of calculating isobutanol yields based on the glucose *provided* to the media, the Feldman Inventors used the much lower amount of glucose *consumed* by the cell as a starting point for their calculations, resulting in the appearance of yields much larger than what was actually obtained. When the isobutanol yields in these examples are calculated based on glucose provided—according to the agreed-upon claim construction—the reported yields are far below the 10% upon which Examiner Ramirez relied to allow the claims of the '375 application. (*See supra* at n.8). Based on this disclosure, a person of skill in the art could not conclude that the Feldman Inventors possessed a yeast microorganism producing isobutanol at a yield greater than 10% of theoretical. (Ex. 3 [Henry Op. Report] ¶¶ 17, 78–84). The claims of the '375 patent are thus invalid for failure to meet the written description requirement of 35 U.S.C. § 112 ¶ 1.[9]

---

[9]   Butamax limits this motion to arguing that the asserted claims are invalid based on the failure to describe the limitations present in claim 1 and carried through to claims 2–7. By so limiting its arguments here, Butamax does not waive its arguments that the dependent claims are invalid for failing to adequately describe claim limitations present solely in the dependent claims. For example, Dr. Henry opines that claim 2 of the '375 patent, directed to organisms engineered to grow independently of C2-compounds," is not adequately described. (Ex. 3 [Henry Op. Report] ¶¶ 20-22, 103–06). Butamax does not address this issue herein, but does

(continued...)

Incredibly, the '375 patent purports to have the benefit of priority to the earlier filed '483 provisional application. In order to support Gevo's priority claim, the '483 provisional must adequately describe the invention of the '375 claims. *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) ("In order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112."). With nothing but "prophetic" examples listing "expected" isobutanol yields between 50% and 80%, and an "expected" ethanol yield of 0.05%, the '483 application not only fails to adequately describe the full scope of the '375 claims, but also eviscerates Gevo's claims of "unexpected results."

Indeed, even if disclosure of the mere words of the claim was enough to satisfy the requirements of Sections 112/120, no such disclosure is present here, since the highest isobutanol yield disclosed—in plain words—is 80%, which falls short of the "greater than 80% [and 85%, 90%, 95% and 97.5%] of theoretical" encompassed by the issued claims. *Cf. Fiers*, 984 F.2d at 1170–71 (a statement that an element is part of the invention does not suffice). Similarly, there is no support for the ethanol yield of 1.8%. None of Gevo's experts have disputed Dr. Henry's and Dr. Michels' opinion that the predicted 0.05% in Tables 7 and 8

---

not waive such arguments. Nor does Butamax waive its other invalidity arguments not addressed herein.

would not lead a person of skill in the art to conclude that the Feldman Inventors had possession of yeast producing ethanol at a yield of 1.8% of theoretical, or less, as of the '483 filing date. (Ex. 3 [Henry Op. Report] ¶ 14; Ex. 4 [Michels Op. Report] ¶ 47).[10]

### 2. The '375 Patent Does Not Adequately Describe or Enable the High Yields Claimed

After agreeing to a particular construction of "theoretical yield" that looked to the amount of glucose "provided" to the system as opposed to the glucose consumed by the cell, upon reviewing the Butamax expert reports with respect to the insufficiency of the '375 patent's disclosure, Gevo has backtracked and tried to create a dispute with respect to the very definition that it initially agreed to. Specifically, Gevo contends that "glucose provided" means glucose provided *to the cell*, which it equates with glucose "consumed" by the cell. Butamax does not address these arguments here because they are insufficient to create a dispute to foreclose summary judgment.

Specifically, even if "theoretical yield" were construed as based on the glucose consumed by the cell, rather than the glucose provided to the system, the specification of the '375 patent does not support the high yields claimed, yields as high as 100% of theoretical. In particular, the only disclosure with respect to the high yields claimed that the Feldman Inventors provide is no more than a statement that these yields are a part of their invention:

> In one embodiment, the yield is greater than 10%. In one embodiment, the yield is greater than 50% of theoretical. In one embodiment, the yield is greater than 60% of theoretical. In another embodiment, the yield is greater than 70% of theoretical. In yet another embodiment, the yield is greater than 80% of theoretical. In yet another embodiment, the yield is greater than 85% of theoretical. In yet another embodiment, the yield is greater than 90% of theoretical. In yet another

---

[10] This motion does not address issues of anticipation or obviousness over the prior art in the context of the '375 patent. However Butamax has identified intervening prior art that renders the '375 claims obvious, and in that context, the issue of priority will ultimately need to be resolved.

embodiment, the yield is greater than 95% of theoretical. In still another embodiment, the yield is greater than 97.5% of theoretical.

('375 patent, 24:21–31). These yields are far beyond the Feldman Inventors' highest purported obtained yield of 12.8%, and present no more than a wish list for further experimentation, which is insufficient to satisfy the written description requirement. *Fiers*, 984 F.2d at 1170–71; *Carnegie Mellon Univ.*, 541 F.3d at 1122. Moreover, the '375 patent specification discloses no protocol or technique for obtaining the high yields covered by the claims. Neither does the '375 specification cite to any scientific literature that teaches obtaining the high yields claimed or pointing to examples where such high yields were achieved. (Ex. 3 [Henry Op. Report] ¶¶ 85–87).

