## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BUTAMAX(TM) ADVANCED BIOFUELS LLC, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | C.A. No.  11-54-SLR |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GEVO, INC., | ) ) | **PUBLIC VERSION** |
| Defendant/Counterclaim Plaintiff, | ) ) ) | |
| v. | ) ) | |
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Counterclaim Defendant. | ) | |

### REPLY BRIEF IN SUPPORT OF BUTAMAX'S MOTION
### FOR SUMMARY JUDGMENT OF INFRINGEMENT OF THE '188 AND '889 PATENTS
### AND RESPONSE TO GEVO'S CROSS-MOTION

OF COUNSEL:

Leora Ben-Ami
Thomas F. Fleming
Christopher T. Jagoe
Daniel Forchheimer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Tel:  (212) 446-4800


Dated:  December 28, 2012
PUBLIC VERSION
Dated:  January 9, 2013
1089303 / 36429

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Plaintiff/Counterclaim Defendant
Butamax[TM] Advanced Biofuels LLC*

## TABLE OF CONTENTS

Page

BUTAMAX'S COUNTER STATEMENT OF FACTS .................................................................4

ARGUMENT .........................................................................................................................6

    I.      BUTAMAX'S CONSTRUCTION IS CONSISTENT WITH THE INTRINSIC EVIDENCE AND PLAIN AND ORDINARY MEANING OF KARI .................6

          A.     The Claim Language Supports Butamax's Construction. .........................6

          B.     The Specification Supports Butamax's Construction.................................8

          C.     The File History Support's Butamax's Construction. ..............................15

          D.     Gevo Mischaracterizes the Federal Circuit's Oral Argument...................16

    II.     GEVO'S CONSTRUCTION IS UNSUPPORTED BY THE INTRINSIC EVIDENCE, AND RELIES ON IMPROPER EXTRINSIC EVIDENCE ..........17

          A.     Gevo's Construction Contradicts the Intrinsic Evidence..........................17

          B.     By Relying on Butamax's Patent Applications and Internal Documents, Gevo Concedes There Was No Lexicography as a Matter of Law.................................................................................20

          C.     Should the Court Find Butamax Acted As Lexicographer It Should Adopt the Description of KARI In Its Entirety. ......................................26

    III.    GEVO'S LEAD STRAINS UNDISPUTEDLY INFRINGE THE DONALDSON PATENTS UNDER BUTAMAX'S CLAIM CONSTRUCTION ......................27

          A.     It Is Undisputed That Gevo's Lead Strains Produce Isobutanol Using a Contiguous Pathway ...............................................................28

          B.     It Is Undisputed That Gevo's Processes Meets the "Single Product" Element of Claim 8 of the '889 Patent.....................................29

          C.     Gevo's Lead Strains Infringe under Any Reasonable Construction .........30

          D.     Gevo's Non-Infringement Arguments Concerning Its KARI's Use of NADPH, Are Irrelevant Under Butamax's Construction, and Erroneous. ............................................................................31

    IV.    UNDER GEVO'S ERRONEOUS CONSTRUCTION THERE ARE ISSUES OF FACT PRECLUDING GEVO'S CROSS-MOTION FOR SUMMARY JUDGMENT.........................................................................................32

          A.     Genuine Issues of Material Fact Preclude Gevo's Motion for Summary Judgment on Doctrine of Equivalents.....................................33

B.     Gevo's Prosecution History Estoppel Argument Is Contrary To Law. ...................................................................................35

C.     Gevo's Argument on Reverse Doctrine of Equivalents is Contrary to Law and Factually Unsupported. ......................................................37

CONCLUSION..............................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ...................................................................................14

*Abbott Labs v. Sandoz, Inc.*,
    566 F.3d 1282 ...........................................................................................................32

*Abbott Labs. v. Dey, L.P.*,
    287 F.3d 1097 (Fed. Cir. 2002) ...............................................................................35

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.*,
    674 F.3d 1365 (Fed. Cir. 2012) ...............................................................................26

*Amstar Corp. v. Envirotech Corp.*,
    730 F.2d 1476 (Fed. Cir. 1984) ...............................................................................38

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
    750 F.2d 1569 (Fed. Cir. 1984) .........................................................................21, 35

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ...........................................................................9, 19

*Bell Atl. Network Servs. v. Covad Communications Group, Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001) ...............................................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................29

*Chiron Corp. v. Genetech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004) ...............................................................................25

*Ciena Corp. v. Corvis Corp.*,
    334 F. Supp. 2d 598 (D. Del. 2004) .........................................................................38

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
    206 F.3d 1440 (Fed. Cir. 2000) .................................................................................7

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008) .................................................................................7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.*,
    535 U.S. 722 (2002) ............................................................................................35, 36

*Fowle v. C & C Cola*,
   868 F.2d 59 (3d. Cir. 1989) ............................................................................................39

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003) ....................................................................................18

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004) ....................................................................................21

*IMRA Am., Inc. v. IPG Photonics Corp.*,
   2010 WL 5420552 (E.D. Mich. Dec. 27, 2010) .............................................................8

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ....................................................................................21

*Intamin, Ltd. v. Magnetar Techs., Corp.*,
   483 F.3d 1328 (Fed. Cir. 2007) ......................................................................................8

*Intel Corp. v. VIA Techs., Inc.*,
   319 F.3d 1357 (Fed. Cir. 2003) ..............................................................................19, 20

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010) ..............................................................................35, 37

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004) .............................................................................39

*Lexion Med., LLC v. Northgate Techs., Inc.*,
   618 F. Supp. 2d 896 (N.D. Ill. 2009) ...........................................................................38

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009) ..............................................................................21, 26

*Medtronic, Inc. v. Boston Scientific Corp.*,
   2002 WL 34447587 (D. Minn. Aug. 8, 2002) ..............................................................39

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ..............................................................................20, 21

*Northern Telecom, Inc. v. Datapoint Corp.*,
   908 F.2d 931 (Fed. Cir. 1990) ......................................................................................38

*On-Line Techs. v. Bodenseewerk Perkin-Elmer GmbH*,
   386 F.3d 1133 (Fed. Cir. 2004) ....................................................................................23

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) ....................................................................................21

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................22, 23

*Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*,
  517 F.3d 1364 (Fed. Cir. 2008) ........................................................................36

*Roche Palo Alto LLC v. Apotex, Inc.*,
  531 F.3d 1372 (Fed. Cir. 2008) ........................................................................38

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) ....................................................................6, 21

*Stored Value Solutions, Inc. v. Card Activation Techs.*, Inc.,
  796 F. Supp. 2d 520 (D. Del. 2011) ..................................................................39

*Texas Instruments, Inc. v. U.S. ITC*,
  805 F.2d 1558 (Fed. Cir. 1986) ........................................................................22

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................................20

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
  617 F.3d 1296 (Fed. Cir. 2010) ........................................................................25

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................20

*Voda v. Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008) ........................................................................33

**Statutes**

35 U.S.C. § 112..................................................................................................7

The entire literal infringement issue before this Court turns on the proper claim construction of "acetohydroxy acid isomeroreductase" and "acetohydroxy acid isomeroreductase having the EC number 1.1.1.86" in Butamax's '889 and '188 patents, respectively ("the KARI element").[1]  There is no disputed issue of material fact that all other elements of the asserted claims are met by Gevo's accused yeast and processes.  Butamax submits that the Court should follow the well-settled cannons of claim construction and interpret the intrinsic evidence to determine claim construction and thus infringement.

First, the Court should consider the plain meaning of the term.  It is undisputed that in 2005, a KARI enzyme was one that was structurally similar to known KARIs and that catalyzed the conversion from AL to DHIV.[2]  The standard way in 2005 to characterize whether an enzyme was a KARI was to use an assay that measured whether any NADPH was used in catalysis.  Since this assay only includes one electron donor — NADPH — KARIs in 2005 were characterized as "using NADPH."  (See, e.g., the '188 patent at 7:38.)  If a protein with the structural attributes of a KARI acted positively in this principle assay, then the protein was a KARI.  The broad claims of the Butamax patents neither speak of nor claim any electron donor; the KARI enzyme itself is claimed only as a feature of the engineered pathway that makes isobutanol, which does not require use of any particular electron donor.

---

[1] Gevo apparently has abandoned calling its enzyme "NKR," after each expert agreed the term was created by Gevo, and is not used by POSAs. (D.I. 596, Brief In Support Of Butamax's Motion For Summary Judgment Of Infringement Of The '188 And '889 Patents (hereinafter "Butamax Br.") at 8.) Taking a new tack, Gevo's opposition uses "AAIR" to refer to the KARI element in Butamax's claims. Because the parties use that term interchangeably with KARI — Gevo even does so in its opposition, calling its own enzyme a KARI on one page and an AAIR on the next — Butamax uses the generally accepted KARI term.  Indeed, Gevo previously admitted: "It is undisputed that "acetohydroxy acid isomeroreductase enzyme" is also known as "ketol-acid reductoisomerase," or "KARI." D.I. 154 at 12, n.9.

[2] "AL" is an abbreviation of acetolactate, and "DHIV" is an abbreviation of 2,3-dyhydroxyisovalerate.