Dr. Henry's expert opinions are largely uncontroverted in this respect. ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████    Tellingly, neither Dr. Voigt, nor other Gevo experts, opine that a person of skill in the art would have understood that the Feldman Inventors were in possession of yeast that produced isobutanol at a yield of 100%, 97.5%, or even 50%, all of which are within the scope of the claims and must be supported. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

Given the exorbitant difference between the highest reported yield and the claimed yields (a difference of nearly 900%), and the absolute lack of disclosure of any literature teaching how to obtain these higher yields, a person of skill in the art would not understand that the Feldman Inventors in fact invented a yeast microorganism producing isobutanol at such high yields as claimed.  *See Ariad*, 598 F.3d at 1351 ("the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology"). *See also In re Wertheim*, 541 F.2d 257, 263-64 (C.C.P.A. 1976) (finding "little difficulty" in concluding that a claim limitation to a solid content range of "at least 35%" was not adequately described by a patent disclosure of only 25–60%); *Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir. 1995) (affirming finding of no written description for a claimed range of 50–60% where the specification only disclosed a range of 45–55%); *Benckiser v. Procter & Gamble Co.*, No. 2011-012650, 2012 WL 1071549 (B.P.A.I. March 28, 2012).  Accordingly, the claims of the '375 patent are invalid for lack of written description.

To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997); *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005).  The more unpredictable the art, the more disclosure is required to satisfy the enablement requirement. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

16

Because the '375 patent contains no disclosure indicating to a person of skill in the art how to obtain the high isobutanol yields claimed, the claims are also invalid for lack of enablement.   (Ex. 3 [Henry Report] ¶¶ 88–98).   Gevo's only argument to the contrary is unpersuasive: ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████   █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

Further, although Gevo asserts that to obtain high yields, ███████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████   the patent specification does not disclose or teach what promoters to use in order to maximize yields.

████████████████████████████████████████████████████████

█████████████████████████████   and given that some glucose must be used for other processes, it is impossible to enable the skilled artisan to practice the full scope of the claims. *Wands*, 858 F.2d at 737.   ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

notwithstanding that the claims cover this lofty goal. Because the '375 patent provides no guidance on how to obtain isobutanol yields beyond what was obvious in the art, there is no enabling disclosure of isobutanol production with so-called unexpectedly high yields, as claimed. *See Magsil Corp. v. Hitachi*, 687 F.3d 1377, 1383 (Fed. Cir. 2012) (where claim recited open-ended range of "at least 10%," finding that "specification only enables an ordinarily skilled artisan to achieve a small subset of the claimed range"); *In re Fisher*, 427 F.2d 833 (C.C.P.A. 1970).

### 3.    Under Gevo's Construction, a "KARI" Lacks Written Description

The parties offer competing constructions of the term "a ketol-acid reductoisomerase" or "KARI," as outlined below.

| Claim Term | Butamax/DuPont's Construction | GEVO's Construction |
|---|---|---|
| *Claim 1* | | |
| a ketol-acid reductoisomerase | an enzyme that is structurally similar to known acetohydroxy acid isomeroreductase or ketol acid reductoisomerase enzymes and that converts acetolactate to 2,3-dihydroxyisovalerate | a naturally-occurring or engineered enzyme that catalyzes the reaction of acetolactate (AL) to dihydroxy-isovalerate (DHIV) using NADH or NADPH as a cofactor |

Butamax alone has proffered a construction that requires the KARI enzyme to be structurally similar to a known KARI enzyme. (*See* D.I. 534 at 11–13). However, as explained above, during prosecution of the '375 patent, the Examiner specifically rejected Gevo's proffered claim to the isobutanol pathway that did not specify any enzyme used in any of the five steps of the pathway, noting that "[n]o correlation between structure and the desired enzymes has been provided." (D.I. 513 at GJA2519, GJA2523). As such, the claims were invalid for inadequate written description and non-enablement. The Feldman Inventors therefore amended the claim to specify the enzymes being used and specifically the term KARI was added in response to this

18

rejection. (D.I. 513 at GJA2813-14, GJA2820).   If Gevo's proffered construction of KARI, which has no structural component and merely requires that an enzyme perform a desired function, is adopted, it would circumvent the entire rejection by the Patent Examiner and reinstate the Examiner's earlier rejections for inadequate written description.

### B.   Adopting Gevo's Proffered Constructions, the Claims of the '375 Patent Are Indefinite

In accordance with 35 U.S.C. § 112 ¶ 2, a patent specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."   Commensurate with this rule is the concept that the claims must be definite in their scope so that a person skilled in the art can understand the metes and bounds of the claim.   The test for definiteness under Section 112 is whether "those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986).

Here, Gevo has proffered the following claim constructions for disputed terms:

| Claim Term | GEVO's Construction |
|---|---|
| *Claim 1* | |
| wherein said recombinant yeast microorganism has reduced endogenous PDC activity as compared to the corresponding yeast microorganism that has not been engineered to have reduced endogenous PDC activity | wherein said recombinant yeast microorganism has less endogenous PDC activity than *a yeast microorganism* that does not have a disruption, mutation or deletion of a PDC gene |
| *Claim 2* | |
| is further engineered or selected to grow on glucose independently of C2-compounds at a growth rate substantially equivalent to the growth rate of the corresponding yeast microorganism that has not been engineered to have reduced endogenous PDC activity | is further engineered or selected to grow on glucose independently of C2-compounds at a growth rate substantially equivalent to the growth rate of *a yeast microorganism* that does not have a disruption, mutation or deletion of a PDC gene |