Second, one looks to the specification, which simply restates the general concept of KARI and then in the definition paragraph states that there are a vast number of such enzymes. A few preferred KARI enzymes are also listed. One, from *Methanococcus maripaludis*, had already been described in the prior art as using NADH. Further, in 2005 (and today) there was only one EC number assigned for the conversion of AL to DHIV: 1.1.1.86. The specification therefore described KARIs as having that number. In so doing, the Butamax inventors did not exclude enzymes based on cofactor utilization. As Gevo itself stated, this has been the "best way" known to identify KARI enzymes that use NADH then and now. ████████

████ and in submissions to the U.S. government, patent applications, and even in a sworn declaration it submitted to this Court on the same day it submitted its opposition to infringement. Gevo's recent hyper-technical interpretation of the EC rules (disputed among EC members themselves) would not inform a POSA,[3] who has only ordinary skill, not the specialized understanding of the EC members. That POSA in 2005 would understand that 1.1.1.86 is the only EC number for the conversion of AL to DHIV, and that number applies to the reaction irrespective of cofactor utilization. The fact that other enzymes, such as ADH enzymes, are known by multiple EC numbers and were so described in the specification does *not* redefine KARI enzymes as Gevo suggests.

Also, in the detailed description of the Butamax patents, examples of KARIs are provided which were genetically engineered. Example 2 tells one to use the Afrin and Umbarger assay (which only provides NADPH as an electron donor and therefore says nothing about "dependence," "selectivity" or the like) to characterize an enzyme as a KARI. The specification

---

[3] There is no dispute that a POSA is a person with a Ph.D in biology, chemistry, or a related field, with several years of relevant experience in an academic or corporate research setting.

states that KARI enzyme function is based on "specific activity" in units/mg. in that Afrin and Umbarger assay. This differs from Gevo's complex calculations of relative rates, binding constants, $K_m$ and $k_{cat}$, which Gevo relies on to determine cofactor "dependency," but which are nowhere in the specification or prosecution history, and should not be read into the claims.

Third, the prosecution history explicitly confirms the above meaning. The PTO examiner asked Butamax how a POSA would understand the structures of the enzymes recited in the claims. Butamax pointed the Examiner to the BRENDA database, which catalogs enzymes by EC numbers (D.I. 508, '188 FH at BJA1702), and, with respect to KARI specifically, Butamax pointed to the KARI assay provided in Example 2 of the specification, stating: "the Examples describe the vectors, primers, enzymes and the like, that are used for cloning the genes encoding the enzymes, in addition to the methods of assaying the respective enzyme's activity. For illustration purposes ... Example 2 provides this information for acetohydroxy acid reductoisomerase [KARI]." (D.I. 509, '889 FH at BJA2138.)

Faced with a simple, clear, and consistent intrinsic record, Gevo has repeatedly tried to rewrite the specification and conjure different claim constructions depending on its audience. For example, during the several months of *Markman* briefing, Gevo asserted a construction of "solely NADPH-dependent (as opposed to NADH-dependent or NADH and NADPH-dependent)." (D.I. 535 at 7.) During oral argument before the Federal Circuit, within seconds of facing questions, Gevo argued "solely" should be dropped. (D.I. 591 at 20:6-8.) Now, in opposition, Gevo argues "dependent" should be replaced with "specific" "selective," "preferred" or "selectively preferred." (D.I. 611, Gevo, Inc.'s Responsive and Opening Brief in Support of its Motion for Summary Judgment of Non-infringement of U.S. Patent Nos. 7,851,188 and 7,993,889 (hereinafter, Def.'s Br.) at 25.) The fact that Gevo must repeatedly reimagine its claim

construction highlights its litigation induced basis.  Gevo is fine with any claim construction so long as it does not cover its enzymes — enzymes which Gevo has consistently called KARIs in public and internally prior to this litigation.

The lack of intrinsic evidence support for Gevo's ever-changing construction, and Gevo's reliance on extrinsic evidence, shows its assertion of "lexicography" by the Butamax inventors is wrong.  Butamax's straightforward construction, which is consistent with the intrinsic evidence, should be adopted, and Butamax should be granted summary judgment.

Finally, even under Gevo's faulty claim construction there is, at a minimum, substantial evidence of doctrine of equivalents ("DOE") infringement compelling denial of Gevo's cross-motion.  Similarly, Gevo's prosecution history estoppel argument fails because Butamax never made a narrowing amendment excluding a KARI that uses NADH.  (*See* Def.'s Br. at 25.)

## BUTAMAX'S COUNTER STATEMENT OF FACTS

At a loss to tie its construction to the intrinsic evidence, the record shows that Gevo chooses instead to consistently repudiate its prior arguments, data, and expert witnesses' testimony.  Indeed, Gevo's arguments and rebuttals to Butamax's clear support for its construction stands in stark contrast to the evidence of record.

On whether the claims support Butamax's construction of a KARI that uses NADH:

- Gevo's Dr. Kirsch testified that claim 14 of the '889 patent claiming "one or more" enzymes that use NADH as a cofactor could only potentially apply to the "KARI and [ADH]" enzymes.  (Ex. A at 451:3-25.)[4]

But when Judge Rader of the Federal Circuit asked Gevo's counsel whether claim 14 cut against Gevo's claim construction of KARI as NADPH-dependent, Gevo's counsel replied:

---

[4]  Exhibits referenced herein (Ex. _) are contained in the Appendices of Exhibits filed with this brief, Butamax's Opening Brief on Infringement, and Butamax's Opposition Brief to Gevo's Motion re Invalidity of the '188 and '889 Patents and Cross-Motion re Validity.

- "NADH could operate on *any of the other enzymes* in that five-step pathway," but KARI. (D.I. 591 at 25:9-10.)

On the issue of whether the Butamax patents disclose a preferred KARI from *Methanococcus* that uses both NADH and NADPH, Gevo's opposition argues:

- "The [KARI] enzyme of *M. maripaludis is NADPH-dependent*." (Def.'s Br. at 27.)

But, Gevo's own patent application states:

- "KARI from Methanococcus species can be used. *These KARI enzymes have been reported to be able to utilize NADH with roughly 60% the activity with NADPH*." (D.I. 517, Gevo's '483 Provisional at ¶ [0082] (GJA00004883).)

- ████████████████████████████████████████████████

On Butamax's use of EC number 1.1.1.86, Gevo's opposition vehemently argues the Butamax patents limited KARI to being NADPH-dependent:

- "by reference to EC 1.1.1.86 as a preferred embodiment." (Def.s' Br. at 12.)

Yet, on the same day of its opposition, Gevo submitted a sworn declaration from a named inventor of Gevo's '376 patent to this Court, stating Gevo's claim to an "NADH-dependent" KARI is fully supported in a provisional application that disclosed KARI by reference to:

- " Keto-acid Reducto-isomerase (*KARI, EC1.1.1.86*)." (D.I. 617 at Attachment B, p. 4.)

On the issue of the Arfin and Umbarger assay and whether it can be used to determine NADPH-dependency, Gevo's opposition now argues:

- "one of ordinary skill in the art *would . . . us[e] the Arfin assay, to determine whether a[ KARI] ... would be NADPH-dependent*." (Def.'s Br. at 38.)

But just one month ago, during *Markman* briefing, Gevo argued:

████████████████████████████████████████████████

- "[T]he *Arfin and Umbarger assay does not show co-factor dependencies* for many reasons[.]" (D.I. 535 at 21, n.11.)

Finally, Gevo now argues that the Butamax patents redefined KARI by lexicography, however, its own expert, Dr. Kirsch admitted Butamax's patents:

- "did not redefine KARI inconsistent with its ordinary and customary meaning." (D.I. 552, Ex. EEE at 134:20-22.)

These contradictions, along with many others recounted herein, show that Gevo's construction of the KARI element as NADPH-dependent lacks any support in the intrinsic evidence, and that Gevo has tied itself in knots trying to argue that there is.

## ARGUMENT

### I.   BUTAMAX'S CONSTRUCTION IS CONSISTENT WITH THE INTRINSIC EVIDENCE AND PLAIN AND ORDINARY MEANING OF KARI

Infringement is a two-step process of first construing the claims, and then applying that construction to the accused product or process. While it may be appropriate to understand the infringement and invalidity consequences of a given construction, Gevo works in reverse, arguing non-infringement because its KARIs have an allegedly new feature (greater use of NADH), and then asking the Court to adopt any construction, so long as the claims do not cover its product. This is improper. *See, e.g., SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("claims are not construed 'to cover' or 'not to cover' the accused device"). Following the cannons of construction it is clear that Butamax's construction is proper.

### A.   The Claim Language Supports Butamax's Construction.

Claim construction begins with the claim language itself. The claims include the limitation of a KARI enzyme. The claims also recite the enzyme is critical to AL to DHIV conversion. There is no limitation to an electron donor and the claims do not require the conversion of NADPH to NADP+; if Gevo's construction were adopted the Court would be importing a limitation. Further, as noted below, claim 1 of the '188 patent's reciting KARIs

having EC 1.1.1.86 would be understood by a POSA in 2005 as including KARIs that can use NADPH or NADH. *See* Sect.IB.