As explained in Butamax's claim construction briefing and as further explained in Dr. Henry's Expert Report, these claim terms must be construed to require a comparison between a

yeast organism that has been engineered and the corresponding yeast organism that has not been engineered so that a proper comparison of endogenous PDC activity and growth rate, respectively, can be undertaken. (*See* D.I. 534 at 19–20; Ex. 3 [Henry Op. Report] ¶¶ 107–118). This is the only construction that is consistent with the prosecution history, discussed above, where the Examiner required an "apples-to-apples" comparison to set the metes and bounds of the claims. If, notwithstanding the prosecution history and Gevo's claim amendments, Gevo's constructions—which only call for a comparison with *an undefined* yeast microorganism—are adopted, the claims are indefinite and must be invalidated, just as the Examiner found. *Cf. Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383–84 (Fed. Cir. 2003) (rejecting a proposed construction that, if adopted, would have rendered the term indefinite). Moreover, as Dr. Henry further explains, since different strains of yeast have different PDC enzymes, different levels of endogenous PDC activity, and different growth rates, if Gevo's construction were accepted, the same embodiment might not infringe when compared to one non-engineered yeast strain but may infringe when compared to another non-engineered yeast strain. (Ex. 3 [Henry Op. Report] ¶¶ 116–17). Such a construction would make the claims incomprehensible and would not allow a person of skill in the art to know whether a particular yeast strain is within the scope of the claims. *See Geneva Pharm., Inc.*, 349 F.3d 1384 (holding that a proposed construction should be rejected if it leads to a given product simultaneously infringing and not infringing, since that is the "epitome of indefiniteness").

## SUMMARY JUDGMENT OF INVALIDITY OF THE '376 PATENT

### I. SUMMARY OF THE ARGUMENT

Butamax's International Patent Appl. PCT/US2011/025258, which published as WO 2011/103300 and is entitled to a priority date of February 17, 2010, discloses every asserted limitation of every asserted claim of the '376 patent. The asserted claims of the '376 patent, with

a filing date of November 24, 2010, are thus invalid under 35 U.S.C. § 102(e)(1).  Gevo does not

dispute that WO 2011/103300 discloses every asserted limitation of every asserted '376 patent

claim.  Instead, Gevo responds that the '376 patent is entitled to a priority date that precedes

February 17, 2010.  Gevo is wrong and cannot meet its burden of proof.  Although Gevo alleges

priority to U.S. Provisional Appl. No. 61/263,952, that application does not enable or describe

the invention of the '376 patent claims because Gevo did not yet possess, and thus could not

teach, that invention.  (*See* Ex. 8 [Rothstein Report] at ¶¶ 3–7; Ex. 9 [Thiele Op. Report] at ¶¶ 4–

7; Ex. 10 [Thiele Supp. Report] at ¶ 10).  Gevo similarly cannot demonstrate, through competent

expert testimony, that Gevo had conceived or reduced to practice every element of the '376

patent claims before February 2010.

In addition to being anticipated under § 102(e)(1), the '376 patent is also invalid under 35

U.S.C. § 112 for failure to satisfy the written description and enablement requirements.  The

'376 patent claims are invalid pursuant to § 112 because they encompass a mode of practicing

the invention (i.e., overexpressing the AFT gene from a 2-micron plasmid) ████████████

█████████████████████████████████████████████████████

████████████████████████The '376 patent claims are further invalid under § 112

as non-enabled, because despite the requirement of every asserted claim that overexpression of

the AFT gene cause increased DHAD activity, the patent does not teach how to achieve the level

of overexpression required for increased DHAD activity without causing toxicity to the cell.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     The '376 Patent

The '376 patent issued on September 13, 2011 from U.S. Appl. No. 12/953,884 ("the

'884 application"), filed November 24, 2010, and purports to have priority to U.S. Provisional

Appl. No. 61/263,952 ("the '952 Provisional"), filed November 24, 2009.  It is titled "Methods

of Increasing Dihydroxy Acid Dehydratase Activity to Improve Productions of Fuels, Chemicals and Amino Acids" and lists Catherine Asleson Dundon, Aristos Aristidou, Andrew Hawkins, Doug Lies and Lynne H. Albert as inventors (collectively, "the '376 Inventors"). The '376 patent contains one independent claim (claim 1) and dependent claims 2–20. Only claims 1–9, 14 and 18–20 are asserted by Gevo in this litigation.

Claim 1 of the '376 patent reads as follows:[11]

A recombinant yeast microorganism comprising a recombinantly overexpressed polynucleotide encoding a dihydroxy acid dehydratase (DHAD), and recombinantly overexpressed one or more polynucleotides encoding one or more activator of ferrous transport (Aft) proteins which increase the dehydratase activity of DHAD.

## B.    Recombinant DNA Technology and the Subject Matter of the '376 Patent

As reflected by claim 1, the '376 invention is generally directed to a recombinant yeast microorganism engineered to "recombinantly overexpress" polynucleotides encoding "Aft" proteins, which increase the activity of "DHAD."

Gene expression (and overexpression) is a cellular process in which the information encoded by a gene's DNA is used by the cell through an intermediate molecule called mRNA to synthesize a protein (a polypeptide).[12]   Gene expression begins when a protein called a transcription factor binds to a "promoter region" of the gene's DNA, which induces the beginning of gene "transcription." (D.I. 534 at 4-7; Ex. 12 [Winge Dep. Tr.] at 78:24–79:16, 87:2–9). The information encoded by the DNA is then "transcribed" to mRNA through a process called transcription and the mRNA is then "translated" into a protein. (D.I. 534 at 5–6;

---

[11]   The '376 patent was provided to the Court at D.I. 515 at GJA4442–97.