Claim 14 of the '889 patent — the only claim that refers to cofactor use — expressly refers to "one or more" enzymes of the engineered pathway that "uses NADH as an electron donor." As noted above, Judge Rader questioned whether claim 14 "cut against [Gevo]," because if step 2 is construed as "only using NADPH as the electron donor, then the term 'or more' would be [read] out of . . . claim [14]." (D.I. 591 at 24:15-18.) Gevo's opposition ignores its counsel's misstatement during oral argument asserting *"any of the other enzymes* [but KARI] *in that five-step pathway"* could also use NADH (*Id.* at 25:10), and Dr. Kirsch's admission that this is incorrect because only the *"KARI* and the alcohol dehydrogenase" could possibly use NADH. (Ex. A at 451:14-25; Ex. BBBB, Kirsch Dep. at 482:21-483:5.) Indeed, Gevo's latest brief now concedes that only ADH and KARI can use "NADH and/or NADPH," implicitly conceding that the "one or more" language of claim 14 must cover a KARI that uses NADH.[6] (Def.'s Br. at 7.) *See, e.g., Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.") (citations omitted). Because claim 14 of the '889 patent must cover such KARIs so must claim 1, as it is black letter law that dependent claims are a narrower subset of their independent claim. *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.,* 206 F.3d 1440, 1446 (Fed. Cir. 2000); 35 U.S.C. § 112(d). This is not a simple application of the doctrine of claim differentiation. The dependent claim is a key part of the intrinsic evidence that clarifies the meaning and breadth of

---

[6] Claim 14 includes the language "uses" NADH as an electron donor. "Uses" is the same language as in the definition section of the patents ("using NADPH... as an electron donor"). As Dr. Kirsch testified, the term should therefore be given a consistent meaning. (Ex. BBBB, Kirsch Dep. at 482:14-20.) Yet, it is impossible to reconcile that "using" in the specification means "NADPH-dependent," but in claim 14 means "NADH-dependent."

the independent claim. *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("In *Phillips*, this court noted that dependent claims can supply additional context for construing the scope of the independent claims associated with those dependent claims .... [and] impliedly embraces more subject matter"); *see also IMRA Am., Inc. v. IPG Photonics Corp.*, 2010 WL 5420552, at *10 (E.D. Mich. Dec. 27, 2010) ("The dependent claims are intrinsic evidence for purposes of claim construction.").

Here, the PTO granted a claim in which the KARI uses NADH as an electron donor. Similarly, as noted below, dependent claim 15 of the '188 patent, claims a KARI from *Methanococcus maripaludis* disclosed in the prior art to use NADH. Therefore, it must be concluded that the PTO did not understand the specification to have redefined KARI to exclude such a species of KARI, or limit KARIs to being NADPH-dependent.

### B. The Specification Supports Butamax's Construction.

Turning to the specification, from the figures, to the section discussing preferred KARIs, to the examples, it is clear the inventors identified the KARI element by structure and conversion of AL to DHIV based on activity in the Arfin and Umbarger assay, and *not* cofactor use.

*First*, Figure 1 discloses the conversion of AL to DHIV by a KARI enzyme, and indicates no limit to cofactor usage, noting only that two electrons are donated in the conversion.[7]

*Second*, the statement that KARI "catalyzes the conversion of [AL] to [DHIV] using NADPH as *an* electron donor" (*see, e.g.*, '188 patent at 7:37-40) supports *not* limiting the KARI element to being "NADPH-dependent." The Federal Circuit "has *repeatedly emphasized* that an indefinite article 'a' or 'an' in patent parlance carries the meaning of '*one or more*' in open-ended claims containing the transitional phrase 'comprising.' That 'a' or 'an' can mean '*one or*

---

[7] *See* '889 and '188 patents at Figure 1, depict the KARI reduction step in brackets as the product of reaction "b", with electron donation indicated by "2 e⁻."

*more' is best described as a rule*, rather than merely as a presumption or even a convention."

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).

It is clear that Butamax did not "disavow" KARIs that use NADH, as the few next sentences of the specification disclose a preferred KARI from *Methanococcus maripaludis* that can use either NADPH or NADH.[8] This sequence is specifically claimed by the '188 patent at claim 15, again showing that Butamax expressly claimed KARIs that use NADH. While Gevo now argues the evidence of *M. maripaludis*'s KARI activity with NADH is unsubstantiated, that assertion is contradicted by the prior art, Gevo's own patent application, ▮▮▮▮▮▮▮▮▮▮ and both parties' expert testimony.

Xing et al. (1991) disclosed three species of *Methanococcus* — *aeolicus, maripaludis, and voltae* — and stated "NADH supported 60% of the *methanococcal* [KARI] activity obtained with NADPH." (D.I. 496, Ex. K at 2089.) Making clear the authors were referring to this genus, rather than any particular species, they state "the ***methanococcal*** [KARI] has a broad specificity for NADPH and NADH." (*Id.* at 2091.) Regardless of any arguments Gevo raises concerning the scientific validity or value of Xing et al. (1991), a POSA in 2005 would know this peer-reviewed article, and understand that the Butamax patents included a *Methanococcus* KARI as a preferred example and did not exclude KARIs that use NADH from their claimed invention. (Ex. CCCC, Babbitt Dep. at 233.)

Moreover, Gevo expressly endorsed the finding of Xing in its own provisional application, stating "a KARI from *Methanococcus* species can be used. ***These KARI enzymes***

---

[8]  Gevo's argument that the patents' disclosure of the *Methanococcus* KARI sequence is based on the "Hendrickson" publication misses the point. (Def.'s Br. at 28.) Prof. Whitman, a co-author of Hendrickson, was also a co-author of Xing et al. (1991), which unambiguously identified that genus as having significant activity with NADH and NADPH.

have been reported to be able to utilize NADH with roughly 60% the activity with NADPH (Xing et al., Journal of Bacteriology 1990 [sic])." (D.I. 517, Gevo's '483 Provisional at ¶ [0082] (GJA00004883).) By using the plural it is clear Gevo also understood Xing was not just referring to one species, but the genus of *Methanococcus*.

Indeed, Gevo cannot seriously contest the KARI from *M. maripaludis* identified in Xing and disclosed in the Butamax patents maintains 60% activity with NADH — ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████ No Gevo expert has ever rebutted this fact. Thus, there is no genuine dispute that the Butamax patents expressly disclosed a preferred KARI from *Methanococcus* that uses either NADH or NADPH.[9]

Similarly, Gevo concedes the *B. subtilis* KARI, also disclosed in the Butamax patents as preferred, and has never been characterized for cofactor use. However, Gevo then speculates it is NADPH-dependent (Def.'s Br. at 31), or that a POSA at the time of filing would expect it to be NADPH-dependent. This assertion cannot be squared with the prior art of Xing et al. (1991), and Rane and Calvo (1997), disclosing natural and recombinant KARIs that use NADH. (*See also* Ex. DDDD, Petersen et al. (1983) at 21-22.) It is also inconsistent with the ordinary meaning of KARI, which, as Gevo admits, is an enzyme that can use either NADH or NADPH.

---

[9] To cloud the issue, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████

(D.I. 621 at 21.)  Gevo's high-level scientist, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

That the specification does not limit KARI to those enzymes using NADPH alone is

further confirmed by its reference to preferred KARIs that are known by EC number 1.1.1.86.  It

is undisputed that POSAs, ***including Gevo***, regularly use EC number 1.1.1.86 to identify

engineered and naturally-occurring KARIs that use NADPH *or* NADH.  Gevo's submission to

the Federal government expressly states its KARI that uses "NADH" has EC number 1.1.1.86.

(Ex. W at A04005; D.I. 70, Gevo USDA Report at Ex. 13.).)  As the Butamax inventors raised

during the prosecution of the '188 patent, databases like BRENDA and MetaCyc, both heavily

relied on by POSAs, reference enzymes by EC number and keep track of the properties of the

associated enzymes.  (D.I. 508, '188 FH at BJA1702.)  Those databases regularly identify mutant

and engineered KARIs that use NADH or NADPH as having EC number 1.1.1.86.  (Ex. X,

Schomburg Report at ¶ 31; D.I. 555 at Ex. VV.)  These images taken from BRENDA, show it

lists KARIs under EC 1.1.1.86 using NADH:

## BRENDA
### The Comprehensive Enzyme Information System
## EC 1.1.1.86 – ketol–acid reductoisomerase

| COFACTOR | ORGANISM | COMMENTARY | LITERATURE | IMAGE |
|---|---|---|---|---|
| NADH | Escherichia coli | can substitute for NADPH | 639183 | ● 2D-image |
| NADH | Spinacia oleracea | can substitute for NADPH | 639176, 639179 | ● 2D-image |

(D.I. 496, Ex. D at 1, 13.)

Unable to refute that the BRENDA entry for EC 1.1.1.86 includes engineered KARIs

and KARIs where NADH and NADPH can substitute for each other, Gevo's EC expert Dr.

Caspi speculates that those KARIs must have been added to BRENDA by "mistake." (D.I. 540, Caspi Decl. at ¶ 35.) However, Butamax's expert, Dr. Schomburg, a founder and developer of BRENDA, noted this "was not a mistake." (D.I. 553, 2nd Schomburg Decl. at ¶ 20). Regardless, a POSA reading the patents' reference to 1.1.1.86 would look in BRENDA, and conclude that KARI enzymes that use NADH are covered by the patents. Even Gevo's expert Dr. Cantor agreed that the reason the EC designations cross-reference databases is so the scientific community can see the enzymes that are considered to have the reaction. (Ex. FFFF, Cantor Dep. at 75-76.) A POSA would not dig up esoteric, decades-old EC nomenclature rules and delve into a highly technical application of those rules — something even the EC members themselves cannot agree on — and use that to conclude KARI enzymes that have a higher catalytic efficiency with NADH compared to NADPH are not covered by the claims. *See, e.g., Pfizer, Inc. v. Teva Pharm.*, 429 F.3d 1364, 1375 (Fed. Cir. 2005) (a POSA's understanding of a term at time of filing is relevant for claim construction, *not* "historical origins" of a term).