[12]   Tutorials on the technology of the '376 patent are provided in Butamax's Experts' Reports and Declarations. *See, e.g.*, Ex. 8 [Rothstein Report] ¶¶ 8–19; Ex. 9 [Thiele Op. Report] ¶¶ 8–15; and Ex. 11 [Thiele Reb. Report] ¶¶ 12–17.

Ex. 12 [Winge Dep. Tr.] at 79:3–80:8, 87:2–9).  According to the '376 patent and the parties'

stipulated claim constructions, gene "**over**expression" refers to:

> an elevated level (e.g., aberrant level) of mRNAs encoding for a protein(s) (e.g.
> an Aft protein or homolog thereof), and/or to elevated levels of protein(s) (e.g.
> Aft) in cells as compared to similar corresponding unmodified cells expressing
> basal levels of mRNAs (e.g., those encoding Aft proteins) or having basal levels
> of proteins.

('376 patent, 10:50–56; D.I. 499 at 13 n.4; *see also* D.I. 534 at 7).  "Aft proteins" are yeast

transcription factors that bind to the promoter region of a specific group of genes in the yeast

nucleus known as the "iron regulon." (Ex. 12 [Winge Dep. Tr.] at 90:16–92:4, 208:21–209:13;

D.I. 534 at 7).  Proper Aft binding induces transcription of the iron regulon genes, which in turn

can lead to an increase in iron taken up by the yeast cell.  (*Id.*).  According to the '376 patent,

"altered expression of an AFT gene . . . enhances cellular iron availability, which leads to an

improvement in the activity of the iron-sulfur (FeS) cluster-containing protein, DHAD." ('376

patent, 16:37–43).

DHAD is an enzyme responsible for catalyzing the conversion of dihydroxy-isovalerate

(DHIV) to α-ketoisovalerate (KIV) ('376 patent, 1:45–60), the third step in an engineered

isobutanol biosynthetic pathway previously disclosed and claimed by Butamax. (*See, e.g., id.* at

52:4–21 (citing Donaldson *et al.*, WO/2007/050671 (Ex. 13)); D.I. 534 at 4–5).  DHAD requires

"iron-sulfur clusters" to remain active and perform its enzymatic functions.[13]  (Ex. 9 [Thiele Op.

Report] at ¶ 15; Ex. 12 [Winge Dep. Tr.] at 216:3–7; D.I. 534 at 7).  When a yeast cell has fewer

of these clusters available than there are DHAD molecules, sub-maximal levels of DHAD

activity can result.  (*Id.*).  The theory behind "overexpressing" the AFT gene according to the

'376 patent, is to increase levels of AFT protein in the cell which purportedly will lead to

---

[13]   Butamax inventor Dennis Flint described DHAD enzymes' requirement for iron-sulfur
clusters as early as 1993. (*See* Ex. 14 [Flint, Dennis., *J. Biol. Chem.*, 268:14732–42 (1993)]).

increased iron uptake (due to increased transcription of the iron regulon genes) and more iron-sulfur clusters being formed allowing for increased levels of DHAD activity. (*See* Ex. 15 [Winge Op. Report] at ¶ 17).

Overexpression can be achieved by introduction of recombinant (man-made from different parts) genes into host organisms (like yeast) on DNA constructs known as vectors. (Ex. 12 [Winge Dep. Tr.] at 98:19–99:22). One type of vector is a plasmid—a circular piece of DNA. (*Id.*). As shown in the following diagram, DNA from one microorganism can be recombined with plasmid DNA to form a "recombinant expression vector," so-called because when introduced into a cell, these vectors may express the recombined DNA (polynucleotides) of the plasmid. (Ex. 12 [Winge Dep. Tr.] at 99:9–22). Plasmid DNA may replicate in the cell giving multiple copies of the recombinant gene. (*Id.* at 100:2–8).



The '376 specification discusses two plasmid types for use in recombinantly expressing genes in yeast—CEN plasmids and 2-micron ("2μ") plasmids. ('376 patent, 55:49–64). The '376 patent specification describes a CEN plasmid as "generally a single or low copy plasmid," reflecting the fact that CEN plasmids generally do not make multiple plasmid copies. (*Id.* at 55:58–59). In contrast, the '376 specification describes 2-micron plasmids as generally having a "high copy number," meaning that the cell reproduces many copies of the plasmid. (*Id.* at 55:59–62; Ex. 12 [Winge Dep. Tr.] at 101:10–14). For this reason, 2-micron plasmids are useful to recombinantly overexpress a gene in yeast when the goal is to produce high levels of encoded

24

protein. (Ex. 8 [Rothstein Report] ¶ 38). However, the use of 2-micron plasmids to overexpress

AFT genes leads to too much protein and cell toxicity.

## III.   ARGUMENT

### A.   The Asserted Claims of the '376 Patent are Anticipated by Int'l Pat. Pub. No. WO 2011/103300 ("the Butamax '300 Publication")

Anticipation requires that a single prior art reference disclose each and every limitation of

the claimed invention. *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir.

2003). Anticipation is a question of fact, but "without genuine factual disputes underlying the

anticipation inquiry, the issue is ripe for judgment as a matter of law." *SmithKline Beecham*

*Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005).