Dr. Kirsch also admitted it is "commonplace in the field" to refer to genetically modified enzymes by EC numbers. (Ex. A,

Kirsch Dep. Tr. at 467:23-468:20.)[10]   Most recently, Dr. Dundon (a Gevo senior scientist and named inventor of Gevo's '375 and '376 patents) submitted a sworn declaration asserting that support for Gevo's '376 patent's claim reciting an *"NADH-dependent"* KARI was the provisional application's specification reciting the conversion of AL to DHIV using *NADPH*, and disclosure of *"KARI, EC 1.1.1.86."* (*See generally* D.I. 617, and at Attachment B, p. 4.)

It is impossible to reconcile how Gevo argues in opposition to infringement that the Butamax patents, by citing EC number 1.1.1.86, limited the KARI element to solely NADPH-dependent KARIs (a word that not used once in those patents to describe KARI), and on the same day, Gevo submitted a sworn declaration from Dr. Dundon stating that *Gevo's application's reference to E.C. 1.1.1.86* supports a claim directed to an *NADH-dependent KARI*. This admission alone should dispose of Gevo's arbitrary and unsupported attempt to improperly limit the Butamax claims to an NADPH-dependent KARI.

*Third*, the specification defines KARI activity in Example 2 by an enzyme's ability to convert AL to DHIV, as measured by the Arfin and Umbarger assay, stating KARI "activity in the cell free extracts *is measured using the method described by Arfin and Umbarger* (J. Bio. Chem. 244(5):1118-1127 (1969))." (*E.g.*, '188 patent at 33:45-47)  As Gevo itself admitted in *Markman* briefing "the Arfin and Umbarger assay *does not* show co-factor dependencies for many reasons…" (D.I. 535 at 21, n.11.)  Similarly, Dr. Kirsch admitted that assay "was not run in competition" (Ex. A at 391:1-10), and differs from his test to determine cofactor dependence,

---

[10]  It is clear that the '188 and '889 patent inventors had no intention of limiting their invention to natural KARIs by citing EC 1.1.1.86.  The patents provide examples of engineered KARI enzymes.  For example, Example 17 of the '188 and '889 patents states that KARIs "generated new start codons to eliminate mitochondrial targeting of these enzymes." ('889 patent at 39:25-29; '188 patent at 43:38-42; Ex. HHHH, ████████████████████████████
███████████████████████████████████████████████████

which relies on "a measure or a constant that is not in the '188 or '889 patents" (*id.* at 439:25-440:4). He also testified that the disclosure of the Arfin and Umbarger assay in the specification was sufficient to describe KARI activity. (Ex. IIII, Kirsch Dep. at 235:22-236:6.) That Gevo now changes positions arguing one "*would* examine the $k_{cat}$ and $K_m$ parameters, using the Arfin assay, to determine whether [a KARI] in question would be NADPH-dependent" only underscores that Gevo knows its construction is improper, and further shows Gevo's attempt to contort the intrinsic evidence. (Def.'s Br. at 38.) Gevo asserts a POSA could do separate assays, first with NADPH to test an enzyme's ability to convert AL to DHIV, and then with NADH to test that enzyme's ability to do the conversion, and that this constitutes running Arfin and Umbarger assays. (Def.'s Br. at 38.) However, Dr. Kirsch admitted that assay only tests use of NADPH. (Ex. A at 390:7-23.) Thus, as Gevo initially conceded, it cannot be used to test "dependency."

Moreover, by defining KARI activity by the Arfin and Umbarger assay run *in a test tube*, the specification contradicts Gevo's latest argument that KARI activity must be shown by use of a particular cofactor in a cell. (Def.'s Br. at 49). The KARI element is directed to a tangible substance, a protein. By default it should be construed in its structural sense. *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371-72 (Fed. Cir. 2003). As Gevo itself has admitted the ordinary and customary meaning of a KARI enzyme does not specify relative amounts of cofactor usage. (D.I. 621 at 21-22.) There is no support in the intrinsic evidence to import a limitation requiring a specific cofactor use in a cell, and it is contrary to how a POSA would characterize an enzyme. Indeed, Dr. Kirsh testified "[i]t's unheard of" to test for cofactor usage in a cell. (Ex. A at 509.) ████████████████████████

██████████████████████████████████████████

██████   Indeed, Butamax's KARI assay based on Arfin and Umbarger is the "gold standard" and is the proper test. (Ex. CCCC, Babbitt Dep. at 239.).

Even if cofactor use in a cell were a relevant consideration, this would provide further support for not limiting KARIs in the Butamax patents to those enzymes that are "NADPH-dependent." ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████   This prior art, and the specification's disclosure of *Methanococcus* KARIs, shows that Butamax had no intention of excluding enzymes that use NADH, in a test tube or a cell.

### C.     The File History Support's Butamax's Construction.

Lastly, the prosecution history is consistent with Butamax's construction.   While prosecuting the '889 patent, the Examiner asked how a POSA would identify a KARI of the claimed invention for purposes of enablement. (D.I. 509, '889 FH at BJA2128.) The inventors informed the Examiner that the specification discloses numerous KARI sequences (providing structure), and discloses the Arfin and Umbarger assay to determine if similar sequences function with KARI activity. (D.I. 509, '889 FH at BJA2138.) Similarly, when prosecuting the '188 patent the inventors noted "the art is replete with databases that provide direct links to exact structural definition of these polypeptides" such as KARI. (D.I. 508, '188 FH at BJA1702.) The inventors stated "[o]ne such database is BRENDA" which could be searched by a POSA by EC number. (*Id.*) As noted above, BRENDA in fact discloses KARIs that use NADH, under EC number 1.1.1.86. Thus, a POSA reviewing the specification and file history would consult BRENDA, see KARIs that use NADH disclosed, and would understand the Butamax inventors included such enzymes as part of their invention. These facts remain undisputed by Gevo.

### D.     Gevo Mischaracterizes the Federal Circuit's Oral Argument

The Federal Circuit's recent opinion stated its decision "should ***not be read to endorse***

the ... very questionable construction of the claim term 'acetohydroxy acid isomeroreductase'

that is 'an enzyme that is solely NADPH dependent.'" (*See* D.I. 590, Op. at 2.)  Without irony,

Gevo now argues this means the Federal Circuit ***did endorse*** Gevo's construction, which breaks

out three categories of "dependent" enzymes, and limits the KARI element to one that only uses

NADPH.  Gevo reaches this "black is white" interpretation by confusing a judges' use of the

Socratic method during oral argument for the Court's point-of-view.  Indeed, the Federal Circuit

Order was for the district court to conduct a *Markman* proceeding.  It did not instruct on how to

correct the preliminary construction.  Gevo mischaracterizes the hearing.

None of the Judges found Butamax employed lexicography to define KARI as NADPH-

dependent.  Gevo's "support" for this position is a question from Judge Dyk asking Butamax's

counsel whether "NADPH-dependent means the same thing as preferring NADPH?"  (D.I. 591

at 7:5-7.)  Butamax's counsel responded that those terms could not be equated because Gevo's

definition of dependency talks of "efficiency," or "turnover rate" and is really a process, which

lacks support in the specification.  (*Id.* at 7:10-12; 9:9-15.)  Expert discovery now shows this is

correct, as Gevo's experts have testified dependence refers to "efficien[cy]" of cofactor use (Ex.

L, Cantor Dep. at 80:2-23), or the rate of "relative" flux (Ex. A, Kirsch Dep. at 392:17-24), and

is determined by a "comparative assay" based on "a measure or constant that is not disclosed in

the '188 or '889 patents." (*Id.* at 390-91, 439:25-440:4.)

It is also undisputed that Gevo's counsel disputed this fact at the hearing to try and

salvage its construction.  For example, Judge Rader picked up on the concern that the

dependency limitation actually creates an improper process limitation and asked "We heard that

that [NADPH-dependent] really refers to a process rather than a dependency. . . It's a rate I think

is what [Butamax's counsel stated]." (D.I. 591 at 21:1-6.) Gevo's counsel responded "I don't think that's correct." (*Id.* at 21:7.) Yet, in opposition, Gevo now admits that one of its different tests for dependency is a measure "$k_{cat}/K_m$." (Def.'s Br. at 36.) Indeed, this is the same rate measure Butamax's counsel noted Gevo had asserted and is unsupported by the specification, but which Gevo's counsel denied at the hearing.

Thus, the Federal Circuit raised several issues beyond just the term "solely," including whether the preliminary construction excluded preferred KARIs, and deviated from the plain meaning of the claims and specification. (D.I. 591 at 4:20-5:4, 21:13-16, 22:15-18, 23:13-16, 25:21-26:1.) Appendix B shows that aside from the word "solely," the Federal Circuit raised various defects with the preliminary construction, and Gevo's and its experts' positions on these matters continue to change and fail to remedy these defects.

## II.   GEVO'S CONSTRUCTION IS UNSUPPORTED BY THE INTRINSIC EVIDENCE, AND RELIES ON IMPROPER EXTRINSIC EVIDENCE

After numerous briefs, Gevo *still* fails to quantitatively or qualitatively define its construction and explain how to distinguish a NADPH-dependent enzyme from a "NADPH and NADH-dependent enzyme," "NADH-dependent," or an enzyme that just has "ancillary" NADH or NADPH activity. Moreover, Gevo's reliance on Butamax's later-in-time and unrelated patent applications and internal documents shows its construction of the KARI element lacks support in the intrinsic record and cannot constitute Butamax's lexicography.