Here, the single prior art reference that Butamax relies on is the Butamax '300

Publication. (Ex. 16 [Butamax '300 Publication]). This reference published on August 25, 2011

from Butamax's International Patent Appl. PCT/US2011/025258 ("the Butamax PCT"), and it

carries forward disclosure originally contained in U.S. provisional application 61/305,333 ("the

Butamax '333 Provisional"), filed on February 17, 2010. The Butamax '300 Publication is prior

art pursuant to 35 U.S.C. § 102(e)(1) relating to published patent applications and priority

entitlement pursuant to 35 U.S.C. § 119.[14] Specifically, 35 U.S.C. § 102(e)(1) provides that:

> A person shall be entitled to a patent unless (e) the invention was described in —
> (1) an application for patent, published under section 122(b), by another filed in
> the United States before the invention by the applicant for patent . . . except that
> an international application filed under the treaty defined in section 351(a) shall
> have the effects for the purposes of this subsection of an application filed in the
> United States only if the international application designated the United States
> and was published under Article 21(2) of such treaty in the English language.

---

[14]   USPTO Manual of Patent Examining Procedure (MPEP) § 706.02(f)(1)(III) illustrates the
proper analysis for determining the prior art date of a § 102(e)(1) reference. MPEP
§ 706.02(f)(1)(III, chart 2).

The Butamax '300 Publication meets the terms of § 102(e)(1). Moreover, it is prior art as of the February 17, 2010, Butamax '333 Provisional filing date, pursuant to 35 U.S.C. § 119(e)(1). Because the Butamax '300 Publication has priority to the Butamax '333 Provisional and reproduces[15] the anticipatory disclosure of that document, the Butamax '300 Publication is prior art as of February 17, 2010.

Butamax's expert, Dr. Dennis J. Thiele, has provided detailed analysis demonstrating that every element of the asserted '376 claims is disclosed by the Butamax '300 Publication. (Ex. 9 [Thiele Op. Report] ¶¶ 6, 49–52, App. A).[16] In response, Gevo's expert, Dr. Dennis Winge, ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ ███ Neither ground is supported by the evidence or adequate expert analysis and opinion.

Indeed, it is not surprising that Dr. Winge does not dispute that the Butamax '300 Publication discloses every element of the '376 patent claims because Gevo based its infringement contentions entirely on the disclosure of this publication. (Ex. 18 [Def. Gevo's

---

[15]   *See* Appendix A, attached hereto, which compares the specifications of the Butamax '333 Application and the '300 Publication.   The '300 Publication incorporates the '333 Application "by reference in its entirety." (Ex. 16 ['300 Publication] at ¶ [0001]). The '333 Provisional incorporates additional disclosures by reference. *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (material not explicitly contained in a single prior art document may still be considered for purposes of anticipation if incorporated by reference into the document) (citing *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)).

[16]   In his expert report and declaration, Dr. Thiele cites to the Butamax '333 Provisional and the published version of the Butamax PCT, pointing to the disclosure that was carried forward to the Butamax PCT. (Ex. 9 [Thiele Op. Report] ¶¶ 49–52 and App. A).

Response to Interrogatories (Set 2, Nos 8–19)] at pp. 8–9 and Ex. B). Citing the disclosure of the Butamax '300 Publication, Gevo alleges that Butamax practices each and every element of the asserted claims. (*Id.*). Gevo thereby admits in its claim charts[17] that the Butamax '300 Publication discloses every element of the asserted claims of the '376 patent.[18] Thus, based on Gevo's own admission and the well-established principle of patent law that "that which infringes if later, anticipates if earlier," the Butamax '300 Publication anticipates every asserted claim of the '376 patent. *Schering Corp.*, 339 F.3d at 1379 (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001)).

**B.    The '376 Patent is Not Entitled to an Earlier Filing Date**

Gevo seeks to invoke priority to its '952 Provisional to escape anticipation by the Butamax '300 Publication. However, Gevo's invention date is presumed to be the filing date of the application filed on November 24, 2010, which actually led to the issuance of the granted '376 patent claims. *See Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000); *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986). A patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112. *Poweroasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008). It is Gevo's burden to demonstrate that the '333 Provisional does not invalidate the '376 patent or that the '376 patent is entitled to the benefit of the filing

---

[17]   Butamax has repeatedly informed Gevo that Butamax has never practiced the claimed subject matter of the '376 patent after the '376 patent issued. (*See, e.g.*, D.I. 117 ¶¶ 39–44, 78–80). In referring to Gevo's claim charts, Butamax is not admitting they are evidence of infringement nor does Butamax adopt Gevo's assertions except that the Butamax '300 Publication provides the anticipatory disclosures referenced by Gevo in its claim charts.

[18]   The elements of '376 patent claim 14, directed to "constitutive mutants" were not recited separately for claim 14 but instead disclosed in Gevo's claim chart for claim "[1c]." (Ex. 18 [Def. Gevo's Response to Interrogatories (Set 2, Nos 8–19)] at Ex. B (p. 2)).

date of the '952 Provisional. *See Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 870–71 (Fed. Cir. 2010) (explaining that once an alleged infringer has put forth invalidating prior art, the patentee has the burden to prove the prior art does not invalidate or that the patentee is entitled to an earlier filing date).