### A.   Gevo's Construction Contradicts the Intrinsic Evidence.

Realizing its construction of "solely NADPH-dependent" cannot stand, Gevo now offers new alternatives by dropping "solely," and replacing "NADPH-dependent" with "specific" "selective," "preferred" or "selectively preferred." (Def.'s Br. at 25.) Just like Gevo's first construction, none of these alternatives are supported by the intrinsic record.

Burying the lead, Gevo waits until page 37 of its brief to admit that its test for NADPH-dependence requires "an analysis of both of the $k_{cat}$ and $K_m$ parameters" for both NADH and NADPH, assayed in the presence of protein, and acetolactate. (Def.'s Br. at 36-37.) However, Gevo's test is devoid of any support in or citation to the intrinsic evidence. (*Id.* at 36-39.) This is because, as Dr. Kirsch testified, "I've gone through [the Butamax Patents.] No. *I don't find any mention of Kcat divided by KM in conjunction with KARI or, in fact, any mention of Kcat or KM at all.*" (Ex. A at 395:13-15.)

Gevo also still cannot identify where to draw the lines between enzymes that are NADPH-dependent versus NADPH- and NADH-dependent versus NADH-dependent, versus an enzyme that has only "ancillary" activity with either cofactor. Tellingly, as Dr. Kirsch admitted, to make such a call — which would be required for an infringement analysis under Gevo's construction — "*it really would depend on who you're talking to.*" (Ex. A at 381:5-22.) Dr. Kirsch was asked directly where the "fixed dividing ... line between NADH dependency" lies, to which he replied "You're asking for a qualitative descriptor on a quantitative continuum, and *that's impossible.*" (Ex. BBBB, Kirsch Dep. at 401.) The vagueness of Gevo's construction compels its denial. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003). Further, switching "dependent" for "selective" or "preferential" does not fix this problem, as these terms are not used in the Butamax patents to describe KARI.

From over a hundred pages of the patents' specification, Gevo points to only two places that it alleges support its construction. First, Gevo notes that in a table (*not* the definition section), the specification refers to the enzyme ADH6 (*not* KARI) as NADPH-dependent. (Def.'s Br. at 22.) Even then, Gevo is forced to turn to more extrinsic evidence to try and

explain this term.  (*Id.*)[11]  If anything, this further proves Butamax did ***not*** define KARI as

NADPH-dependent.  Rather, a POSA would understand use of that term with respect to ADH6

and not KARI means the inventors did not limit KARI in that manner.

Second, Gevo cites the specification's reference to other enzymes as using "NADH...

and/or NADPH as electron donor," "NAD(P)H," and "either NADH or NADPH as electron

donor," and argues this proves Butamax broke down KARI into a tripartite categorization.

(Def.'s Br. at 20.)  This is wrong.  The patents' description of other enzymes, like ADH

enzymes, reflects the different EC number listings for different classes of ADH enzymes.  But

KARI, in contrast both in 2005 and today, has only a single associated EC number.  That is why

████████████████████████████████████████████████████████  and also

why Gevo's extensive discussion of ***other*** EC numbers concerning ***unrelated*** enzymes is

irrelevant to how a POSA would understand EC 1.1.1.86.  Indeed, Butamax's years of

investment in R&D should not be made available to Gevo merely because Butamax used known

terminology in the art that Gevo now attempts to redefine after being sued for infringement.

Further, Gevo's argument that Butamax implicitly defined three categories of KARIs

(when the art had only one category for all KARIs) in the specification by stating that KARIs use

NADPH as "an electron donor" turns the Federal Circuit's rule for indefinite articles on its head,

arguing what typically means "one or more" to mean one and only one.  *Baldwin Graphic*, 512

F.3d at 1342.  This disclosure in no way evinces an intent to disavow enzymes that also use

NADH as a cofactor.  Indeed, even Gevo's Dr. Kirsch agreed there is nothing in the Butamax

---

[11] Gevo's cites to Dumas I and Dumas II to support its implicit definition of "dependence." (Def.'s Br. at 22.)  These references are quintessential extrinsic evidence, which cannot be used to contradict the intrinsic record.  *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.").

patents where the inventors state "we are excluding NADH-dependent KARIs," (Ex. A, Kirsch

Dep. at 453:25-454:19), and "there would be no reason to exclude it." (*Id.* at 454:22-455:3.)

Here, Gevo's definition of dependency has zero support in the claims, specification or

file history, and reads in a limitation that deviates from KARI's plain meaning, which as its own

expert admits, makes it is impossible to draw a line between enzymes that fall within the three

categories of its construction. As such, Gevo's construction must be rejected.

**B.    By Relying on Butamax's Patent Applications and Internal Documents, Gevo Concedes There Was No Lexicography as a Matter of Law.**

Gevo has failed to tie its purported lexicographic redefinition of KARI as NADPH-

dependent or test for such dependency to anything in the intrinsic evidence. As such, its

construction fails because it is black letter law that "[w]hen a patentee acts as his own

lexicographer in redefining the meaning of particular claim terms away from their ordinary

meaning, *he must clearly express that intent in the written description.*" *Merck & Co., Inc. v.*

*Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370-71 (Fed. Cir. 2005) (citing *Bell Atl. Network*

*Servs. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)); *Thorner v.*

*Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012) (holding to deviate

from the plain meaning "require[s] a clear and *explicit* statement by the patentee").

Gevo now turns to extrinsic evidence of unrelated and later Butamax patent applications

and internal documents to try and bolster its construction. However, extrinsic evidence may be

used only to clarify an ambiguity in the intrinsic evidence. *Intel Corp*, 319 F.3d at 1367. But if

there is ambiguity there is can be no lexicography, which is why extrinsic evidence is irrelevant

to prove alleged lexicography. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83

(Fed. Cir. 1996) ("In those cases where the public record unambiguously describes the scope of

the patented invention, reliance on any extrinsic evidence is improper."); *Martek Biosciences*

*Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1382 (Fed. Cir. 2009) (extrinsic evidence is "simply irrelevant" if the "patentee explicitly defined" a claim term). Citing extrinsic evidence, Gevo implicitly acknowledges that the intrinsic evidence lacks "sufficient clarity" to constitute narrowing lexicography. *Merck*, 395 F.3d at 1370-71.

        1.    *Butamax's applications do not support Gevo's claim construction.*

Gevo's reliance on a later unrelated patent application — U.S. 2009/0163376 ("the '376 application") — with different inventors, directed to new, "[s]pecific mutant" KARIs is contrary to law and irrelevant. D.I. 535, Ex. 2 at Abstract. Statements made prosecuting a later, unrelated patent cannot be used to interpret the claims of an earlier patent. *See Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006); *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004).

Furthermore, Gevo misapprehends the '188 and '889 patent inventions, which are not directed to specific KARIs, but rather to a new engineered biosynthetic pathway useful for commercial production of isobutanol, where KARI is one of five enzymes that work together in a new way. The '376 application, in contrast, is directed to specific improvements in engineered KARIs that could be used in an isobutanol pathway. (Ex. JJJJ, FH of U.S. Patent 8,129,162 at 3.) A later improvement of a patent claim element, even if separately patentable, does not exclude that improvement from falling within the scope of earlier, dominant claim. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1580 (Fed. Cir. 1984). Nor does a patent need to describe every conceivable future embodiment. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough."); *SRI Int'l v. Matsushita*, 775 F.2d at 973-74. Thus, this extrinsic evidence cannot subsequently narrow the '188 and '889 patents' scope. *Pfizer*, 457 F.3d at 1290.

Gevo's reliance on a continuation-in-part is also unavailing. (Def.'s Br. at 23.)   That application, filed five years after the '889 patent's disclosure, incorporates narrow, novel KARIs with specific mutations. (D.I. 535, Ex. 3.)   The further description provided by that application's discussion of KARIs is *not* intrinsic evidence to the '188 and '889 patents, and cannot retroactively narrow the '188 and '889 patents' KARI limitations.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (claim terms are construed as they would be understood "at the time of the invention, i.e., as of the effective filing date of the patent application.").

Indeed, Gevo's attempt to rewrite the specification by citing Butamax's unrelated applications is a red herring.  Later patents and patent applications would not inform a POSA in 2005/2006 about what "using NADPH as an electron donor" means.  Nor would they show that Butamax believed the '188 and '889 patents did not cover isobutanol-producing yeast where the engineered pathway incorporates a "NADH-dependent KARI."   Those disclosures do not somehow make Gevo's construction comprehensible in view of the '188 and '889 patents, or save Gevo's inability to identify any reasonable dividing line between its tripartite division of KARIs.  Improvements on patented inventions are common; it does not mean that what is claimed in a later patent is not covered by the earlier patents.  By analogy, a patent to a chair is still infringed by a chair that has rollers.  While a rolling chair may be separately patentable, it does not mean the accused chair does not fall within the scope of the dominating patent.  *Texas Instruments, Inc. v. U.S. ITC*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent.").

2.     *Gevo's reliance on Butamax's internal documents is improper as a matter of law, and irrelevant.*

On the issue of Butamax's internal documents, many of which were developed after the

22

patents' filing dates, Gevo repeats the same arguments it made during *Markman* briefing and they continue to be wrong for the same reasons previously explained.