To carry its burden, Gevo must establish that the prior application satisfies all of the requirements of § 112 ¶ 1. *Lockwood*, 107 F.3d at 1571 ("In order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112."). Without any competent expert testimony, Gevo is unable to meet the burden of showing written description and enablement of each and every claim. *See also Ariad Pharms*, 598 F.3d at 1351 (the written description requirement of § 112 requires that the "disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date"); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1255 (Fed. Cir. 2004) (holding that because the patentee was not capable of practicing the claimed technology, it could not have been in possession of the technology and thus could not satisfy the written description requirement).

Butamax has come forward with an anticipatory reference—the Butamax '300 Publication—and Gevo must try to show that this reference is not prior art by establishing the '952 Provisional satisfies the requirements of 35 U.S.C. § 112 ¶ 1 on a claim-by-claim basis. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) (holding that after the accused infringer has come forward with evidence of anticipatory art, the patentee then has "the burden of going forward with evidence either that the prior art does not actually anticipate, or . . . that it is not prior art because the asserted claim is entitled to the benefit of a filing date prior to the alleged prior art" or to an "earlier application [date that] supports the claim[s].").

Here, Gevo cannot meet that burden. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g., In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991) ("[A]n

expert's opinion on the ultimate legal issue [of enablement] must be supported by something

more than a conclusory statement."). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Gevo cannot put forth any genuine issue of material fact that shows the '952 Provisional enables

and describes the claims of the '376 patent. *In re Buchner*, 929 F.2d at 661.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, as explained in the next section, the inventors

never taught how to use a 2-micron plasmid and in fact admitted such in a provisional filing,

discussed below. Every claim of the '376 patent expressly requires that the DHAD activity be

increased by overexpressing an Aft gene—a limitation required by the Examiner. (D.I. 513 at

GJA4393–99). However, the '952 Provisional does not describe a single example of a yeast cell

recombinantly overexpressing DHAD and AFT genes resulting in *increased* DHAD activity.

---

[19]   Citing Dundon Dep. Tr. at 246:23–247:9, 259:22–262:14 (Ex. 7); Lies Dep. Tr. at 230–231
(Ex. 20); Albert Dep. Tr. at 258–59 (Ex. 21).

(Ex. 9 [Thiele Op. Report] ¶¶ 39–41, Ex. B (¶ 30), Ex. C (¶¶ 7–8)). 

In fact, Gevo conceded its failure in another provisional

application filed prior to the date that the application that resulted in the '376 patent was filed.

(Ex. 22 [U.S. Prov. Appl. No. 61/350,209] at p. 130–31 (Example 14)).

---

[20] Citing Dundon Dep. Tr. at 178:5–22 (Ex. 7); Albert Dep. Tr. at 224–230, 248:9–16 (Ex. 21); Lies Dep. Tr. at 135:19–136:12, 147:4–17, 158:13–159:16, 170–171, 228–231 (Ex. 20).

[21] Citing '376 patent, col. 55–56; Albert Dep. Tr. at 103–5, 224–230, 248:9–16, 262–270 (Ex. 21); Lies Dep. Tr. at 135:19–136:12 (Ex. 20); Dundon Dep. Tr. at 246:23–247:9, 247:21–248:3 (Ex. 7).

[22] Citing '376 patent, 21:15–17, 22:58–59, 24:46–47, claims 2 and 20; Albert Dep. Tr. at 176 (Ex. 21).

██████████████████████████████████████.  *See Star Scientific, Inc. v. RJ Reynolds Tobacco Co.*, 655 F.3d 1364, 1371 (Fed. Cir. 2011) ("the written description of the provisional application must enable one of ordinary skill in the art to practice the invention claimed in the non-provisional application") (citing *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002)).

Nor does the '952 Provisional describe the claimed combination of elements of the '376 patent claims: a recombinant yeast that recombinantly *over*expresses polynucleotides for *both* DHAD enzyme and Aft proteins, *which increases DHAD activity.*  (Ex. 9 [Thiele Op. Report] at Ex. C (¶¶ 4–14)).  ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Thus, a person of ordinary skill in the art would not understand from the '952 Provisional that the '376 Inventors were in possession of the invention claimed in the '376 patent.  *See Ariad Pharms*, 598 F.3d at 1351; *Chiron Corp.*, 363 F.3d at 1255.

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

*See In re Costello*, 717 F.2d 1346, 1349 (Fed. Cir. 1983) (A patentee may overcome a § 102(e) prior art reference by "showing that [it was] in possession of [its] invention prior to the effective date of the reference").  But in order to remove the Butamax '300 Publication based on a prior invention, Gevo must show either that the '376 invention was reduced to practice before February 17, 2010 or that the '376 Inventors first conceived of the invention prior to that date, followed up by reasonable diligence to reduction to practice.  *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001); *see also Cooper v. Goldfarb*, 154 F.3d

31

1321, 1327 (Fed. Cir. 1998) ("Priority, conception, and reduction to practice are questions of law which are based on subsidiary factual findings.").

Again, Gevo cannot meet its burden. (*See* Ex. 10 [Thiele Sup. Report] ¶¶ 10–26). 

"conception . . . encompass[ing] all limitations of the claimed invention" that was "so clearly defined . . . that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *See Brown v. Barbacid*, 276 F.3d 1327, 1336 (Fed. Cir. 2002) (citations omitted).

*see also Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229 (Fed. Cir. 1994) ("A conception is not complete if the subsequent course of experimentation, especially experimental

failures, reveals uncertainty that so undermines the specificity of the inventor's idea that it is not yet a definite and permanent reflection of the complete invention as it will be used in practice.").