Butamax's internal documents (Def.'s Br. at 13, 32-34) are not part of the intrinsic record, and therefore are irrelevant to claim construction, and certainly to show lexicography. *See, e.g., On-Line Techs. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004) ("Extrinsic evidence, however, cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence."). None of these documents were publically available, and the majority was created after the filing date, so they do not reflect how a POSA would understand the specification. *Phillips*, 415 F.3d at 1313. Gevo's reliance on these documents cannot supplant the intrinsic evidence, which Dr. Kirsch admits did not redefine KARI inconsistent with its "ordinary and customary meaning." (D.I. 552, Ex. EEE at 134.)[12]

The internal documents are not evidence of the Butamax inventors' understanding of the scope of the '188 and '889 patents. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[12] Gevo miscites Dr. Maggio-Hall's testimony as it had during *Markman* briefing. ███

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

The more reasonable interpretation, comporting with the evidence, is that the Butamax inventors

wrote the patents as broadly as permissible to encompass KARIs that use NADH, which is

supported by the specific disclosure and claiming of the *Methanococcus* sequence (in addition to

the vast array of other natural and recombinant sequences disclosed).[13]  Indeed, as one of the

Butamax inventors noted: "we didn't mean[] to exclude any KARI enzyme. The important part

was the acetolactate being converted to the next step in our pathway." (D.I. 555, Ex. GGG,

Maggio-Hall Dep. at 229.)  *See, e.g., On-line,* 386 F.3d at 1140 (finding inventor testimony on

claim scope rebutted extrinsic evidence offered to support a narrow claim construction).

Butamax and DuPont have invested significantly in developing fundamental technology, and

optimizing that technology.  It would undermine the patent system's incentive to innovate if

others, such as Gevo, could copy this core technology simply by making narrow alleged

improvements.

### 3.    *Gevo's Invalidity Arguments Are Without Merit.*

Gevo argues that the Butamax patents' claims would be invalid for lack of written

description and non-enablement, *if* they cover KARIs that use NADH.  (Def.s' Br. at 23-26.)

Gevo has the analysis backwards.  The claims, including claim 14 of the '889 patent and claim

15 of the '188 patent covering a KARI from *Methanococcus do* cover KARIs that use NADH

and the claims are presumptively valid.  This issue is not currently before the Court, as Gevo did

not move for invalidity on this basis when burden-based motions were due or even now.  Indeed,

this issue is unsupported by any of Gevo's experts.

---

[13]  *Methanococcal* organisms are from the kingdom "archeabacteria" which is distinct from
eubacteria (true bacteria) and fungi. *See* D.I. 496, Ex. K, Xing et al. at Abstract.

To the extent this issue is considered, the file histories show that the Examiner raised written description and enablement concerns, and the inventors were able to satisfy the Examiner. The inventors cited the extensive disclosure of representative sequences, assays and disclosure of EC numbers, which could be used by a POSA to search databases including BRENDA. The Examiner found the specification provided a POSA with sufficient structural and functional information, and allowed the claims. Therefore, these patents more than adequately disclosed KARIs that use both NADH and NADPH. Indeed, Gevo itself admits, the prior art had described how to engineer an enzyme to have increased use of a cofactor as early as 1990 (Def.s' Br. at 6 n.6 (citing Scrutton et al. (1990)), and had would enable use of these KARIs to "balance[] the NADH/NADPH imbalance." (D.I. 517, Gevo's '483 Provisional at ¶ [0082] (GJA00004883).)

Further, while Gevo asserts that Butamax's later filed '376 application on specific KARI sequences somehow renders the '188 and '889 patents unsupported, this is contrary to law. Butamax is not obligated to disclose "every possible variant" enzyme sequence within the range of potential KARI enzymes that can be used in the claimed invention, *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004), nor does Butamax have to enable every conceivable optimization of its invention or a commercial embodiment. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1306-07 (Fed. Cir. 2010). Even Gevo does not contest that the broad claims of the Butamax patents are enabled and teach how to produce isobutanol through the engineered pathway.

Conversely, by construing KARI without regard to a cofactor, that in no way makes the claims of the later '376 application obvious. Unlike in *Kao Corp.* which Gevo cited in *Markman* (D.I. 547 at 11), the '376 application is not claiming the same invention as the '188 and '889

patents, but as the Examiner noted, that application concerns specific mutations to specific KARI enzymes not found in the prior art.  (Ex. JJJJ, FH of U.S. Patent 8,129,162 at 3.)

### C.   Should the Court Find Butamax Acted As Lexicographer It Should Adopt the Description of KARI In Its Entirety.

Butamax maintains that its construction of KARI is proper.  However, to the extent that the Court is inclined to find that Butamax acted as a lexicographer to redefine this KARI element and give a special definition, it should adopt the explicit language from the specification stating KARI "refer[s] to an enzyme that catalyses the conversion of [AL] to [DHIV] using NADPH … as an electron donor." ('188 patent at 7:35-40; '889 patent at 7:8-13.)  Courts do not normally engage in the process of derivative constructions of words "that are not in claims" when not necessary.  *Advanced Fiber Techs. Trust v. J&L Fiber Servs.*, 674 F.3d 1365, 1373-74 (Fed. Cir. 2012).  Thus the Court should not construe the words "using NADPH as an electron donor" and read into them a complex, technical formula proffered by Gevo that is not supported by the specification and introduces ambiguity.

Based on the intrinsic evidence, "using NADPH … as an electron donor" cannot be construed to disavow KARI enzymes that convert AL to DHIV in the presence of NADPH in the Arfin and Umbarger assay, but may also use NADH.  That would be inconsistent with the ordinary meaning of KARI, claim 14 language's encompassing "one or more" enzymes that use NADH, the specification's use of the indefinite article ("*an* electron donor"), the disclosure and claiming of a preferred *Methanococcus* KARI that uses NADH, the citation to EC 1.1.1.86, the disclosure of the Arfin and Umbarger assay, and the file history, which references that assay and databases like BRENDA, that disclose KARI enzymes that use NADH.  *See, e.g., Martek*, 579 F.3d at 1382 (reversing the trial court's claim construction, which deviated from the express definition in the specification, and improperly excluded embodiments).

**III.   GEVO'S LEAD STRAINS UNDISPUTEDLY INFRINGE THE DONALDSON PATENTS UNDER BUTAMAX'S CLAIM CONSTRUCTION**

Butamax has shown there are no disputed facts that Gevo's Lead Strains and commercial processes[14] infringe each element of asserted claim of the '188 and '889 patents under Butamax's construction. Gevo provides no rebuttal for virtually any of these elements.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Similarly, Gevo does not dispute that it repeatedly referred to its enzymes as KARIs having EC number 1.1.1.86 (Butamax Br. at 17-18). As such, there is no dispute of material fact that under Butamax's construction, ████████████████████████████████████

Aside from that element, Gevo raises only four bases for non-infringement purportedly under Butamax's construction. Two of the four — that Gevo's Lead Strains do not produce isobutanol using a contiguous pathway, and do not meet the "single product" limitation — apply only to the '889 patent, and Gevo has failed to raise any disputed issue of fact concerning these limitations. Indeed, Dr. Kirsch admitted he was not contesting either element (Ex. A, at 461-67, 549, 551-554), and Gevo did not put in *any* rebuttal expert report on these issues.

The remaining two arguments — that Butamax has not proven Gevo's KARI use NADPH (i) based on ████████████████████████, or (ii) in a cell ("*in vivo*") — are unrelated to Butamax's construction, which does not require particular cofactor usage. Therefore, under Butamax's construction, these allegations cannot avoid summary judgment as a

---

14 ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ Moreover, Gevo has announced publicly that it can restart production at Luverne at will. (Ex. KKKK, Gevo Q3 2012 Earnings Call at 3.)

matter of law.  Further, as explained below, these assertions are factually inaccurate.

### A. It Is Undisputed That Gevo's Lead Strains Produce Isobutanol Using a Contiguous Pathway



at p. 309, *with* '188 and '889

patents at Claim 1).

As noted further below, Gevo

refused to provide fulsome evidence on its commercial processes, which would have further

proven this fact.  However, Gevo has rebutted none of this evidence, and its Lead Strains meet

this element as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (where a party meets his burden, the non-moving party must rebut to avoid summary judgment).

**B.    It Is Undisputed That Gevo's Processes Meets the "Single Product" Element of Claim 8 of the '889 Patent.**



Gevo construes the term to mean only isobutanol is produced. (Butamax Br. at 35.) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ In contrast, under Butamax's reasonable construction, Butamax has set out substantial evidence that shows that Gevo's production of isobutanol meets the single production limitation. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Gevo proffers nothing to contest this evidence. Further, Gevo has not provided discovery from Luverne, preventing Butamax from obtaining more evidence.

During discovery Butamax sought inspection and samples from Gevo's Luverne facility. (D.I. 348, 425, 426.) Gevo objected. (D.I. 456.) The Court denied the inspection request at the time, but scheduled a conference to revisit the issue after Butamax had taken Gevo's 30(b)(6) deposition regarding Gevo's manufacturing process. (D.I. 462.) Butamax served expert reports showing that Gevo's process at Luverne infringed based on the partial discovery it had. Gevo did not rebut any of those positions.[15]

Gevo's failure to produce appropriate discovery or contest evidence proffered by Butamax compels granting summary judgment of infringement of claim 8 of the '889 patent.

---

[15] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

### C.    Gevo's Lead Strains Infringe under Any Reasonable Construction

If the Court were to adopt an alternative construction using the specification to define KARI as "an enzyme that catalyzes the conversion of [AL] to [DHIV] using NADPH … as an electron donor," there is no dispute Gevo's KARIs would satisfy this definition.