. (*See id.* ¶ 21–23 and Table 2). *See In re Omeprazole Patent Litig. v. Apotex Corp.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) ("To demonstrate reduction to practice, a party must prove that the inventor…'determined that the invention would work for its intended purpose.'").

### C. The '376 Patent is Invalid under 35 U.S.C. § 112[23] for Failure to Satisfy the Written Description and Enablement Requirement

The evidence discussed above in Section B establishes that ███████████████ ███████████████████████████████████████████████, but also, the '376 patent specification itself does not demonstrate the inventors possessed the claimed invention. *Ariad Pharms., Inc.*, 598 F.3d at 1351 (to satisfy the written description requirement, "the disclosure of the application relied upon [must] reasonably convey[] to those of skill in the art that the inventor had possession of the claimed subject matter as of the filing date."). Thus,

---

[23] For all of the same reasons the '376 is invalid under 35 U.S.C. § 112, the '952 Provisional, which contains even less disclosure that the '376 patent specification, fails to provide § 112 support for the '376 patent.

for all the reasons discussed in Section B, the '376 patent is invalid for lack of written description.

The asserted claims of the '376 patent are also invalid because they are not enabled by the '376 patent specification itself. To meet the enablement requirements of 35 U.S.C. § 112, a patent "must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009). In determining whether "undue experimentation" would be required to practice the '376 patent, it is appropriate for the Court to consider the *Wands* factors, such as the quantity of experimentation necessary, the amount of direction or guidance presented, the presence or absence of working examples, the nature of the invention, the state of the prior art, the relative skill of those in the art, the predictability or unpredictability of the art, and the breadth of the claims. *Id.* (citing *Wands*, 858 F.2d at 737). A court need not review all of these factors before making an enablement determination. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

As previously discussed, each of the '376 patent claims expressly requires recombinant overexpression of AFT to achieve *increased DHAD activity*—a limitation required by the patent examiner. (D.I. 513 at GJA0004393–99). The '376 patent specification recommends that recombinant overexpression of the AFT gene be accomplished by introducing a recombinant gene into a plasmid and suggests one of two options—low copy CEN plasmids and high-copy 2-micron plasmids. (*See* Ex. 8 [Rothstein Report] ¶¶ 36–37 (citing '376 patent, col. 55–56; Albert Dep. Tr. at 103–105 (Ex. 21))). ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ The uncontroverted evidence

establishes that DHAD activity cannot be increased if a 2-micron plasmid is used to recombinantly overexpress a gene encoding an Aft protein.

For example, Gevo's second provisional, filed June 1, 2010,[24] included Example 14, titled "*Overexpression of AFT1 from 2 Micron Plasmid **does not** Increase DHAD activity*." (Ex. 22 ['209 provisional] at p. 130–31 (emphasis added)).   This example emphasizes how unpredictable the subject matter of the '376 patent is, stating:

> The purpose of this example is to demonstrate that when expressed from a 2 micron (high copy number plasmid), ***overexpression of AFT1 does not increase DHAD activity***. This indicates some titration of the expression level of *AFT1* is necessary to positively impact DHAD activity. Further, it indicates that ***an optimal level of AFT1 expression was required*** to observe a positive effect on DHAD activity and that *the optimal level was not obvious*.

(Ex. 22 ['209 provisional] ¶ [00439] (emphasis added)).   Gevo's admission that an "optimal level" of AFT1 expression is required to observe increased DHAD activity and concession that one of the two modes suggested by the '376 specification failed, underscores the tremendous unpredictability that one of skill in the art would encounter in attempting to practice the '376 patent claims and the utter lack of guidance provided by the '376 patent specification. (*See* Ex. 8 [Rothstein Report] ¶¶ 40–41, 59–86 and App'x A–B[25]).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[24]   Gevo's second provisional—U.S. Provisional Appl. No. 61/350, 209 ("the '209 Provisional application")—was filed over six months after the '952 Provisional, which the '376 patent purports to be entitled to the benefit of priority. Priority to this application is irrelevant to the anticipation of the '376 patent by the Butamax '300 Publication.

[25]   Citing '376 patent, col. 28, 59; GEVO0001845059 (Ex. 23); GEVO000262918 at '918–19 (Ex. 24), GEVO000018530 at '530–31, '545 (Ex. 25), GEVO000262241 at '243–44 (Ex. 26); GEVO000262004 at '2006–07 (Ex. 27); GEVO0001486806 at '806–07 (Ex. 28); GEVO000294514 (Ex. 29); Lies Dep. Tr. at 230:1–16, 236:3–21 (Ex. 20); Smith Dep. Tr. at 67:17–23 (Ex. 30); Dundon Dep. Tr. at 263–268 (Ex. 7); Albert Dep. Tr. at 48–50 (Ex. 21); Wickman Dep. Tr. at 87:2–88:6 (Ex. 31).





Gevo's failures establish that undue experimentation would be required to practice the

'376 patent claims and thus the claims are not enabled.  The fact that Gevo stated in their '209

---

26 [redacted]

27 Citing '376 patent and claims 2, 20; GEVO000338703 at '852 (Ex. 33); Albert Dep. Tr. at 176, 258–59 (Ex. 21); GEVO000329323 at '410, '444 (Ex. 34); Flint 1993 (Ex. 14); Dundon Dep. Tr. at 178:5–22, 259:22–262:14 (Ex. 7); Lies Dep. Tr. at 170–71, 178:23–179:5, 236:3–21 (Ex. 20); GEVO0001494564 (Ex. 35); '209 Provisional, Example 14 (Ex. 22); Smith Dep. Tr. at 67:17–23 (Ex. 30).