According to the patents, prosecution history, and even Gevo's own expert, KARI activity is defined by use of the Arfin and Umbarger assay. ('188 Patent at 33:45-57; D.I. 509, '889 FH at BJA2138; Ex. IIII, Kirsch Dep. at 235:22-236:6 ("I would imagine that that is enough for one to determine the activity, yes."); Ex. A at 397:8-398:3.)    Importantly, the Butamax patents quantify activity under Arfin and Umbarger according to "specific activity" measured in units/mg ('889 Patent at 35:2-9), *not* $k_{cat}/K_m$ upon which Gevo's unsupported "dependency" test relies.   The Butamax patents state a specific activity of 0.026 units/mg means an enzyme has KARI "activity." ('889 Patent at 35:2-9; '188 Patent at 39:5-10 ("Three hours after induction with IPTG, an *acetohydroxy acid reductoisomerase activity of 0.026 units/mg was detected*.").)

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████   Thus, Gevo's bald assertion that its

30

engineered KARIs only have "ancillary activity" with NADPH is untenable, and is insufficient to create any issue of material fact in light of these undisputed data.

Gevo's KARIs would meet the KARI element, and Gevo's Lead Strains would undisputedly infringe the asserted claims.

**D.   Gevo's Non-Infringement Arguments Concerning Its KARI's Use of NADPH, Are Irrelevant Under Butamax's Construction, and Erroneous.**

16

Similarly, Gevo's argument that Butamax failed to show its KARIs use NADPH inside a cell is irrelevant. (Def.'s Br. at 49.) Neither party's construction calls for a showing that the KARI enzyme uses a certain cofactor in a cell, nor could it. As noted above, there is no support in the intrinsic evidence for such a limitation. Indeed, Butamax's KARI assay based on Arfin and Umbarger is the "gold standard" and is the proper test. (Ex. CCCC, Babbitt Dep. at 239.)

██████████████████████████████████████████████████

████████

██████████████████████████████████████████████

██████████████████████████████████████████████ and

Gevo cannot escape liability by asserting its infringement is *de minimis*. *See Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1299 (Fed. Cir. 2009) (". . . *de minimis* infringement can still be infringement . . .") (citations omitted). Accordingly, under any reasonable construction (including KARIs that use NADPH in an Arfin and Umbarger assay, but may also use NADH) Gevo's KARIs satisfy the KARI element, and Gevo's Lead Strains infringe the asserted claims of the '188 and '889 patents.

## IV.   UNDER GEVO'S ERRONEOUS CONSTRUCTION THERE ARE ISSUES OF FACT PRECLUDING GEVO'S CROSS-MOTION FOR SUMMARY JUDGMENT

Even under Gevo's claim construction, there are genuine issues of material fact precluding summary judgment of non-infringement, as both parties' experts agree a KARI's use of NADPH is insubstantially different than use of NADH.

_____

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████

A.    **Genuine Issues of Material Fact Preclude Gevo's Motion for Summary Judgment on Doctrine of Equivalents.**

Infringement under the doctrine of equivalents ("DOE") is a ***question of fact*** that may be shown by the "insubstantial differences" test or the "function-way-result" test. *See, e.g., Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008). "Under the insubstantial differences test, '[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial.'" *Id.* (citation omitted). "Alternatively, under the function-way-result test, an element in the accused device is equivalent to a claim limitation if it 'performs substantially the same function in substantially the same way to obtain substantially the same result.'" *Id.* (citation omitted).

1.    *According to the claimed invention a KARI that uses NADPH is equivalent to a KARI that uses NADH*

The patents claim a process and product of a microorganism containing an engineered biosynthetic pathway that converts pyruvate to isobutanol.  Gevo seeks to read a limitation into these claims, arguing that one of the five enzymes — KARI — is NADPH-dependent, and Gevo asserts its enzymes do not use NADPH.  These assertions are unsupported by the evidence.

Even assuming it is true, substantial evidence shows that the use of NADH as an electron donor is insubstantially different from the use of NADPH with respect to the inventions claimed in the '188 and '889 patents.  As the figure below shows, these cofactors are virtually identical.  Further, as Dr. Kirsch confirmed with handwritten circles, the two molecules both donate two electrons in the form of a hydride (H⁻) from identical positions on the respective molecules during the KARI reaction:

(Ex. OOOO, Kirsh Dep. Ex. 28.)

Testifying that the cofactors function the same, Dr. Kirsch stated: "NADPH donates a hydride to the acetolactate intermediate from wild-type enzyme. NADH *donates the hydride to the same substrate from the NKR enzymes*." (D.I. 594, Ex. A at 370:20-22.) Testifying that the cofactors do this transfer in the same way, Dr. Kirsch admitted: "The *mechanism of hydride transfers is the same* for the two [NADPH and NADH], yes." (*Id.* at 379.) And finally testifying that they cause the same result, Dr. Kirsch admitted: "The *DHIV is the same*," which is the result of the cofactors' transfer of the two electrons. (*Id.* at 371.)

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████

Thus, at a minimum, there is a triable jury issue as to whether Gevo's Lead Strains infringe by DOE under Gevo's construction. Gevo's unsubstantiated assertions that its KARIs perform additional functions, allegedly curing a redox imbalance under certain conditions, are irrelevant because such functions are unclaimed by the Butamax patents and "[t]he addition of

34

[unclaimed] features does not avoid infringement." *Atlas Powder*, 750 F.2d 1580-81. Moreover, Gevo denied Butamax discovery concerning its isobutanol production at Luverne, which reasonably would show whether Gevo's KARIs provide some type of true difference or not.

2.     *Issues of fact preclude summary judgment of no DOE for claim 15.*

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████▌   ████████████████████████████████████████████

████████████████ under either party's construction there is, at a minimum, a triable jury issue as to infringement under DOE. *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1291 (Fed. Cir. 2010) (finding DOE applied to a sequence 99% identical to a claimed sequence).

### B.     Gevo's Prosecution History Estoppel Argument Is Contrary To Law.

Under Butamax's construction, or any other reasonable construction, Gevo's KARIs are clearly within the literal scope of the claims. Even if Gevo could only infringe under DOE, Gevo's prosecution history estoppel arguments are inapposite.

Under *Festo* a "narrowing amendment made to satisfy any requirement of the Patent Act *may* give rise to an estoppel." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.*, 535 U.S. 722, 736 (2002). However, if the limitations allegedly met by equivalents were not amended during proseuction, then "amendment-based estoppel will not bar the application of the dotrine of equivalents." *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1103 (Fed. Cir. 2002). Further, even if the limtation at issue was amended during proseuction, "[t]he applicability of prosecution history estoppel does not completely bar the benefit of the doctrine of equivalents from all litigation related to the amended claim." *Intervet*, 617 F.3d at 1291. Rather, "[t]he scope of the estoppel must fit the nature of the narrowing amendment." *Id.* "A district court

---

[17]     Claim 15 has a mistake, and should read SEQ ID NO:4, rather than SEQ ID NO:43.

35

must look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular [DOE] argument being made." *Id.* DOE will still apply if "the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent at issue." *Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1376 (Fed. Cir. 2008).

Here, prosecution history estoppel does not apply because KARIs that have activity in the Afrin and Umbarger assay, and also use NADH as a cofactor are not within the scope of the territory surrendered during prosecution.  During that prosecution, the Examiner rejected the original claims because there was no structure tied to each of the cited substrate-to-product conversions.  (D.I. 508, '188 FH at BJA1483-86; D.I. 509, '889 FH at BJA2126-29.)  In response, Butamax amended the claims to limit the universe of things—mechanical, biological, or otherwise—that could catalyze the reaction to KARIs.  (D.I. 508, '188 FH at BJA1662; D.I. 509, '889 FH at BJA2140.)  Gevo argues that Butamax is now prevented from asserting DOE infringement against a subset of those KARIs that are "NADH-dependent." (Def.'s Br. at 46.)  However, Gevo is wrong because Butamax's amendments had no relation to NADH cofactor usage.  Butamax's amendment concerned identifying that the conversion of AL to DHIV is catalyzed by a KARI enzyme.  The inventors also explained to the Examiner that KARI function was determined by the Afrin and Umbarger assay, which tests that conversion in the presence of NADPH, ***regardless of an enzyme's ability to use other cofactors***.  (D.I. 509, '889 FH at BJA2138; D.I. 596 at 4-5.)  Stated simply, an amendment narrowing the means of converting AL to DHIV to KARIs with activity under the Afrin and Umbarger assay did not exclude KARIs that have such activity, but also use NADH.  Thus, prosecution history estoppel does not apply.

Even if the *Festo* presumption could attach, it would be rebutted because the amendment

36

is only tangentially related to the equivalent subject matter in dispute. In *Intervet*, the Federal Circuit held that the patentee was not precluded from the benefit of DOE where the "[t]he rationale for the amendment was to narrow the claimed universe of ORFs down to those of PCV-2, and bore only a tangential relation to the question of which DNA sequences are and are not properly characterized as PCV-2." 617 F.3d at 1291-92. The same rationale applies here. The Butamax amendments narrowed the universe of catalysts to KARIs with Arfin and Umbarger activity, or which were identified in databases by EC 1.1.1.86 (such as BRENDA). This has nothing to do with excluding KARIs that also use NADH, and use of NADH has nothing to do with what is or is not a KARI according to that assay, or according to databases like BRENDA. Further, these amendments were not made to avoid any prior art or §112 rejections concerning KARIs that use NADH. Therefore, as in *Intervet*, the imposition of prosecution history estoppel would be a "draconian preclusion [that] would be beyond a fair interpretation of what was surrendered." *Id.* at 1292.