28 Citing '376 patent, col. 55–56, claims 2 and 20; Albert Dep. Tr. at 103–05, 271–73 (Ex. 21).; GEVO000295504 (Ex. 36).

Provisional application that DHAD activity is not increased using the 2-micron plasmid for AFT overexpression, but then nonetheless claimed it, renders their claims invalid as a matter of law. *See, e.g., AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) (holding that a patent requires undue experimentation as a matter of law where it claims subject matter that the specification teaches against and the patent applicant could not make and use despite a desire to do so.); *see also Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1340 (Fed. Cir. 2003) (holding patent invalid for lack of enablement where the patent claims encompassed subject matter that was difficult to produce and the specification did not teach how to do so); *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1361–62 (Fed. Cir. 2007) (affirming holding that patent failed to satisfy the enablement requirement where the patent claimed subject matter that could not be achieved by one of ordinary skill in the art).

████████████████████████████████████, Gevo has acknowledged that an "optimal level" of AFT expression is required to increase DHAD activity as required by the claims.   (Ex. 22 ['209 provisional] at p. 130–31 (Example 14)).   ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

Yet, against this backdrop of complexity and unpredictability, the '376 patent fails to teach the levels of AFT overexpression that are required to increase DHAD activity.  (Ex. 8 [Rothstein Report] ¶¶ 68–69 (citing Dundon Dep. Tr. at 263–268 (Ex. 7); *see also id.* at ¶¶ 37, 41 (citing '376 patent, col. 55–56; Albert Dep. Tr. at 103–05 (Ex. 21); Ex. 9 [Thiele Op. Report] at Ex. C (pp. 3–5)).  At best, the '376 patent sets forth a handful of specific embodiments where

AFT overexpression purportedly resulted in increased DHAD activity but nothing in those examples indicates the level of AFT protein needed to increase DHAD activity without making the cells sick.



. Nowhere does the '376 patent teach a skilled artisan how to achieve the required "optimal levels." (Ex. 8 [Rothstein Report] ¶¶ 68–69; Ex. 9 [Thiele Op. Report] at Ex. C (¶¶ 8–10)).

Given this lack of guidance, Dr. Rothstein has explained that a person of ordinary skill in the art attempting to achieve the right level of AFT overexpression required to practice the '376 patent claims—a level that Gevo admits is "not obvious"—would be left only with unguided trial and error and no expectation of success without undue experimentation. (Ex. 8 [Rothstein Report] ¶¶ 31, 68–69). Because, however, "[t]he patent laws do not reward an inventor's invitation to other researchers to discover [what]…could conceivably work" especially when the art is "unpredictable," the '376 patent's failure to teach the level of AFT overexpression required to observe increased DHAD activity renders it invalid. *See, e.g., Boston Sci. Corp. v. Johnson & Johnson,* 647 F.3d 1353, 1367 (Fed. Cir. 2011); *Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.,* 713 F. Supp. 2d 184, 193–94 (W.D.N.Y. 2010) (holding patent invalid for lack of enablement where patent required trial-and-error to achieve the desired result).

## CONCLUSION

For the foregoing reasons, Butamax and DuPont respectfully request that the Court grant their motion that the asserted claims of the '375 and '376 patents are invalid.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Leora Ben-Ami
Thomas F. Fleming
Christopher T. Jagoe
Daniel Forchheimer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel:  (212) 446-4800

*Attorneys for Plaintiff/Counterclaim Defendant*
*Butamax$^{TM}$ Advanced Biofuels LLC*

Dated:  November 30, 2012
PUBLIC VERSION
Dated:  December 12, 2012
1086324 / 36429

By:  /s/ David E. Moore
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com
      bpalapura@potteranderson.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Butamax$^{TM}$ Advanced Biofuels LLC and*
*Counterclaim Defendant E. I. du Pont*
*de Nemours and Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on December 12, 2012, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on December 12, 2012, the attached document was Electronically

Mailed to the following person(s):

Jack B. Blumenfeld
Jeremy A. Tigan
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
jblumenfeld@mnat.com
jtigan@mnat.com

James P. Brogan
Ann Marie Byers
Michelle Rhyu
Carolyn V. Juarez
Cooley LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO  80021
jbrogan@cooley.com
abyers@cooley.com
mrhyu@cooley.com
cjuarez@cooley.com
zGevoButamaxLitigation@cooley.com

Melissa Harwood
Cooley LLP
719 Second Avenue, Suite 900
Seattle, WA  98104-1732
mharwood@cooley.com

Daniel Knauss
Matthew J. Brigham
Stephen C. Neal
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
dknauss@cooley.com
mbrigham@cooley.com
nealsc@cooley.com

Tryn T. Stimart
Adam Pivovar
Cooley LLP
777 6th Street, NW
Suite 1100
Washington, DC  20001
tstimart@cooley.com
apivovar@cooley.com

Benjamin G. Damstedt
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
bdamstedt@cooley.com

By:   */s/ David E. Moore*
     Richard L. Horwitz
     David E. Moore
     Bindu A. Palapura
     POTTER ANDERSON & CORROON LLP
     Tel:  (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com
     bpalapura@potteranderson.com

1012762 / 36429