### C.   Gevo's Argument on Reverse Doctrine of Equivalents is Contrary to Law and Factually Unsupported.

By raising this issue, Gevo acknowledges that Butamax satisfied its burden of proving infringement. *Ciena Corp. v. Corvis Corp.*, 334 F. Supp. 2d 598, 604 (D. Del. 2004) (noting reverse DOE "only becomes an issue once the patentee has established literal infringement"). However, while it is Gevo's burden to prove a *prima facie* case of reverse DOE under a four-prong analysis (*id.* at 605), Gevo's brief mentions none of these factors, does no analysis, and just baldly asserts that its infringing Lead Strains and processes are substantially different. To show reverse DOE requires assessing "(1) the principle of the claimed invention; (2) the principle of the accused product; (3) the degree of change in the principle of the accused product from that of the claimed invention; and (4) whether the product performs in a substantially

different way." *Id.* at 604-605 (citations omitted). "The reverse doctrine of equivalents is rarely applied, and th[e Federal Circuit] has never affirmed a finding of non-infringement under the reverse doctrine of equivalents." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1378 (Fed. Cir. 2008).

That doctrine fails again here because Gevo fails to make any showing regarding the first three prongs and its argument on the fourth prong is legally and factually erroneous. On substantial difference, Gevo argues it may avoid infringement simply by adding a feature to its KARI that improves its use of NADH as a cofactor. However, this does not take Gevo outside of Butamax's claims, or amount to a substantially different way of making isobutanol. *See, e.g., Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) ("Nor is infringement avoided if a claimed feature performs not only as shown in the patent, but also performs an additional function."); *Ciena*, 334 F. Supp. 2d at 608 ("To the extent that Corvis also contends that its device contains additional features or performs additional functions which are not claimed ... those additional features and functions are insufficient to avoid infringement.").

Gevo also asserts reverse DOE based on its speculation that its use of KARIs cause increased efficiency of isobutanol production in its Lead Strains. However, this also fails to constitute a "substantially different way" of performing the same method because simply increasing efficiency of a claimed product or process does not amount to a "substantial difference." *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) ("[I]nfringement cannot be avoided by the mere fact that the accused device is more or less efficient or performs additional functions."); *Lexion Med., LLC v. Northgate Techs., Inc.*, 618 F. Supp. 2d 896, 901 (N.D. Ill. 2009) (rejecting allegations based on improved efficiency, noting "the existence of one's own patent does not constitute a defense to infringement of someone

else's patent.") (citations omitted).

Further, Gevo provides no admissible evidence tending to show that its Lead Strains produce substantially more isobutanol because of ▮▮▮▮▮▮▮▮▮▮▮▮, as compared to a corresponding yeast without those KARIs. Gevo's reliance on an unsworn declaration from Dr. Arnold "is not competent to be considered on a motion for summary judgment," and cannot raise an issue of disputed fact. *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d. Cir. 1989) (citations omitted).[18] Gevo's other purported "evidence" amounts to third-party publications and Butamax documents and applications concerning ***Butamax's*** unique enzymes and strains. These documents cannot possibly support Gevo's assertion that ***Gevo's*** strains act in a different way. (*See* D.I. 623 at 36-37; *see generally* Butamax's *Daubert* Motion filed herewith.)

Indeed, Dr. Kirsch, whose expert report only has a passing reference to this speculative theory including zero supporting evidence, admitted he failed to compare Gevo's Lead Strains against a control to test Gevo's speculation that its KARIs contribute to higher isobutanol production. (Ex. BBBB, Kirsch Dep. at 545-47.) As such, Dr. Kirsch's and Gevo's speculation fail to adhere to the scientific method and cannot sustain Gevo's burden of proving its Lead Strains have better yields based on Gevo's KARIs. *See, e.g., Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 602 (D. Del. 2004) (excluding expert DOE opinion that sought to draw conclusions regarding some accused products based not on testing but only on data from other accused products); *Medtronic, Inc. v. Boston Scientific Corp.*, 2002 WL 34447587 at *5 (D. Minn. Aug. 8, 2002) (excluding expert opinion on tests failing to employ a

---

[18]   This is in contrast to Butamax's expert reports, which have all been signed under penalty of perjury and are properly of record for summary judgment. *Stored Value Solutions, Inc. v. Card Activation Techs.*, Inc., 796 F. Supp. 2d 520, 552 n. 39 (D. Del. 2011) (noting reports sworn by the author are competent testimony).

proper control).

Moreover, as admitted by Gevo's counsel, "The Luverne plant has been shut down ... with respect to isobutanol" because as Gevo publically announced it failed to obtain desired yields, and its "rate of production" "is not on track." (Ex. PPPP, Gevo, Inc. v. Butamax, Civ. No.    12-301,    10/25/12    Hr.    Tr.    at    20:2-3;    Ex.    QQQQ, http://www.startribune.com/business/171157951.html (*last visited* 12/20/12). Gevo has provided no discovery on the basis for this shut-down.

Ultimately, Gevo's unsupported argument regarding fixing a redox imbalance and increasing yields is unsupported speculation, divorced from the claimed method. This point was well-stated by Gevo's expert Dr. Papoutsakis when testifying about Gevo's '375 patent, noting:

> [W]e're trying to make a big deal out of a single step, the assumption being ... that this is the bottleneck, or the rate limiting step, which it may not be. And there's no evidence yet as to what is the bottleneck either in many of those patents or anything else. That's why I do not want to isolate a single item and make a big deal out of that item unless this has been so experimental that there is a big deal about a specific part of the claim. (Ex. RRRR, Papoutsakis Dep. at 177:23-178:8.)

Here, Gevo attempts to make a big deal out of a small change to its enzyme. Gevo has failed to show that change causes any improvement to Butamax's claimed invention, let alone increased yields, or amounts to a "substantial difference." Thus, Gevo's argument fails as a matter of law. Even assuming these KARIs did lead to some improvement, Gevo's multiple admissions show (and Gevo's opposition does not contest) its Lead Stains and processes use the same engineered reaction in the same pathway to make the same product, amounting to no difference at all.

## CONCLUSION

For the foregoing reasons Butamax's summary judgment should be granted, and Gevo's cross-motion denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Leora Ben-Ami
Thomas F. Fleming
Christopher T. Jagoe
Daniel Forchheimer
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800


Dated: December 28, 2012
PUBLIC VERSION
Dated: January 9, 2013
1089303 / 36429

By:    /s/ David E. Moore
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE 19801
        Tel: (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com
        bpalapura@potteranderson.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Butamax*TM *Advanced Biofuels LLC*

41

# APPENDIX B

## Federal Circuit Argument, and Gevo's Changing Positions

| Issues Raised by The Federal Circuit | Gevo's Oral Argument | Gevo's Contradictory Expert Testimony and Evidence | Outstanding Issues with Gevo's Constructions |
|---|---|---|---|
| Reading out preferred embodiments (D.I. 591 at 4:20-5:4; 22:15-18; 25:21-26:1.) | "Absolutely" all the listed enzymes in the patent are within the claims and are limited to "NADPH-dependent" enzymes. (D.I. 591 at 25:14-26:4.) |  | *No current Gevo construction would cover the patents' Methanococcus preferred embodiment.* |
| Reading out the "one or more" element of '889 patent claim 14 (D.I. 591 at 24:15-18.) | "NADH could operate on any of the other enzymes in that five-step pathway," but KARI. (D.I. 591, 25:8-11.) | NADH as a cofactor could only potentially apply to the "KARI and [ADH]" enzymes. (Ex. A, Kirsch Dep. at 451:3-25.) | *No current Gevo construction would remedy claim 14 covering an NADH using KARI, but not claim 1.* |
| "dependent" refers to efficiency or activity and creates an improper process limitation. (D.I. 591 at 21:1-6.) | "I don't think that is correct . . . this [construction] is structural really" (D.I. 591 at 21:7-17.) | Noting dependence means "efficien[cy]", "relative" flux, or is based on a "competitive assay." (Ex. L, Cantor Dep. at 80:2-23; Ex. A, Kirsch Dep. at 392:17-24, 390-91, 439:25-440:4.) | Gevo proffers new terms of NADPH-selective, preferred, and specific, *but no structural definition.* |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

     I, David E. Moore, hereby certify that on January 9, 2013, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

     I further certify that on January 9, 2013, the attached document was Electronically

Mailed to the following person(s):

Jack B. Blumenfeld
Jeremy A. Tigan
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
jblumenfeld@mnat.com
jtigan@mnat.com

James P. Brogan
Ann Marie Byers
Michelle Rhyu
Carolyn V. Juarez
Cooley LLP
380 Interlocken Crescent, Suite 900
Broomfield, CO  80021
jbrogan@cooley.com
abyers@cooley.com
mrhyu@cooley.com
cjuarez@cooley.com
zGevoButamaxLitigation@cooley.com

Melissa Harwood
Cooley LLP
719 Second Avenue, Suite 900
Seattle, WA  98104-1732
mharwood@cooley.com

Daniel Knauss
Matthew J. Brigham
Stephen C. Neal
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
dknauss@cooley.com
mbrigham@cooley.com
nealsc@cooley.com

Tryn T. Stimart
Adam Pivovar
Cooley LLP
777 6th Street, NW
Suite 1100
Washington, DC  20001
tstimart@cooley.com
apivovar@cooley.com

Benjamin G. Damstedt
Cooley LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA  94306-2155
bdamstedt@cooley.com

By:    */s/ David E. Moore*
       Richard L. Horwitz
       David E. Moore
       Bindu A. Palapura
       POTTER ANDERSON & CORROON LLP
       Tel:  (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com
       bpalapura@potteranderson.com

1012762 / 36429